US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**MAR 0 1 2017**

DOUGLAS F. YOUNG, Clerk
By
　　Deputy Clerk

UNITED STATES OF AMERICA            )
                                    )
v.                                  )       CRIMINAL NO. 5 : 17 CR 50010 -001-003
                                    )
JONATHAN E. WOODS, -001             )       18 U.S.C. § 1341
OREN PARIS III,   -002              )       18 U.S.C. § 1343
RANDELL G. SHELTON, JR. -003        )       18 U.S.C. § 1346
                                    )       18 U.S.C. § 1957
                                    )       18 U.S.C. § 2

## INDICTMENT

THE GRAND JURY CHARGES:

### GENERAL ALLEGATIONS

At all times material to this Indictment:

1.      JONATHAN E. WOODS served as a Senator in the Arkansas Senate from 2013 to

2017.  As a member of the Arkansas Senate, WOODS represented District 7 of the State of

Arkansas, which includes Washington County, Arkansas.    As a Senator, WOODS had

responsibility and authority to, among other things, draft and vote on proposed bills and legislation,

to appropriate government monies including funds from the State of Arkansas's General

Improvement Fund (GIF), and to direct the allocation of GIF monies. Also, as a Senator, WOODS

owed a fiduciary duty to provide honest services to the State of Arkansas and its citizens. Prior to

his service in the Arkansas Senate, WOODS served as a Representative of House District 93 in

the Arkansas House of Representatives from 2007 until 2012. Both House District 93 and Senate

District 7 are located in the Western District of Arkansas.

2.      OREN PARIS III was the president of "Entity A," a non-profit corporation

1

operating a college located in Springdale, Arkansas, in the Western District of Arkansas. PARIS was a friend of WOODS's. Entity A was the only "work college" as defined by U.S.C., Title 42, Section 275b, that is part of the Work College Consortium, in the State of Arkansas. From approximately June 1, 2012 to approximately May 31, 2016, PARIS received more than $300,000 in compensation from Entity A. During the same period of time, PARIS, his immediate family members, and their spouses received in excess of $1 million in compensation from Entity A.

3.     RANDELL G. SHELTON, JR. was the incorporator and sole member of "Entity B," a limited liability corporation incorporated in the State of Arkansas that purportedly provided consulting services. SHELTON also was a friend of WOODS's and PARIS's.

## RELEVANT INDIVIDUALS, ENTITIES, AND PROGRAMS

4.     Micah Neal served as a Representative in the Arkansas House of Representatives from 2013 to 2017. As a member of the Arkansas House of Representatives, Neal represented District 89 of the State of Arkansas, which includes parts of Washington County in the Western District of Arkansas. As a Representative, Neal had responsibility and authority to, among other things, draft and vote on proposed bills and legislation, to appropriate government monies including funds from the State of Arkansas's GIF, and to direct the allocation of GIF monies. Also, as a Representative, Neal owed a fiduciary duty to provide honest services to the State of Arkansas and its citizens.

5.     "Businessman A" was a licensed lobbyist in the State of Arkansas. Businessman A also was the incorporator, registered agent, and a member of the board of directors for "Entity C." Entity C was a non-profit corporation, with an address in the Western District of Arkansas, which purportedly sought to create manufacturing jobs in northwest Arkansas, specifically for a specialized workforce including disabled veterans, disadvantaged youth, and individuals

2

recovering from substance abuse.  Entity C was associated with "Entity C-1," which was a company that provided behavioral health and other services with facilities in the Western District of Arkansas and elsewhere.  Businessman A was a high-ranking executive with Entity C-1, and also was paid separately by Entity C-1 through his lobbying company for lobbying efforts on behalf of Entity C-1.

6.      "Person A" was an employee at Entity A.  Person A was hired by PARIS on or about August 5, 2013, to purportedly serve as an administrative assistant to PARIS.  Person A was a close friend of WOODS's.

7.      The General Improvement Fund (GIF) was a fund established by the Arkansas General Assembly consisting of what was commonly referred to as "surplus" state revenues, which consisted of special revenues from various sources as specified by the General Assembly.

8.      Arkansas law recognized the boundaries of eight economic development districts throughout the State of Arkansas and authorized the Arkansas Department of Finance and Administration (DFA) to make payments to these eight economic development districts.

9.      The Northwest Arkansas Economic Development District (NWAEDD), which consisted of Benton, Washington, Madison, Carroll, Boone, Newton, Marion, Searcy, and Baxter counties, was one of the economic development districts authorized to receive state funds.  The NWAEDD was a non-profit corporation with offices in Harrison, Arkansas, in the Western District of Arkansas.

10.     In 2013 and 2015, the Arkansas General Assembly appropriated GIF monies to the DFA for disbursement to the NWAEDD, and the DFA disbursed GIF monies to the NWAEDD, to be utilized to assist local governments and nonprofit organizations to plan, develop, promote and/or implement economic and community development projects and activities designed to

improve the economic community and/or social well-being of the citizens of Arkansas.

11. According to Arkansas law, the operations of the economic development districts and their disbursement of funds was solely within the discretion and control of the local governing board of directors, which was comprised of local government officials and private sector representatives. However, at all times relevant to this Indictment, legislators, in effect and in practice, exerted substantial control and authority over a set amount of GIF monies that they had appropriated for disbursement to the economic development districts. Specifically, WOODS and Neal, as state legislators, exerted substantial control and authority over a specific amount of NWAEDD GIF monies, and the NWAEDD awarded these GIF monies only to eligible organizations approved by WOODS and Neal and in the amounts designated by WOODS and Neal.

12. "Director A" was the Executive Director of the NWAEDD from 1990 to in or about September 2014.

13. "Assistant Director A" was the Executive Assistant Director of the NWAEDD from in or about October 2014 to present.

## COUNTS ONE through TWELVE

### 18 U.S.C. §§ 1341, 1343, 1346, and 2
### (Honest Services Mail and Wire Fraud)

14. The allegations contained in Paragraphs 1 through 13 of this Indictment are re-alleged as though fully set forth herein.

15. Beginning at a time unknown but at least as early as in or about January 2013 to in or about October 2015, in the Western District of Arkansas, Fayetteville Division, and elsewhere, the Defendants

### JONATHAN E. WOODS,

4

**OREN PARIS III, and**
**RANDELL G. SHELTON, JR.**

and others known and unknown to the Grand Jury, knowingly and willfully devised and intended to devise a scheme and artifice to defraud and deprive the citizens of the State of Arkansas of the honest services of a public official through bribery; that is, to deprive the citizens of Arkansas of the honest services of WOODS, an Arkansas state senator, and Neal, an Arkansas state representative.

## PURPOSES OF THE SCHEME

16. The purposes of the scheme included, but were not limited to, the following:

a. For WOODS and Neal to enrich themselves by soliciting and accepting bribes in exchange for using their official positions as Arkansas legislators to direct GIF monies to Entity A and Entity C;

b. For PARIS to enrich himself, his family, and Entity A, by paying bribes to WOODS and Neal, through SHELTON, in exchange for the use of their authority as legislators to obtain and direct GIF monies to Entity A;

c. For SHELTON to enrich himself by keeping a portion of the bribe funds paid to WOODS and Neal through Entity B; and

d. For Businessman A to enrich himself, Entity C, and Entity C-1 by paying bribes to WOODS and Neal, in exchange for the use of their authority as legislators to obtain and direct GIF monies to Entity C and Entity C-1.

## MANNER AND MEANS

17. The manner and means by which the Defendants and others carried out the scheme included, but were not limited to, the following:

a. WOODS solicited, and WOODS and Neal accepted, payments from PARIS

5

and Entity A.

    b.    WOODS solicited PARIS to provide employment to Person A, a friend of WOODS's.

    c.    WOODS and Neal used and agreed to use their official authority as Arkansas legislators to direct the NWAEDD to allocate GIF monies to Entity A.

    d.    WOODS also used and agreed to use his official authority as an Arkansas legislator to advise other Arkansas legislators, including Neal, to allocate additional GIF monies either directly to Entity A or to another applicant in an effort to secure more GIF money for Entity A.

    e.    PARIS paid WOODS and Neal and agreed to hire and retain Person A as an employee of Entity A, in exchange for WOODS's and Neal's official assistance as Arkansas legislators.

    f.    WOODS, PARIS, SHELTON, and Neal concealed and attempted to conceal the bribe payments as follows: SHELTON formed and opened a bank account in the name of Entity B; Entity A would write a check to Entity B as a pass-through; SHELTON would deposit checks from Entity A into an account in the name of Entity B; SHELTON would make payments to WOODS, either in cash or by electronic transfer from Entity B; and on one occasion, SHELTON would make a cash payment to Neal.

    g.    WOODS solicited, and WOODS and Neal accepted, payments from Businessman A in exchange for using their official authority as Arkansas legislators to attempt to direct the NWAEDD to allocate approximately $400,000 in GIF monies to Entity C and to allocate approximately $400,000 to Entity C-1 doing business as Entity C.

    h.    Businessman A paid and agreed to pay WOODS and Neal for their official

6

assistance as Arkansas legislators. After being contacted by law enforcement agents, Businessman A returned $400,000 in GIF money from Entity C-1 to the NWAEDD.

     i.     After Entity C-1 returned $400,000 in GIF monies to the NWAEDD, WOODS and Neal used their official authority as Arkansas legislators to direct the NWAEDD to allocate $200,000 of those same GIF monies to Entity A.

     j.     In total, WOODS and Neal jointly directed approximately $600,000 to Entity A and Entity C-1.

     k.     WOODS, PARIS, and SHELTON used, and caused and directed others to use, interstate wire communications and mail delivered by the United States Postal Service.

## ACTS IN FURTHERANCE OF THE SCHEME

18.     In furtherance of the scheme to defraud, and to accomplish its purposes, WOODS, PARIS, SHELTON, and others known and unknown to the Grand Jury committed the following acts in the Western District of Arkansas and elsewhere:

### WOODS Obtains and Directs $200,000 GIF Money to Entity A in 2013

     a.     On or about January 18, 2013, PARIS emailed two fundraisers for Entity A to provide, among other things, updates and "Action items" concerning fundraising activities. Among the "Action items," PARIS included: "call John Woods to get update, personal pledge and set date and discuss strategy for maximizing GIF participation[.]"

     b.     On or about February 18, 2013, WOODS filed and sponsored Senate Bill 352 that became Act 793 of the 2013 Regular Session of the Arkansas General Assembly ("Bill 352/Act 793"). Bill 352/Act 793 provided for an appropriation of GIF monies to the DFA for disbursement up to $2 million to each economic development district including the NWAEDD.

     c.     On or about March 18, 2013, WOODS voted in favor of Bill 352/Act 793.

7

d. Also on or about March 18, 2013, WOODS voted in favor of House Bill 1608 that became Act 742 of the 2013 Regular Session of the Arkansas General Assembly ("Bill 1608/Act 742"). Bill 1608/Act 742 provided for an appropriation of GIF monies to the DFA for disbursement up to $15 million to each economic development district including the NWAEDD.

e. On or about April 17, 2013, PARIS texted WOODS, stating, "Jon, just couple of days of session remaining. I'm very proud of the amazing things you guys accomplished this session and pray for energy for a strong finish."

f. On or about April 21, 2013, PARIS texted WOODS about efforts to solicit support for Entity A from other Arkansas legislators. Specifically, PARIS wrote, "Good selling point to conservative legislators is that [Entity A] produces graduates that are conservative voters. All state and secular colleges produce vast majority liberal voters." WOODS replied, "Agreed."

g. On or about April 22 and 23, 2013, WOODS voted in favor of Senate Bill 364 and House Bill 2232, both of which provided funding for the GIF appropriation legislation that had been approved previously, including Bill 352/Act 793 and Bill 1608/Act 742. The Arkansas General Assembly later enacted Senate Bill 364 into Act 1519 and House Bill 2232 into Act 1518. As a result of the GIF and funding legislation, the NWAEDD received a total of $11,152,500 in GIF monies.

h. On or about August 4, 2013, at approximately 5:09 p.m., WOODS sent PARIS an email with the subject, "GIF Application." Attached to the email was a "Request For Projects" form that invited applications to the NWAEDD for GIF money. After receiving the email from WOODS, PARIS forwarded it to an Entity A employee who prepared the GIF grant application.

i. Also on or about August 4, 2013, after receiving WOODS's email regarding

8

the GIF application, PARIS texted WOODS, stating, "You're awesome, Jon. Thank you for your generosity to [Entity A]. WOODS replied, "I'm trying lol."

j.  On or about August 5, 2013, an Entity A employee sent himself an email with the subject, "[Entity A] RFP 2013," and with an attachment entitled, "Proposal for [Entity A] Land and Residence Hall Acquisition." The proposal requested a $105,000 grant, and identified PARIS, who signed it, as the "Authorized Representative" for the proposal. The email stated, "Oren, Please review and advise on any changes required."

k.  On or about the morning of August 7, 2013, WOODS and PARIS exchanged text messages regarding a meeting they both planned to attend that day. Specifically, WOODS texted PARIS, stating, "On way to [a restaurant]." Paris replied, "Me too. I'll save a seat if I'm there first."

l.  On or about the evening of August 7, 2013, an employee of Entity A sent an email to himself with the subject, "Jon Woods RFP," attaching a GIF grant proposal that was similar to the one that he sent to himself on August 5, 2013, but increasing the grant amount requested from $105,000 to $110,000. A short time later, the same employee sent another an email to himself with the subject, "Jon Woods RFP [Entity A] 2013," attaching the same GIF grant proposal but increasing the grant amount requested to $130,000.

m.  On or about August 9, 2013, Director A sent an email to WOODS with the subject, "Re: NWAEDD GIF Application." Specifically, Director A wrote: "Jon, Please find attached the Northwest Arkansas Economic Development District, General Improvement Fund grant application." WOODS forwarded Director A's email to PARIS, stating, "Oren, This is the new application. Get this filled out and we can send to [Director A] this weekend. Jon." PARIS replied, "Thank you, Jon. We'll get on it."

9

n.      Also on or about August 9, 2013, Director A sent WOODS an email, at WOODS's request, with a GIF grant application form in Microsoft Word format attached to it. WOODS forwarded Director's A email and its attachment to PARIS, and PARIS forwarded it to an Entity A employee.

o.      Also on or about August 9, 2013, PARIS signed Entity A's GIF grant application to the NWAEDD requesting $130,000. According to the "Need and Nature of the Project" section in the application, Entity A would use the GIF award "[t]o purchase a 23-acre parcel of land with an existing student residence hall adjacent to the existing [Entity A] property necessary to provide critically needed space for incoming resident students beginning fall of 2013." WOODS was the legislator listed in the application.

p.      On or about August 13, 2013, Director A emailed WOODS, stating in part:

> Jon – For Your Information: The Northwest Arkansas Economic Development District (NWAEDD) received the General Improvement Funds (GIF) disbursements today. Act 793 has disbursements of $1,470,000.00. Am I correct that you have $840,000 of that? Can you give me the brake [sic] down of the rest. I do not have any signed applications from the three you are trying to get approved this week.

WOODS replied, "Great news. I passed out the new applications. Waiting to hear back from several of the groups. I did have 2 return over the weekend[.]"

q.      On or about August 16, 2013, PARIS sent WOODS an email attaching proof that Entity A was a 501(c)(3) organization. WOODS forwarded PARIS's email and attachment to Director A.

r.      On or about August 17, 2013, WOODS and PARIS exchanged text messages to arrange a meeting.

s.      On or about August 19, 2013, WOODS texted PARIS telling him to

10

increase the amount of GIF money in Entity A's application. Specifically, WOODS wrote, "Can you send me new application with $200k?" PARIS replied, "Yes, I'll get [an Entity A employee] to do it now if he hasn't already."

t. Also on or about August 19, 2013, PARIS emailed WOODS with the revised GIF grant application requesting $200,000 attached to it. The application was signed by PARIS. WOODS forwarded PARIS's email and the revised GIF grant application to Director A. In the email, WOODS wrote, "The dollar amount has been revised. New attachment. Thank you, Jon."

u. Between approximately August 20, 2013 and approximately September 3, 2013, WOODS texted PARIS updating him on the status of the NWAEDD's review and approval process for the GIF grant applications and awards.

v. On or about September 2, 2013, PARIS emailed Person A and other Entity A employees, with the subject, "Re: Development items." Among the "items" PARIS listed in the email were: "Jon Woods is set for $200,000"; "[Person A] to call Jon about Micah Neal to see who should call and if Micah knows he's good for 10k"; and "[Person A] to contact or delegate contacting remaining legislators on list from Jon." In the email, PARIS also listed under the header, "Strategies": "go forward with Randell and consulting agreement a) appointment with [a former Arkansas legislator] –> [local businessperson] b) Shooting Sports fundraising and promotion strategy."

w. Between approximately September 11, 2013 and approximately September 17, 2013, WOODS and Director A exchanged emails to confirm to which grantees WOODS wanted his GIF money to be sent and in what amounts. Among those emails, on or about September 11, 2013, Director A emailed WOODS a list of applicants requesting WOODS's GIF

11

money. Included on the list was Entity A, who had a "Grant Request" for $200,000. In the email,

Director A wrote:

> Below are the GIF Applications that I have received to date that are
> in your Senate District file. I have correspondence from you on most
> of the applications giving the funding level that you recommend and
> support. Please look over the application list and funding level to
> make sure you agree with the list and amounts shown. If you
> approve the GIF Applications listed will be presented to the
> NWAEDD Board of Directors on September 18, 2013 for approval.

x. On or about September 18, 2013, the NWAEDD's Board of Directors

approved all GIF grant applications proposed by Director A, including the $200,000 GIF grant

sponsored by WOODS for Entity A.

y. On or about September 19, 2013, Director A emailed WOODS notifying

him that the NWAEDD's "Board of Directors approved the GIF Grants that you supported for

funding at its meeting Wednesday, September 18, 2013." Director A also wrote, "If you wish to

deliver the checks to the grant award recipients and get the Grant Agreement signed, please let me

know and I will get the checks to you." WOODS replied, "This is wonderful news! Thanks for

all your hard work and putting up with me. I'll handle delivering the checks and getting the grant

agreements signed." WOODS then provided a post office box in Springdale, Arkansas, to which

the NWAEDD could send the GIF grant check and grant agreement for Entity A, among others.

z. On or about September 25, 2013, the NWAEDD issued a GIF grant check,

drawn on the NWAEDD's Arvest Bank account ending in 8611, for $200,000 made out to Entity

A. On or about that same date, the NWAEDD sent the $200,000 check, a GIF grant agreement

form, and an award letter for Entity A, via the United States Postal Service, to the Springdale,

Arkansas post office box that WOODS had provided for purposes of receiving GIF grant checks

and agreements. The award letter, which was signed by Director A, stated that the "funds were

12

appropriated to the GIF program through an Act sponsored by State Senator Jon Woods. We wish to thank Senator Woods and the Arkansas Legislator's [sic] for enabling NWAEDD to serve Arkansas and its citizens."

      aa.    On or about September 27, 2013, PARIS signed the GIF grant agreement on behalf of Entity A. By signing the agreement, PARIS, on behalf of Entity A, agreed to, among other things, "comply with all parts of this Agreement" and to "accept[] full legal responsibility for properly implementing the project described in the original grant application documents and agrees to expend funds in accordance with the original grant application form."

      bb.    On or about October 3, 2013, Entity A's $200,000 GIF grant check from the NWAEDD was deposited into Entity A's Liberty Bank account ending in 0681.

      cc.    On or about October 4, 2013, the $200,000 GIF grant check from the NWAEDD to Entity A was settled between Liberty Bank and Arvest Bank via an interstate wire communication received by Arvest Bank.

## SHELTON Sets up Entity B to Pass Bribe Payments from PARIS/Entity A to WOODS

      dd.    On or about August 26, 2013, SHELTON texted PARIS, stating in part: "Oren what is your email? I am about to send u the 1st draft of the consulting agreement… Added a few other services to the list… i.e. we need to develop a PR campaign to announce the capitol (sic) campaign, the use of social media, etc." PARIS responded by providing SHELTON with his email address at Entity A.

      ee.    Also on or about August 26, 2013, SHELTON emailed PARIS with the subject, "Draft: [Entity B] – Proposal- [Entity A]," stating: "Oren attached is a draft of the proposal regarding our consulting services. Please let me know if there are any changes which need to be made and we can work through them. Please feel free to call me at your convenience [phone

number provided]." Attached to the email was an unsigned consulting agreement between Entity A and Entity B, dated August 26, 2013. The agreement stated that Entity B would provide consulting services for a one-year period commencing September 3, 2013, with a payment of $5,000 due on the date of commencement and $45,000 due on or before September 20, 2013.

ff.    On or about August 30, 2013, PARIS responded to SHELTON's email suggesting changes to the language in the consulting agreement.

gg.    Between approximately September 10, 2013 and approximately September 12, 2013, SHELTON and PARIS exchanged emails containing drafts and edits of the consulting agreement between Entity A and Entity B.

hh.    On or about September 11, 2013, WOODS texted PARIS, stating, "Call Randell on his cell."

ii.    On or about September 21, 2013, PARIS and SHELTON exchanged text messages to set up a meeting that day to meet with each other and WOODS.

jj.    On or about September 22, 2013, SHELTON emailed PARIS, stating, "Attached is the consulting agreement between [Entity B] and [Entity A]. If any modifications are needed please let me know. I look forward to seeing you on Wednesday for the campus tour." Attached to the email was a document entitled, "Draft [Entity A] Proposal 2."

kk.    Between approximately September 22, 2013, and approximately September 27, 2013, PARIS and SHELTON, on behalf of Entity A and Entity B, respectively, entered into a consulting agreement, dated September 16, 2013. Pursuant to the agreement's terms, SHELTON agreed to engage in fundraising and marketing efforts for Entity A for a one-year period commencing September 16, 2013, in exchange for a payment of $50,000 on or before September 27, 2016, with performance bonuses possible by mutual consent. The agreement also provided

14

that reasonable and pre-approved expenses shall be reimbursed to Entity B by Entity A.

      ll.    On or about September 24, 2013, PARIS emailed Entity A's financial officer about both WOODS's GIF award and SHELTON's agreement with Entity A. Specifically PARIS advised, among other things, that "I believe Jon is trying to bring his $200,000 to an appointment we have tomorrow if he receives it in the mail by then." PARIS also wrote, "We need to write a $50,000 check to [Entity B] that I can hand to Randell Shelton on Wednesday. Can you write that and give it to me before 2:00 Wednesday?"

      mm.    On or about September 26, 2013, SHELTON incorporated Entity B as a limited liability company in the State of Arkansas and listed SHELTON as the sole member.

      nn.    On or about September 27, 2013, the same day that PARIS signed an agreement accepting $200,000 in GIF monies that WOODS directed to Entity A, Entity A issued a check, drawn on its Liberty Bank account ending in 0681, to Entity B in the amount of $50,000.

      oo.    Also on or about September 27, 2013, SHELTON opened an Arvest Bank account ending in 7761 for Entity B, using the $50,000 from Entity A as the initial deposit. SHELTON was the sole signatory on the account.

      pp.    On or about October 1, 2013, SHELTON transferred $40,000 from Entity B's Arvest Bank account ending in 7761 to WOODS's personal Arvest Bank account ending in 2553. At the time of the transfer, the only funds in Entity B's Arvest Bank account ending in 7761 were those funds received from Entity A.

      qq.    Also on or about October 1, 2013, WOODS withdrew $33,000 from his personal Arvest Bank account ending in 2553 to purchase an Arvest Bank cashier's check payable to another person. At the time WOODS purchased the cashier's check, the only funds in his personal account were those funds transferred to the account from Entity B's Arvest Bank account

15

ending in 7761.

rr.     Also on or about October 1, 2013, SHELTON issued a check, drawn from Entity B's Arvest Bank account ending in 7761, to himself in the amount of $1,035.62. SHELTON noted on the memo line, "Expense Reimbursement – Gas [Aug – Oct 1]."

ss.     By a resolution dated October 3, 2013, the same day Entity A deposited $200,000 in GIF monies, Entity A's Board of Governance approved a $25,000 bonus payment to PARIS.

## Entity A Hires Person A at WOODS's Request

tt.     On or about June 18, 2013, WOODS texted PARIS to inquire about potential employment for Person A at Entity A. Specifically, WOODS wrote: "Are you free Thursday if I bring a friend to your school for a tour? A time best for you. She is the mother of my friend who died in Afghanistan. She's looking for employment and maybe you and I can work something out." PARIS replied, "In Branson with family for the remainder of the week. Will be back and can do a tour next week. Will that work for you?"

uu.     On or about July 23, 2013, WOODS texted PARIS about Person A, stating: "I gave [Person A] your cell. She'll prob text you. She wants to start volunteering until things come through. You & I can discuss more at lunch tmrw." PARIS replied, "Sounds good. Did you mean lunch Thursday?" WOODS responded, "Oh yeah sorry lunch Thursday."

vv.     On or about July 25, 2013, WOODS and PARIS exchanged text messages to confirm that they would be meeting for lunch around noon. That same day, following an email from WOODS containing Arkansas legislators' email addresses, PARIS emailed to WOODS and an Entity A fundraiser a draft email intended to invite Arkansas legislators to visit and contribute GIF monies to Entity A.

16

ww.     On or about July 31, 2013, PARIS texted WOODS about both Person A's employment at Entity A and GIF. Specifically, PARIS wrote, "Good talk with [Person A] today. She's planning to come into work Monday. What day do you get back?" After WOODS provided his schedule, PARIS texted WOODS again that same day, stating, "Great. Hope you are getting some rest and having a good time. Let's get together regarding [Person A] and GIF strategy this weekend." WOODS replied, "Deal."

xx.     On or about August 4, 2013, the same day that WOODS sent PARIS an application to the NWAEDD for GIF money, PARIS texted WOODS, asking, "Can you give me a ring later this afternoon or tonight regarding [Person A]?" PARIS and WOODS then exchanged text messages setting up a meeting for that afternoon at approximately 4:30 p.m.

yy.     On or about August 5, 2013, PARIS and Entity A's financial officer exchanged emails regarding the financial compensation to be paid to Person A. Specifically, Entity A's financial officer wrote to PARIS, "Please send me an email so I have documentation on compensation for your new secretary." PARIS replied: "[Person A's] salary is $43,000 beginning today plus $4,000 bonus up front. I'd like to get take [sic] the $4,000 to her tomorrow if you get a check written to her in that amount. Thank you." The financial officer responded, "She hasn't turned in her payroll paperwork yet, so I'll need that before I can pay her the bonus."

zz.     On or about August 7, 2013, the same day that an Entity A employee was drafting and emailing Entity A's request for $130,000 in GIF monies, PARIS emailed Entity A's financial officer to request that Person A's signing bonus be increased. Specifically, PARIS wrote: "[Person A's] salary will still be at 43k beginning this past Monday, but her signing bonus is 7k rather than 4k." Entity A's financial officer replied, "With the employer's share of payroll taxes we have to pay, our expense would be $53,825 per year for her, which is over what Jon was giving

17

us."

aaa.    Also on or about August 7, 2013, Entity A issued a check for $7,000, drawn on Entity A's Liberty Bank account ending in 0681, to Person A. A notation on the check read, "Pay Period 08/05/2013 – 08/05/2013." From approximately August 7, 2013 through approximately May 31, 2016, Entity A paid Person A in excess of $120,000.

### WOODS and Neal Direct $400,000 to Entity C in Return for Cash in 2013

bbb.    Between approximately May 2013 and approximately June 2013, WOODS discussed with Neal how a legislator could direct GIF monies in exchange for receiving a kickback payment.

ccc.    In or about June 2013, WOODS advised Neal that Businessman A would pay WOODS and Neal 20% of any GIF monies that they, as Arkansas legislators, would approve and direct from the NWAEDD to Entity C.

ddd.    On or about June 26, 2013, Businessman A emailed employees of Entity C-1, stating: "Please fill this application out for [Entity C] at our Springdale Office, this is for a grant for $250,000.00. Please put a small note on a cover sheet not in the grant application these funds are coming from Senator Jon Woods and State Representative Micah Neal. This is new funding we just received an hour ago. This is already pre-approved so don't worry about the grading process." Attached to the email was a NWAEDD document describing how to request a GIF grant.

eee.    On or about June 27, 2013, Businessman A and other Entity C-1 employees received an email from an Entity C-1 employee, which attached a draft of a GIF grant proposal for Entity C. The draft proposal listed startup costs of $250,000. Businessman A replied to his colleagues, "Looks great to me. Can I send to Senator Woods to look at."

fff. On or about July 2, 2013, Businessman A emailed WOODS, "See when we can send in our grant app." WOODS replied, "Have it emailed to me and I will print it. I plan to meet with [Director A] about it this week."

ggg. On or about July 9, 2013, Businessman A emailed two Entity C-1 employees and another person, attaching a revised draft of the GIF grant proposal for Entity C, which, among other things, increased the startup costs to $400,000.

hhh. On or about July 10, 2013, Businessman A emailed his Entity C-1 colleagues with the subject, "[Entity C]." In the email, Businessman A wrote, "They are just transferring the funds by August 1. It will not take us long to get our applications in and The Legislators will walk them thru immediately."

iii. On or about July 24, 2013, Businessman A sent an email to two Entity C-1 employees with the subject, "[Entity C]." In the email, Businessman A wrote:

> We are ready for the grant application and our proposal for this one. I have attached the Logo if we want to replace the black and white one. The only question I have; we list $400k for our start up cost, should we say we are applying for $400k for our start up cost for this particular grant since we will be applying for more? This grant is from Senator Jon Woods.

Attached to the email was a draft of the GIF grant proposal for Entity C.

jjj. On or about July 26, 2013, Neal emailed Director A, stating, "I'm partnering with Senator Woods for $125,000 to go towards [Entity C]. Senator Woods is pitching in $275,000 for a total of $400,000. This is an email to authorize the distribution of $125,000 of my GIF." Director A replied, "Thanks for your communication. We have not received authorization or funds from the Department of Finance and Administration yet, but expect it around the first of August. As soon as we are authorized we will get the application forms to [Entity C] and work with them on the project. I did talk to Jon earlier today and expect some information coming my way."

19

kkk.    On or about August 8, 2013, Businessman A emailed WOODS, stating, "Can you send me the application and info we already filled out for [Entity C]?" WOODS replied: "I can't do it electronically until the morning. The new application is being emailed to me in the morning. The [Entity C] paperwork is a hard copy you gave me. Ill [sic] scan that in the morning as well." Businessman A responded, "Sound good."

lll.    On or about August 13, 2013, Director A sent an email to WOODS with the subject, "GIF Disbursement & Application," attaching the NWAEDD GIF application and grant agreement. WOODS forwarded Director A's email and its attachments to Businessman A. Businessman A replied, "I will get it done."

mmm.    On or about August 22, 2013, an Entity C-1 employee emailed Businessman A, stating in part, "checking in, [another Entity C-1 employee] says we can't divert [Entity C-1] funds to [Entity C]. Can we figure another way around it or get other funds the Senators have left over that are new funds . . . ." Businessman A replied, "[Entity C] has its own funds! We don't have to, the $400,000 from the Planning district never was [Entity C-1] funds and the other funds in other bills never was. [Entity C-1] has its own funds also."

nnn.    On or about August 25, 2013, Businessman A emailed an Entity C-1 employee, and copied another, stating, "Hey bubba here is the application you was [sic] asking about. It needs to be for $400,000 for [Entity C] from Senator Jon Woods Springdale Arkansas." The email listed the attachments as "NWAEDD GIF Application Package 2013 2014" and "NWAEDD GIF Grant Agreement 2013 2014." The Entity C-1 employee responded that the other Entity C-1 employee was "going to work on it and get it in ASAP."

ooo.    On or about September 3, 2013, Businessman A and an Entity C-1 employee emailed to Businessman A various scanned documents that were later submitted to the

20

NWAEDD as Entity C's application requesting a $400,000 GIF grant. The application listed WOODS as the legislator and also listed District 31 (which was Neal's district, though "District 31" was struck out and replaced with "7" in the application later received by the NWAEDD).

ppp.     Between approximately September 3, 2013, and approximately September 18, 2013, the Entity C application requesting a $400,000 GIF grant was submitted to the NWAEDD with a handwritten note signed by WOODS, stating:

> [Director A], If you have any questions please feel free to contact [Businessman A] at cell: [ ]. They decided not to do a joint [Entity C]/ [Entity C-1] Application. They want to try just for [Entity C]. [Entity C] is pretty solid and is located in same building as [Entity C-1]. Whatever questions you might have feel free to contact [Businessman A].

qqq.     Between approximately September 11, 2013 and approximately September 17, 2013, WOODS and Director A exchanged emails to confirm to which grantees WOODS wanted his GIF money to be sent and in what amounts. Among those emails, on or about September 11, 2013, Director A emailed WOODS a list of applicants requesting WOODS's GIF money, as detailed in Paragraph "w". Included on the list was "[Entity C] (A.K.A. [Entity C-1])," who had a "Grant Request" for $275,000 and a "Total Request" for $400,000.

rrr.     On or about September 18, 2013, the NWAEDD's Board of Directors approved all GIF grant applications proposed by Director A, including the $275,000 GIF grant sponsored by WOODS and the $125,000 GIF grant sponsored by Neal for Entity C-1 doing business as Entity C. Entity C had not submitted to the NWAEDD any documentation demonstrating it was an incorporated non-profit organization as required for a GIF grant, but the NWAEDD did have such documentation for Entity C-1 in connection with another GIF grant that was awarded to Entity C-1. Entity C was not incorporated until on or about September 27, 2013.

21

sss.    On or about September 19, 2013, Director A and WOODS exchanged emails regarding the GIF awards and WOODS's request to receive the GIF checks and grant agreements, including Entity C-1's, for disbursement, as described in Paragraph "y".

ttt.    Also on or about September 19, 2013, WOODS forwarded Director A's email to Businessman A. In the email, WOODS wrote, "Wanted you to see the good news." Businessman A replied, "You did great bubba[.]"

uuu.    On or about September 24, 2013, Neal emailed Director A, stating, "What are the odds of checks being printed and in the mail this week? Just trying to plan ahead for the later part of this week and next week. Thank you for all of your help!"

vvv.    On or about September 26, 2013, Businessman A signed the GIF grant agreement on behalf of Entity C-1, doing business as Entity C. By signing the agreement, Businessman A, on behalf of Entities C and C-1, agreed to, among other things, "comply with all parts of this Agreement" and to "accept[] full legal responsibility for properly implementing the project described in the original grant application documents and agrees to expend funds in accordance with the original grant application form."

www.    On or about September 27, 2013, the NWAEDD issued two GIF grant checks, drawn on the NWAEDD's Arvest Bank account ending in 8611, for $275,000 and $125,000, made out to "[Entity C-1] d/b/a [Entity C]." On or about that same date, the NWAEDD provided the GIF grant checks for Entity C-1, doing business as Entity C, and GIF grant award letters addressed to Businessman A. The award letters referenced the fact that the funds were appropriated to the GIF program through acts sponsored by WOODS and Neal and thanked WOODS and Neal "for enabling NWAEDD to serve Arkansas and its citizens."

xxx.    On or about September 30, 2013, the checks from the NWAEDD to Entity

C-1, doing business as Entity C, were deposited into Entity C's U.S. Bank account ending in 9717.

yyy.    On or about October 1, 2013, the $275,000 and the $125,000 GIF checks from the NWAEDD to Entity C-1, doing business as Entity C, were settled between U.S. Bank and Arvest Bank via an interstate wire communication.

zzz.    In or about October 2013, following Entity C's receipt of the GIF money appropriated by WOODS and Neal, Businessman A paid WOODS an unknown amount of money but at least several thousands of dollars in cash.

aaaa.    In or about October 2013, after having received the cash from Businessman A, WOODS, on behalf of Businessman A, provided Neal $20,000 in cash.

bbbb.    On or about October 15, 2013, a check was issued by Entity C, drawn from its U.S. Bank account ending in 9717, in the amount of $16,500 to Businessman A's lobbying firm.  With the exception of an initial deposit of $100, the only funds in Entity C's account at the time the check was issued were funds received from the NWAEDD.

## WOODS and Neal Direct $200,000 GIF Money to Entity A After Entity C Returns its GIF Money

cccc.    On or about August 13, 2014, shortly after being contacted and interviewed by federal law enforcement officials regarding his dealings with WOODS and other matters, Businessman A notified NWAEDD that he was returning the $400,000 in GIF money. Businessman A sent, via United States Postal Service, a letter to the NWAEDD, addressed to Director A, notifying the NWAEDD that Entity C-1, doing business as Entity C, was returning the $400,000 GIF grant it had been awarded.  Included with the letter was a check from Entity C-1 made out to the NWAEDD in the amount of $400,000.

dddd.    On or about August 14, 2014, the $400,000 check was deposited into the NWAEDD's Arvest Bank account ending in 8611.

23

eeee.   In or about the end of November 2014, Assistant Director A notified WOODS and Neal that Entity C had returned a total of $400,000 of their GIF monies to the NWAEDD.  After receiving this information, WOODS and Neal agreed to direct $200,000 of their returned GIF money to Entity A.  WOODS previously had advised Neal that WOODS had an arrangement with PARIS whereby PARIS would pay WOODS a percentage of funds WOODS obtained for Entity A.

ffff.   On or about December 3, 2014, Assistant Director A sent an email to WOODS and Neal with the subject, "GIF Applications," stating, "Gentlemen, Attached is the updated GIF application.  It was great speaking with both of you.  Let me know if we can help either of you in any way."  Attached to the email was an updated GIF grant application form.  Shortly after receiving the email, WOODS forwarded it and its attachment to PARIS, and wrote, "New GIF application."

gggg.   On or about December 5, 2014, an email was sent from an Entity A email account to Assistant Director A and PARIS with the subject, "[Entity A] GIF application."  Attached to the email was Entity A's GIF grant application to the NWAEDD requesting $200,000 in GIF money toward a project costing a total of $500,000.  The application's "Project Summary" stated, "25.5 acre property acquisition to provide much needed additional student residence and work learning facilities."  The application listed WOODS and Neal as the legislators.  The application was dated December 5, 2014, and was signed by PARIS.

hhhh.  On or about December 17, 2014, the NWAEDD's Board of Directors approved Entity A's $200,000 GIF grant application, with WOODS directing and approving $150,000 from the GIF money he controlled and Neal directing and approving $50,000 from the GIF money he controlled.

24

iiii.    On or about December 18, 2014, Assistant Director A emailed a NWAEDD employee directing her to issue checks for the GIF grants sponsored by WOODS and Neal that had been approved at the Board of Directors meeting the previous day. In the email, Assistant Director A stated, "We will be meeting with Senator Woods tomorrow (Friday 12/19) and are going to hand deliver these to him." Soon after the email, the NWAEDD issued a check in the amount of $200,000, drawn on its Arvest Bank account ending in 8611, to Entity A.

jjjj.    On or about December 19, 2014, Assistant Director A and the NWAEDD Director met with WOODS and PARIS at Entity A's campus and hand-delivered the $200,000 GIF grant check, grant agreement, and an award letter. The award letter, which was dated December 19, 2014, stated that the "funds were appropriated to NWAEDD for the GIF program through Acts supported by your Senator Jon Woods from Northwest Arkansas. We wish to thank all the Northwest Arkansas Legislator's [sic] for their support and enabling NWAEDD to serve Arkansas and its citizens."

kkkk.    Also on or about December 19, 2014, PARIS signed the GIF grant agreement associated with the $200,000 grant that the NWAEDD awarded to Entity A and that WOODS and Neal sponsored. By signing the agreement, PARIS, on behalf of Entity A, agreed to, among other things, "comply with all parts of this Agreement" and "to accept[] full legal responsibility for properly implementing the project described in the original grant application documents and agrees to expend funds in accordance with the original grant application form."

llll.    Also on or about December 19, 2014, PARIS, on behalf of Entity A, also signed the NWAEDD's "General Improvement Fund Project Closeout" form. In signing the form, PARIS certified that "all funds awarded to" Entity A "were spent strictly in accordance with the submitted and approved proposed project"; "that any monies spent or not spent in accordance with

the approved budget are to be repaid to NWAEDD"; and "that the approved project has been completed and all payments have been made in full."

mmmm.         Also on or about December 19, 2014, the $200,000 GIF grant check from the NWAEDD was deposited in Entity A's Centennial account ending in 0681. Centennial Bank had purchased Liberty Bank and taken over Entity A's account ending 0681.

nnnn.         On or about December 22, 2014, the $200,000 GIF grant check from the NWAEDD to Entity A was settled between Centennial Bank and Arvest Bank via an interstate wire communication received by Arvest Bank.

### PARIS/Entity A Pay Bribes to WOODS and Neal Through SHELTON/Entity B

oooo.  On or about December 2, 2014, PARIS caused a check to be issued to Entity B in the amount of $15,000, drawn from Entity A's Centennial account ending in 0681.

pppp.  On or about December 2, 2014, Entity B deposited the $15,000 check from Entity A into Entity B's Arvest Bank account ending in 7761.

qqqq.  On or about December 4, 2014, SHELTON withdrew $12,400 in cash from Entity B's Arvest Bank account ending in 7761.

rrrr.         On or about December 30, 2014, SHELTON submitted a letter contract whereby Entity B "propose[d] to extend the consulting agreement, signed on September 16, 2013, by and between [Entity A] and [Entity B] for an additional twelve (12) months," in exchange for "one payment of $65,000, due on or before January 15, 2015." The letter contract was signed by SHELTON but not signed by PARIS.

ssss.         On or about January 5, 2015, PARIS caused a check to be issued to Entity B in the amount of $65,000, drawn from Entity A's Centennial account ending in 0681.

tttt.         Also on or about January 5, 2015, Entity B deposited the $65,000 check

from Entity A into Entity B's Arvest Bank account ending in 7761.

uuuu.   On or about January 6, 2015, the $65,000 check from Entity A to Entity B was settled between Arvest Bank and Centennial Bank via an interstate wire communication.

vvvv.   On or about January 6, 2015, SHELTON withdrew $25,000 in cash from Entity B's Arvest Bank account ending in 7761.  SHELTON noted on the withdrawal slip, "Cash for operations."

wwww.   On or about January 7, 2015, SHELTON withdrew $10,700 in cash from Entity B's Arvest Bank account ending in 7761.  SHELTON noted on the withdrawal slip, "Cash for Home Improvements G.B.C."

xxxx.   On or about January 8, 2015, SHELTON withdrew $18,000 in cash from Entity B's Arvest Bank account ending in 7761.  SHELTON noted on the withdrawal slip, "Cash for Development – Real Estate."

yyyy.   On or about January 9, 2015, SHELTON withdrew $2,500 in cash from Entity B's Arvest Bank account ending in 7761.

zzzz.   Between approximately December 4, 2014 and January 31, 2015, SHELTON paid WOODS an unknown amount of money but at least several thousands of dollars in cash.

aaaaa. Between approximately December 4, 2014 and January 31, 2015, SHELTON met Neal in person, as arranged by WOODS, and SHELTON provided Neal $18,000 in cash.

### 2014 to 2015 — WOODS Uses His Power as a Senator to Obtain and Direct Additional GIF Money to Entity A

bbbbb. On or about January 16, 2014, PARIS, on behalf of Entity A, signed a GIF grant application to the NWAEDD requesting $30,000.  The application listed a legislator.

27

ccccc. On or about February 2, 2014, PARIS texted WOODS, "Should I thank [the

legislator] yet? Randell said the 30k request was sent to [Director A]." WOODS replied, "I'll call

you in just a few min."

ddddd. On or about February 3, 2014, WOODS texted the legislator, stating:

> I sent over a letter with 3 GIF applications to [Director A]
> that he should of [sic] received today. It would be fantastic
> if you could text him and give him the thumbs up. I prepared
> this below for you if this helps. "[Director A], I'm helping
> Jon Woods out with 3 GIF requests. [Listing two entities
> with amounts] (3) $30k [Entity A]. You should of [sic]
> received these in an envelope today. Thanks for all your
> hard works. Thanks, [the legislator]."

eeeee. On or about February 11, 2014, PARIS texted WOODS, stating, "Okay to

thank [the legislator] yet for the other 30k?" WOODS replied, "U bet."

fffff. On or about March 4, 2014, the NWAEDD issued a $30,000 GIF grant

check, drawn from its Arvest Bank account ending in 8611 to Entity A.

ggggg. On or about March 19, 2014, the $30,000 GIF grant check from the

NWAEDD was deposited in Entity A's Centennial account ending in 0681.

hhhhh. On or about March 20, 2014, the $200,000 GIF grant check from the

NWAEDD to Entity A was settled between Centennial Bank and Arvest Bank via an interstate

wire communication.

iiiii. On or about April 13, 2014, WOODS texted PARIS, stating, "I'm having

lunch with Randell brain storming in LR. . . . We are trying to think of ways to raise you $$. Got

some good ideas." PARIS replied, "Amen! Thank you." WOODS responded, "No problem."

jjjjj. On or about April 15, 2014, PARIS texted WOODS, stating, "Next time

you get a chance to stop by the office, can you give a little advice on questions we have about the

GIF forms that need to be sent." WOODS replied, "You bet. I'll call you when on the road."

28

kkkkk. On or about April 25, 2014, PARIS texted WOODS, stating, "Please drop by when you can to advise [Person A] and I on GIF reports."

lllll.     On or about June 25, 2014, the NWAEDD Board of Directors removed Entity A's GIF grant application requesting $28,500 from consideration. The removal was the result of opposition to the grant by one of the NWAEDD board members (hereinafter, "NWAEDD board member").

mmmmm.     On or about August 18, 2014, WOODS texted PARIS, stating, "Please text me the dollar amounts and senators (sic) names and total amount that was recently rejected. I'm doing a follow up tmrw."

nnnnn. Between approximately June 25, 2014 and approximately September 5, 2014, WOODS met with NWAEDD board member and secured NWAEDD board member's agreement not to oppose any future GIF grant applications by Entity A. During this meeting, WOODS promised to secure GIF monies for NWAEDD board member's projects.

ooooo. On or about September 5, 2014, WOODS and PARIS texted about GIF grant commitments by other Arkansas legislators for GIF grants to Entity A. In one of those text messages, WOODS stated, in part, "I wouldn't mention the hold up [referencing the June board removal of Entity A's GIF application] unless [a legislator] asks then you can explain the [NWAEDD board member] is now ok. Tell [a legislator] [Director A] just needs the green light. Tell [a legislator] your [sic] trying to raise $150k and this helps tremendously. This way [a legislator] might give more. You never know."

ppppp. From approximately September 8, 2014, to approximately September 12, 2014, WOODS and PARIS texted about GIF grant commitments by Arkansas legislators for GIF grants to Entity A, and WOODS agreed to make efforts to get legislators to approve the GIF grants

29

for Entity A. In one of those text messages regarding efforts to secure GIF money for Entity A, WOODS wrote, "This is our last shot until next July. I had to give a lot to the [NWAEDD board member] just to make this work. It's been a rough experience this go around. We need to make up for what it's taking to make this work."

qqqqq. On or about September 10, 2014, WOODS and Director A exchanged emails regarding the distribution of GIF money to grant applicants including the applications submitted by NWAEDD board member. In one of those emails, WOODS wrote, "Micah [Neal] & [another legislator] have agreed to endorse the proposals and split both projects down the middle. Micah and [other legislator] if you could respond to [Director A] and let him know you support this that would be wonderful. Thanks everyone." As WOODS requested, both Neal and the other legislator emailed Director A to direct their GIF monies to projects that NWAEDD board member submitted.

rrrrr. On or about September 17, 2014, the NWAEDD Board of Directors approved a GIF grant in the amount of $91,500 to Entity A, which was supported by various legislators within the NWAEDD. The NWAEDD board member seconded a motion to resubmit Entity A's GIF application and the Board approved Entity A's $91,500 GIF grant application. At that same meeting, GIF grants totaling $36,000 were approved for the projects that NWAEDD board member had submitted.

sssss. Also on or about September 17, 2014, WOODS texted PARIS, stating, "All requests for GFI [sic] funds approved. [Director A] resigned after board voted 16-3 asking for his immediate resignation." PARIS replied, "Great news. Sorry for [Director A]. Who will cut checks and when?" WOODS responded, "no idea."

ttttt. On or about September 19, 2014, the NWAEDD issued a GIF grant check

30

in the amount of $91,500, drawn from its Arvest Bank account ending in 8611, to Entity A.  The check was subsequently received by Entity A.

uuuuu.         On or about October 6, 2014, WOODS texted PARIS, stating, "Did you receive the letter from NWAEDD?"  PARIS replied, "Looking," and then, "Got it."  WOODS responded, "excellent."

vvvvv. On or about October 16, 2014, the $91,500 GIF grant check from the NWAEDD was deposited in Entity A's Centennial account ending in 0681.

wwwww.         On or about October 17, 2014, the $91,500 GIF grant check from the NWAEDD to Entity A was settled between Centennial Bank and Arvest Bank via an interstate wire communication.

xxxxx.         On or about December 8, 2014, an employee with the Arkansas Bureau of Legislative Research (BLR), an agency of the State of Arkansas that, among other duties, drafts proposed bills for legislators, sent WOODS an email with the subject, "Draft General Improvement Fund Bill for Work Colleges."  In the email, the BLR employee stated: "In response to your request we have revised the GIF appropriation bills for a grant to a Work College to reference the 'Work College' definition found in the United States Code.  Please let me know if you need anything further."

yyyyy. On or about December 15, 2014, WOODS sent an email to another BLR employee and copied PARIS to the email.  Specifically, WOODS wrote: "I've got a constituent who is Oren Paris and Oren is the president of [Entity A] in Springdale.  I would like whomever does the education bill drafting to please reach out to Oren.  Oren and I have several bills we would like drafted.  If you would please forward this email to the appropriate person that would be great."

zzzzz.         On or about February 11, 2015, WOODS filed and sponsored Senate

Bill 323 that became Act 417 of the 2015 Regular Session of the Arkansas General Assembly. The bill and act (hereinafter, "Work College Act") provided for an appropriation to the DFA from the GIF to each economic development district including the NWAEDD of up to $2 million to be used to make "grants to work colleges, as defined by U.S.C., Title 42, Section 275b, that is part of the Work College Consortium." At the time of the filing of this Bill and the passage of this Act, Entity A was the only college in the State of Arkansas that would have been eligible to receive grants under the Work College Act.

aaaaaa. On or about February 17, 2015, WOODS texted PARIS a link to the bill that would later become the Work College Act that WOODS had filed and sponsored.

bbbbbb.       Also on or about February 17, 2015, WOODS filed and sponsored Senate Bill 410 that became Act 444 of the 2015 Regular Session of the Arkansas General Assembly (hereinafter, "GIF Appropriation Act"). The bill and act provided for an appropriation to the DFA from the GIF to each economic development district including the NWAEDD of up to $1 million in grants.

cccccc. On or about February 26, 2015, WOODS texted PARIS a link to the bill that would later become the Work College Act that WOODS had filed and sponsored. In the text, WOODS stated, "Congrats. Made it out of budget and now to the house and senate for vote."

dddddd.       On or about February 27, 2015, WOODS filed and sponsored Senate Bill 641, which provided for an appropriation from the GIF to the Arkansas Department of Higher Education of up to $3.5 million to be used to make "grants to work colleges, as defined by U.S.C., Title 42, Section 275b, that is part of the Work College Consortium." The bill did not become law.

eeeeee. On or about March 2, 2015, WOODS voted for passage of the Work College

Act and the GIF Appropriation Act.

ffffff.    On or about March 8, 2015, WOODS texted PARIS a link to the Work College Act, and advised, "track this link this week." WOODS then texted PARIS, "Call you in a min." On or about March 11, 2015, the Arkansas House of Representatives voted for passage of the Work College Act, which became law on March 16, 2015.

gggggg.    On or about March 31, 2015, WOODS voted for passage of Senate Bill 691 that became Act 1147 of the 2015 Regular Session. It provided for $33,000 in funding for the Work College Act and $50,000 in funding for the GIF Appropriation Act.

hhhhhh.    On or about April 28, 2015, Assistant Director A emailed WOODS attaching a new NWAEDD GIF grant application. WOODS forwarded the application to PARIS, who responded, "Thank you I will forward to [two employees of Entity A]." PARIS forwarded WOODS's email to two employees of Entity A, stating: "This is the current GIF application. I know of $33,000 that we can apply for already, but hopefully this number will rise into the six figures."

iiiiii.    On or about May 15, 2015, PARIS emailed an Entity A employee, stating: "Randell spoke with the guys at NWAEDD and said we should write the $33,000 GIF app with Jon as the Senator. He said also put Jon down on the GIF app for $200,000. That one isn't funded, but the others can sign on to support it. They have a list of potential supporters, several that have already verbally committed."

jjjjjj.    On or about June 2, 2015, SHELTON sent an email to PARIS with subject, "Fwd: GIF Application," and with an attachment entitled, "GIF Application." PARIS forwarded the email to an Entity A employee, stating: "This is the new GIF application for NWAEDD. Please make one out for $33,000 and another for $250,000. Jon is the sponsor on both."

33

kkkkkk.     Also on or about June 2, 2015, PARIS emailed Assistant Director A, stating, "Please find the attached application per Jon's request. Hope you're doing well. I'll send a second application with different content following this one." Attached to the email was an application, dated June 1, 2015, listing WOODS as the legislator and signed by PARIS. The application requested a $33,000 GIF grant for Entity A to be used for scholarship match of federal work learning funds.

llllll.     Also on or about June 2, 2015, PARIS emailed Assistant Director A, stating, "Here is the second application." Attached was an application, dated June 1, 2015, listing WOODS as the legislator and signed by PARIS. The application requested a $250,000 GIF grant for Entity A to be used for scholarship match of federal work learning funds.

mmmmmm.     On or about October 26, 2015, the NWAEDD was served with a grand jury subpoena for records relating to Entity A, and thereafter, the NWAEDD took no further action on Entity A's GIF grant applications.

## PARIS/Entity A Make Additional Payments to WOODS Through SHELTON/Entity B

nnnnnn.     On or about March 5, 2014, the day after NWAEDD issued a $30,000 GIF check to Entity A, PARIS and SHELTON signed an extension agreement that provided for a "six (3) [sic] months" extension of the September 16, 2013 consulting agreement between Entity A and Entity B. This was the second extension agreement executed by PARIS and SHELTON. Although the letter was dated March 5, 2015, it called for payment of $15,000 to be made by Entity A to Entity B on or before March 14, 2014.

oooooo.     On or about March 6, 2014, PARIS caused Entity A to issue a check in the amount of $15,000, drawn from Entity A's Centennial Bank account ending in 0681, to Entity B. The check was deposited that same day in Entity B's Arvest Bank account ending in

34

7761.

ppppp. On or about March 10, 2014, SHELTON withdrew $4,650 in cash

from Entity B's Arvest Bank account ending in 7761.

qqqqqq. On or about October 6, 2014, the same day that WOODS checked

with PARIS about whether he had received a letter and $91,500 GIF check from NWAEDD,

SHELTON submitted a signed letter invoice to PARIS, which stated:

> [Entity B] in connection with the consulting agreement, signed on
> September 16, 2013 with [Entity A], is invoicing a fee for service of
> $45,000 in connection with the arrangement of the [a charitable
> foundation's] campus visit, their offer to match over $1,000,000 in
> contributions. Additionally, consultant plans to generate over
> $500,000 from private and public sources in 2015 based on the
> groundwork laid in 2014.

PARIS signed the letter invoice next to a line titled, "accepted."

rrrrrr. Also on or about October 6, 2014, PARIS caused Entity A to issue a check

in the amount of $45,000, drawn from its Centennial Bank account ending in 0681, to Entity B.

The check was deposited that same day in Entity B's Arvest Bank account ending in 7761.

ssssss. From approximately October 7, 2014 to approximately October 28, 2014,

SHELTON withdrew a total of $29,000 in cash from Entity B's Arvest Bank account ending in

7761.

tttttt. On or about February 16, 2015, the same week that WOODS filed and

sponsored the Work College Act, which would benefit Entity A, SHELTON submitted a letter

invoice to PARIS, which stated, "[Entity B], 'Consultant' in connection with the consulting

agreement, signed on September 16, 2013 with [Entity A], is invoicing a fee for consulting services

of $7,500." The invoice was signed by SHELTON and accepted by PARIS.

uuuuuu. On or about February 19, 2015, PARIS caused Entity A to issue a

35

check to Entity B in the amount of $7,500 drawn on Entity A's Centennial Bank account ending in 0681.

vvvvvv. On or about February 20, 2015, Entity A's check for $7,500 to Entity B was deposited into Entity B's Arvest Bank account ending 7761.

wwwwww. On or about February 21, 2015, SHELTON withdrew $4,000 in cash from Entity B's Arvest Bank account ending 7761.

xxxxxx. On or about April 28, 2015, the same day that WOODS sent a blank GIF application to PARIS, SHELTON submitted a letter invoice to PARIS, which stated, "[Entity B], 'Consultant' in connection with the consulting agreement, signed on September 16, 2013 with [Entity A], is invoicing a fee for consulting services of $7,500." The invoice was signed by SHELTON but not signed by PARIS. The letter was stamped, "approved to pay," by Entity A's financial officer with a date of April 30, 2015.

yyyyyy. On or about May 8, 2015, a check for $7,500 was issued by Comerica Bank showing Entity A as the remitter and Entity B as the payee. The payment was made through an arrangement between Entity A and bill.com, whereby the funds were reimbursed to bill.com from Entity A's Centennial Bank account ending in 0681. Entity A's request for this payment was received by bill.com on or about April 30, 2015.

zzzzzz. On or about May 11, 2015, the check that Entity A caused to be issued to Entity B for $7,500 on May 8, 2015, was deposited in Entity B's Arvest Bank account ending 7761.

aaaaaaa. On or about May 12, 2015, SHELTON made a cash withdrawal of $4,000 from Entity B's Arvest Bank account ending 7761.

bbbbbbb. On or about July 17, 2015, SHELTON submitted a letter invoice to

36

PARIS, which stated, "[Entity B], 'Consultant' in connection with the consulting agreement, signed on September 16, 2013 with [Entity A], is invoicing a fee for consulting services of $2,500." The invoice was signed by SHELTON but not signed by PARIS. The letter was stamped, "approved to pay," by Entity A's financial officer with a date of July 20, 2015.

ccccccc. On or about July 21, 2015, PARIS caused Entity A to issue a check to Entity B in the amount of $2,500, drawn on Entity A's Centennial Bank account ending in 0681.

ddddddd. On or about July 21, 2015, Entity A's check for $2,500 to Entity B was deposited into Entity B's Arvest Bank account ending in 7761.

eeeeeee. On or about October 1, 2015, SHELTON submitted a letter invoice to PARIS, which stated, "[Entity B], 'Consultant' in connection with the consulting agreement, signed on September 16, 2013 with [Entity A], is invoicing a fee for consulting services of $10,000." The invoice was signed by SHELTON but not signed by PARIS. The letter was stamped, "approved to pay," by Entity A's financial officer with a date of October 2, 2015.

fffffff. On or about October 2, 2015, PARIS caused Entity A to issue a check to Entity B in the amount of $10,000 drawn on Entity A's Centennial Bank account ending in 0681.

ggggggg. On or about October 5, 2015, Entity A's check for $10,000 to Entity B was deposited into Entity B's Arvest Bank account ending 7761.

hhhhhhh. On or about October 6, SHELTON made a cash withdrawal of $3,600 from the Entity B Arvest Bank account ending 7761.

37

## PARIS Paid a Total of $267,500 to Entity B
## Without the Knowledge or Approval of Entity A's Board of Governance

iiiiiii.   Between approximately September 16, 2013 and approximately October 1, 2015, Entity A paid Entity B and SHELTON a total of approximately $267,500.  Each payment made by Entity A to Entity B was directed and authorized by PARIS.

jjjjjjj.   PARIS entered into the agreements with Entity B and caused payments to be made by Entity A to Entity B without the knowledge or approval of Entity A's Board of Governance.  Pursuant to Article II of Entity A's bylaws, which were applicable between 2013 and 2015, "[a]ll actions and activities of this College shall be subject to the consent and approval of the College Board of Governance."

kkkkkkk.   On or about October 22, 2015, after being interviewed by federal law enforcement agents about the payments to Entity B, PARIS submitted a Financial Development report to Entity A's Board of Governance.  The report informed the Board generally about the payments to Entity B, and stated that Entity B's activities resulted in strategic positioning with new large donors, which was anticipated to result in additional multiple millions of dollars over the next few years.

### EXECUTION OF THE SCHEME

19.   The allegations contained in Paragraphs 1 through 18 of this Indictment are re-alleged as though fully set forth herein.

20.   On or about the dates listed below, in the Western District of Arkansas and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and deprive, WOODS, PARIS, and SHELTON transmitted and caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals, and sounds:

38

| Count | Date | Signal and Sound | Defendant(s) |
|-------|------|------------------|--------------|
| 1 | August 19, 2013 | Electronic mail from WOODS to Director A forwarding Entity A's application requesting $200,000 GIF grant for Entity A | WOODS, PARIS, SHELTON |
| 2 | September 22, 2013 | Electronic mail from SHELTON to PARIS attaching consulting agreement between Entity A and Entity B | WOODS, PARIS, SHELTON |
| 3 | October 1, 2013 | Electronic transmission received by Arvest Bank to settle Entity C's deposit of $275,000 check, dated September 27, 2013 and drawn from NWAEDD's Arvest Bank account ending in 8611, into Entity C's U.S. Bank account ending in 9717 | WOODS |
| 4 | October 1, 2013 | Electronic transmission received by Arvest Bank to settle Entity C's deposit of $125,000 check, dated September 27, 2013 and drawn from NWAEDD's Arvest Bank account ending in 8611, into Entity C's U.S. Bank account ending in 9717 | WOODS |
| 5 | October 4, 2013 | Electronic transmission received by Arvest Bank to settle Entity A's deposit of $200,000 check, dated September 25, 2013 and drawn from NWAEDD's Arvest Bank account ending in 8611, into Entity A's Liberty Bank account ending in 0681 | WOODS, PARIS, SHELTON |
| 6 | March 20, 2014 | Electronic transmission received by Arvest Bank to settle Entity A's deposit of $30,000 check, dated March 4, 2014 and drawn from NWAEDD's Arvest Bank account ending in 8611, into Entity A's Centennial Bank account ending in 0681 | WOODS, PARIS, SHELTON |
| 7 | October 17, 2014 | Electronic transmission received by Arvest Bank to settle Entity A's deposit of $91,500 check, dated September 19, 2014 and drawn from NWAEDD's Arvest Bank account ending in 8611, into Entity A's Centennial Bank account ending in 0681 | WOODS, PARIS, SHELTON |
| 8 | December 5, 2014 | Electronic mail from Entity A employee to NWAEDD submitting $200,000 GIF grant application | WOODS, PARIS, SHELTON |

| Count | Date | Signal and Sound | Defendant(s) |
|-------|------|------------------|--------------|
| 9 | December 15, 2014 | WOODS's electronic mail to official at the State of Arkansas's Bureau of Legislative Research, instructing the official, among other things: "I would like whomever does the education bill drafting to please reach out to Oren [PARIS]. Oren and I have several bills we would like drafted. If you would please forward this email to the appropriate person that would be great." | WOODS, PARIS, SHELTON |
| 10 | December 22, 2014 | Electronic transmission received by Arvest Bank to settle Entity A's deposit of $200,000 check, dated December 18, 2014 and drawn from NWAEDD's Arvest Bank account ending in 8611, into Entity A's Centennial account ending in 0681 | WOODS, PARIS, SHELTON |
| 11 | January 6, 2015 | Electronic transmission received by Arvest Bank to settle Entity B's deposit of $65,000 check, dated January 5, 2013 and drawn from Entity A's Centennial account ending in 0681, into Entity B's Arvest Bank account ending in 7761 | WOODS, PARIS, SHELTON |

21. On or about the dates listed below, in the Western District of Arkansas and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and deprive, WOODS, PARIS, and SHELTON transmitted and caused to be transmitted by means of private or commercial interstate carrier, the following mailing:

| Count | Date | Mail | Defendants |
|-------|------|------|------------|
| 12 | September 25, 2013 | NWAEDD check in the amount of $200,000, dated September 25, 2013, to Entity A, sent from NWAEDD's office to WOODS's mailing address in Springdale, Arkansas, via U.S. Postal Service | WOODS, PARIS, SHELTON |

All in violation of 18 U.S.C. §§ 1341, 1343, 1346, and 2.

## COUNT 13

### 18 U.S.C. § 1957
### (Engaging in Monetary Transactions in Property
### Derived from Specified Unlawful Activity)

22.     The allegations contained in Paragraphs 1 through 21 of this Indictment are re-alleged as though fully set forth herein.

23.     On or about October 1, 2013, in the Western District of Arkansas, Fayetteville Division, and elsewhere, the Defendant

### JONATHAN E. WOODS,

unlawfully and knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and was derived from specified unlawful activity, that is, WOODS withdrew approximately $33,000 from his Arvest Bank account ending in 2553 to purchase an Arvest Bank cashier's check payable to another person, and said funds being derived from honest services wire and mail fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1346, and 2, as set forth in this Indictment, all in violation of 18 U.S.C. § 1957.

## FORFEITURE ALLEGATION

### Honest Services Mail and Wire Fraud

1.     The allegations contained in Counts One through Twelve of this Indictment and all supporting paragraphs are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of any of the offenses in Counts One through Twelve, the Defendants, **JONATHAN E. WOODS, OREN PARIS III,** and **RANDELL G.**

41

**SHELTON, JR.**, shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s). The property to be forfeited includes, but is not limited to a money judgment.

3.    If any of the property described above, as a result of any act or omission of the Defendants:

  a.    cannot be located upon the exercise of due diligence;

  b.    has been transferred or sold to, or deposited with, a third party;

  c.    has been placed beyond the jurisdiction of the court;

  d.    has been substantially diminished in value; or

  e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

## Money Laundering

4.    The allegations contained in Count Thirteen of this Indictment and all supporting paragraphs are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(1).

5.    Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1957, the Defendant, **JONATHAN E. WOODS**, shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property. The property to be forfeited includes, but is not limited to a money judgment.

6.      If any of the property described above, as a result of any act or omission of the

Defendants:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be divided

             without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section

982(b)(1) and Title 28, United States Code, Section 2461(c).

A True Bill.

/s/ Grand Jury Foreperson
Grand Jury Foreperson

Kenneth Elser
United States Attorney
Arkansas Bar No. 89184
414 Parker Avenue
Fort Smith, AR  72901
Telephone: 479-783-5125
E-mail: Kenny.Elser@usdoj.gov

Raymond Hulser
Chief, Public Integrity Section

Sean F. Mulryne
Trial Attorney
United States Department of Justice
Criminal Division / Public Integrity Section
New Jersey Bar No. 027052008

43