IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**V.**                             **CASE NO. 5:17-CR-50010**

**JONATHAN E. WOODS;**
**OREN PARIS III; and**
**RANDELL G. SHELTON, JR.**                                    **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Currently before the Court are Defendant Jonathan Woods's Motion to Disqualify District Court Judge Timothy L. Brooks from All Proceedings in this Matter (Doc. 265) and the Government's Response (Doc. 268) in opposition. For the reasons given below, Mr. Woods's Motion is **DENIED**.

### I. BACKGROUND

This is a criminal case in which the three Defendants, Jonathan Woods, Oren Paris, and Randell Shelton, have been charged with conspiring to bribe Mr. Woods while he was a state senator in the Arkansas General Assembly, in violation of federal law. The docket in this case is far more lengthy and tortured than those of typical criminal cases in this Court; it is presently hovering around 300 entries, and many more will doubtlessly follow. Although there are a variety of reasons why this case is more complex than most, the lion's share of litigation has revolved around a deluge of accusations by the Defendants that the Government, as well as Mr. Woods's former attorney, have all committed various types of misconduct during the investigation and prosecution of this case. That history will be recounted in more fulsome detail in the Order that will be filed

1

immediately following this one. Suffice it to say here that the vast majority of those accusations, in this Court's view, have been meritless, but a couple have not been.

At any rate, on January 9, 2018, the undersigned Judge became the latest participant in this case to be accused of impropriety, or at least of permitting the appearance thereof, when Mr. Woods filed a Motion to Disqualify, arguing that the undersigned Judge "should recuse himself" from this case "pursuant to 28 U.S.C. § 455(a) and applicable case law." *See* Doc. 265, ¶ 2. The Government filed its Response in opposition on January 18. That Motion is now ripe for decision. Although typically orders will refer to "the Court" or "this Court," this particular Order will make extensive use of the first-person, because the relief being sought by the instant Motion pertains to the specific person occupying the bench, rather than to the venue, forum, or court. *See, e.g., S.W. Bell Tel. Co. v. F.C.C.*, 153 F.3d 520 (8th Cir. 1998) (Hansen, J., employing the first-person when explaining why he will not be recusing from a case).

## II. LEGAL STANDARD

28 U.S.C. § 455(a) states, in its entirety, that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "A party introducing a motion to recuse carries a heavy burden of proof; a judge is presumed to be impartial and the party seeking disqualification bears the substantial burden of proving otherwise." *Pope v. Fed. Express Corp.*, 974 F.2d 982, 985 (8th Cir. 1992). The decision whether to recuse is committed to a district court's "sound discretion," but "[r]ecusal is required when an average person knowing all the relevant facts of a case might reasonably question a judge's impartiality." *Dossett v. First State Bank*, 399 F.3d 940, 953 (8th Cir. 2005). Where a judge finds that

the facts do not warrant recusal, he has an obligation not to recuse. *See S.W. Bell Tel. Co.*, 153 F.3d at 523.

## III. DISCUSSION

The arguments in Mr. Woods's Motion to Disqualify appear to fall into three separate categories. One category of arguments pertains to the Order to Show Cause (Doc. 255) that this Court entered on December 19, 2017. The second category of arguments is generally premised on Mr. Woods's perception that I am holding him and/or his codefendants to a different standard than the Government in this case. (For the sake of brevity, this Order will refer below to this second category of arguments as "arguments concerning unfair treatment.") The third category of arguments concerns the relationship between myself and Mr. Woods's former attorney in this matter, W.H. Taylor, who is also my former law partner. Below, I will address each category of arguments, in the sequence just described.

### A. The Order to Show Cause

As mentioned above, this Court entered an Order to Show Cause on December 19. That Order was directed to Gregory Payne, who is one of the attorneys representing Mr. Paris in this matter. It was issued in response to Mr. Payne having filed materials on the public docket that this Court believed were subject to the Protective Order (Doc. 14) in this case. *See generally* Doc. 255. Mr. Woods takes exception, *see* Doc. 265, ¶¶ 17, 30, to the following language that appeared near the end of the Order to Show Cause:

> [I]t seems very difficult for the Court to escape the conclusion that Mr. Payne not only violated this Court's Protective Order, but that he intentionally did so, possibly with the assistance of others, in a manner calculated to prevent this Court from implementing any sort of effective remedy for the violation after the fact. The Court believes that further inquiry is necessary in order

3

to determine whether this is in fact the case, and to determine what sanctions, if any, should be imposed as a consequence for these actions.

(Doc. 255, p. 4).

Mr. Woods's objections to this language appear to be twofold. First, Mr. Woods contends "it would appear to a reasonable person that the Court has formed conclusions and is accusing Counsel and co-defendant's counsel of conspiring to manipulate this Court and being disingenuous." (Doc. 265, ¶ 30). I do not understand what Mr. Woods means by "Counsel and co-defendant's counsel." The Order to Show Cause was directed to Mr. Payne and to nobody else. It was not directed to Mr. Woods's counsel, nor was it even directed to any of Mr. Paris's counsel other than Mr. Payne. Mr. Woods's counsel was neither required nor expected to attend Mr. Payne's show-cause hearing, though his presence was welcome if he wished to observe.

If the Court had any basis for believing that counsel for Mr. Woods engaged in any wrongdoing with respect to the matters discussed in its Order to Show Cause, then the Court would have said so, it would have provided reasons in support thereof, and it would have ordered counsel for Mr. Woods to show cause along with Mr. Payne. This did not happen, so I do not see why counsel for Mr. Woods feels he has anything to worry about here.

Mr. Woods's second objection to the above-quoted language in the Order to Show Cause is that "[t]he Court made this determination based solely on the filing of [Mr. Payne's motion] and prior to hearing any facts or arguments on behalf of the parties." See id. This objection is premised on a fundamental misreading of the Order's plain language. The Order to Show Cause explicitly stated that "further inquiry is necessary in order to determine whether" the Court's suspicions were "in fact the case," and the Court

4

explicitly left open the possibility that *no* sanctions would be imposed at all, when it wrote that this further inquiry was necessary "to determine what sanctions, *if any*, should be imposed." *See* Doc. 255, p. 4 (emphasis added). The Court expressed concerns about Mr. Payne's actions, and it spent four pages providing the reasons for those concerns, which it will not rehash here. But the Court had not made up its mind about any of these matters. Instead, it gave Mr. Payne notice of its concerns, and it then gave Mr. Payne an opportunity to explain himself and to persuade the Court that his behavior was proper, or at least excusable. On February 15, 2018, Mr. Payne availed himself of that opportunity, conceded that he had made a mistake, and persuaded the Court that sanctions were not warranted.

In other words, the Order to Show Cause simply had nothing to do with Mr. Woods or his counsel. The person to whom that Order *was* directed was given notice and an opportunity to be heard before any adverse action would be taken against him. And ultimately, *no* adverse action at all was taken against him, other than a bare admonishment. Hopefully the foregoing discussion has clarified any misunderstandings Mr. Woods may have previously held regarding the Order to Show Cause. Given a proper understanding of the situation, I cannot imagine what objections Mr. Woods could possibly have to the provision of due process to someone else in a proceeding that is none of his business. But to whatever extent such objections remain, they plainly are not a proper basis for recusal.

## B. Arguments Concerning Unfair Treatment

Turning now to Mr. Woods's arguments concerning unfair treatment—these arguments seem to fall into two subcategories. First, and more generally, Mr. Woods

5

contends that throughout this case I have been "tak[ing] the government at its word" while demanding proof from the Defendants, *see* Doc. 265, ¶¶ 26, 28, 29, and holding the Defendants "to a different standard than the government," *see id.* at ¶ 27. Second, and more specifically, Mr. Woods objects to certain statements, observations, or findings that were made from the bench during oral argument on Mr. Woods's Second Motion to Continue Trial (Doc. 155) at the November 30, 2017 Pretrial Conference. *See id.* at ¶¶ 13–14, 29. Below, I will deal first with the more general set of arguments about holding the parties to different standards. Then I will take up the more specific arguments concerning my remarks from the bench on November 30, 2017.

### 1. Allegation of Holding Different Parties to Different Standards

I will begin with an illustrative and typical example: Mr. Woods writes that "[w]hen arguing for a continuance, the Court took the government at its word that the discovery provided was 'not relevant' with little inquiry at all, while at the same time requiring defense counsel to show time sheets and documentation to prove to the Court our position is sincere." *Id.* at ¶ 28. There are two profound problems with Mr. Woods's argument here.

The first problem is that, in fact, the Court most certainly did *not* "take the government at its word that the discovery provided was 'not relevant.'" Indeed, the Court went out of its way to state from the bench, on the record, that "[t]he Court *still does not know* whether the production contain[s] highly relevant e-mail communications with the defendants or whether it contains wholly nonrelevant information, as the government contends." (Doc. 260, p. 58) (emphasis added). So Mr. Woods's assertion on this particular point is just objectively false.

6

The second (and closely related) problem with Mr. Woods's argument here is that he is completely ignoring the *legal burden* that was *his* to carry on *his* Motion to Continue. He complains about the undersigned demanding proof from *him* on *his* Motion to Continue—which was opposed by every single other party in this case including his own codefendants—as if this demand of proof were something astonishing and scandalous rather than the perfectly ordinary and predictable thing that it actually is. Six months earlier, when this Court granted Mr. Woods's first Motion to Continue Trial (Doc. 47)— over the opposition of his codefendant Mr. Paris—this Court made very clear that it "remains very sensitive to Mr. Paris's legitimate interest in having these proceedings resolved as speedily as is reasonably possible," and that "[a]ccordingly, the Court *will not grant any further continuances of the trial date* after today, barring *truly extraordinary and presently unforeseeable good cause*." *See* Doc. 57, pp. 6–7 (emphasis added). Furthermore, the United States Supreme Court has observed that the problem of "assembling the witnesses, lawyers, and jurors at the same place at the same time . . . counsels against continuances except for *compelling reasons*." *Morris v. Slappy*, 461 U.S. 1, 11 (1983) (emphasis added). So I am simply baffled as to why counsel for Mr. Woods would take exception to a demand for proof in support of his Second Motion to Continue, half a year after he was put on explicit notice that he would need to show "truly extraordinary and presently unforeseeable good cause" in order to obtain any further continuances of the trial date.

Given these problems with the aforementioned example, one might expect that Mr. Woods would point to some *additional* rulings by this Court, on *other* motions in this case,

as specific examples of apparent bias. He certainly seems to think such examples abound, writing:

> The Court has repeatedly questioned the sincer[it]y of Woods and the other co-defendants in challenging the government's representations that they have provided "all relevant" discovery, including documents and recordings. The Court has repeatedly taken the government at its word regarding a number of matters, including the relevancy of discovery; whether the government aided Neal in the recording of Woods while represented by counsel; and whether it was in possession of relevant discovery, including audio recordings—positions that are either not true or that are now at the very least in doubt. The record is replete of instances where representations made by the government were indeed disingenuous, inaccurate, or untrue. Yet it's Woods, his counsel, and co-defendant's counsel that are being found by this Court to be "disingenuous" in its request and "hysterical" in his motion practice.

(Doc. 265, ¶ 26). But one searches Mr. Woods's Motion to Disqualify in vain for so much as even a single exemplary citation to anything other than oral argument on his Second Motion to Continue at the November 30, 2017 hearing.

I am left to wonder, then, what Mr. Woods is referring to. Presumably he is not referring to the times when the Court has summarily granted motions by the Government that were either unopposed or run-of-the-mill motions for leave,[1] given that the Court has likewise summarily granted every single such motion filed by Mr. Woods and his codefendants.[2] Presumably he is not referring to the times when the Court has found

---

[1] *See, e.g.*, Docs. 13 & 14; 50 & Text-Only Order of May 8, 2017; 65 & 66; 80 & 81; 105 & 121; 107 & 108; 137 & 138; 118 & 127; 142 & 144; 181 & 182; 230 & 231; 236 & 237; 239 & 241; 249 & 252; 256 & 259; 257 & 259.

[2] *See, e.g.*, Docs. 55 & Text-Only Order of May 22, 2017; 62 & Text-Only Order of July 31, 2017; 70 & Text-Only Order of September 8, 2017; 88 & 89; 104 & 126; 130 & 131; 135 & 140; 146 & 147; 158 & 162; 159 & 162; 191 & 197; 193 & 194; 240 & 245; 246 & 247.

some motion moot—which, for whatever it matters, has happened only to Mr. Shelton[3] and the Government[4] alike. Presumably he is not referring to the fact that the Court has permitted the Government to engage in some *ex parte* motion practice,[5] given that the Court has also permitted Mr. Woods to do the same,[6] sometimes even over the protests of his codefendant Mr. Paris.[7] Presumably he is not referring to the fact that literally *every single* Government motion not already mentioned has been *denied in part*.[8] Presumably he is not referring to the time when the Court granted the full six-month continuance of the trial date that Mr. Woods sought in his first Motion to Continue,[9] over the objection of his codefendant Mr. Paris.[10] Presumably he is not referring to the time when the Court sniffed out[11] and *granted* an obscure motion for documents, which Mr. Woods had embedded inside the seventh page of a nine-page reply brief instead of bothering to

---

[3] *See, e.g.*, Docs. 102 & 123; 133 & 153.

[4] *See, e.g.*, Docs. 238 & 244.

[5] *See, e.g.*, Docs. 124 & 196; 207 & 213.

[6] *See, e.g.*, Docs. 60 & 61; 242; 253.

[7] *See* Doc. 209.

[8] *See, e.g.*, Docs. 160 & 212; 262 & 264; 271 & 278; 273 & 278.

[9] *See* Docs. 47 & 57.

[10] *See* Doc. 52.

[11] This, despite the fact that this Court is generally of the opinion that "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). *See, e.g.*, *3A Composites USA, Inc. v. United Indus., Inc.*, 2015 WL 5437119, at *7 n.4 (W.D. Ark. Sept. 15, 2015).

prominently display it in a separate filing.[12] And *certainly* he is not referring to the time when the Court required the Government's lead attorney on this case, Kenny Elser, to take the stand and submit to examination, under oath, by Mr. Woods's attorney at an *in camera* hearing; after all, Mr. Woods filed the instant Motion on the evening immediately preceding that particular event.

Perhaps Mr. Woods is referring to the time when the Court denied his July 31, 2017 Motion and Request for Hearing (Doc. 63). But that seems rather unlikely, since the Court did not "take the Government at its word" in doing so, but instead, explicitly held that "under controlling legal precedent, it would not have been a Sixth Amendment violation for the Government to do *exactly what Mr. Woods accuses it of doing.*" *See* Doc. 72, pp. 2–3 (emphasis added). Nor can one find a single instance of this Court accepting or adopting any factual representation by the Government in the Opinion and Order (Doc. 128) denying Mr. Woods's Motion for Reconsideration (Doc. 83) of that prior ruling.

Out of all the motions that Mr. Woods has filed, then, we are left only with the Motion to Compel Discovery (Doc. 91) that he filed jointly with his two codefendants on September 25, 2017, which the Court denied at Doc. 150, pp. 1–4. That Motion involved the Government's August 4 production to the Defendants of nearly 4.3 million files of electronically stored information on an external hard drive, which the Defendants complained of being unable to access or effectively search. In the Court's Order on that Motion, the Court took *all* parties at their word that it would cost around $1,400.00 to

---

[12] *See* Docs. 235, ¶ 12 & 253.

10

purchase litigation software that would facilitate searching the hard drive.[13] *See* Doc. 150, p. 2. The Court took the *Defendants* at their word that various free alternatives proposed by the Government had not worked for the Defendants. *See id.* The Court further observed that the Defendants' frustration over the situation was "understandable." *See id.* at 3. And although the Court also took the *Government* at its word that the Government did not believe it was required to produce anything on the hard drive that was not already separately produced, *see id.*, the Court nevertheless found—just in case the Government's belief was wrong or mistaken—that the August 4 hard drive production would *not* "be independently sufficient to satisfy any of the Government's discovery obligations in this case," *id.*

In that Order, the Court declined to make a finding that the Government had acted in bad faith, and accordingly, the Court declined the Defendants' request to sanction the Government. *See id.* But I do not see what else the Court could possibly have done in that situation. At the time the Court issued that Order, the Defendants had not presented the Court with even a single specific example of material from the hard drive that the Defendants would contend the Government was obligated to produce but that had not been separately produced. (After all, how could they? Remember, the Defendants contended that they could not even meaningfully access the hard drive in the first place.) So if *this* is what Mr. Woods has in mind with respect to apparent bias, then the undersigned can only point, once again, to the elementary legal concept of *burden*, and

---

[13] Actually, a variety of prices had been thrown around in the parties' filings. *Compare* the Defendants' Joint Motion, Doc. 91, p. 5 n.11 ($1,000.00) *and* Reply, Doc. 116, p. 2 ($750.00) *with* the Government's Response, Doc. 103, p. 4 n.4 ($1,400.00). The Court went with $1,400.00, which was the figure in the record that was *most favorable to the Defendants' argument*.

11

remind him that it was the *Defendants'* burden to support the *Defendants'* motion with *proof* of bad faith.

So perhaps Mr. Woods is not thinking of *any* of the motions he filed in this case, but instead, is thinking of some motion(s) filed by his codefendants. But if this is the case, then we are now in the same position where we found ourselves at the end of the discussion above of the Show Cause Order: wondering, in the absence of any meaningful explanation from Mr. Woods, how anyone could possibly construe any appearance of bias against him from rulings that simply had nothing at all to do with him.[14] I am thus led to conclude that, notwithstanding Mr. Woods's unsupported generalizations about the Court's "repeated" instances of unfair treatment, *see* Doc. 265, ¶ 26, his arguments on this point are really, at bottom, only concerned with my remarks to his counsel from the bench on November 30.

### 2. Remarks from the Bench on November 30, 2017

In his Second Motion to Continue and during oral argument on that Motion, counsel for Mr. Woods essentially claimed that he was so underprepared that if trial proceeded as scheduled then he would provide unconstitutionally defective assistance of counsel to Mr. Woods. *See* Doc. 155, pp. 5, 9; Doc. 260, pp. 41, 66, 150. This was a very grave proposition which, if true, would seem to place Mr. Woods's Sixth Amendment right to

---

[14] At the Pretrial Conference on November 30, and in a motion filed on December 15, Mr. Woods moved to retroactively join all of his codefendants' previously-filed substantive motions. *See* Doc. 246. The Court granted Mr. Woods this leave. *See* Doc. 247. But surely any reasonable observer, including Mr. Woods, would agree that when the Court issued its rulings on the prior motions by Mr. Woods's codefendants, I did not know, and could not have known, that Mr. Woods would later retroactively seek leave to join in those motions.

12

counsel in direct opposition to Mr. Paris's Sixth Amendment right to a speedy trial, thus giving special urgency to Mr. Paris's repeated requests for a severance. Therefore, I felt it was necessary to make a finding as to whether counsel for Mr. Woods was truly as unprepared as he claimed to be. I concluded that he was not, and gave extensive reasons[15] to support this finding from the bench, which necessarily entailed that some of counsel's arguments were "disingenuous and without merit." *See id.* at 56.

Counsel for Mr. Woods takes issue with my use of those particular words to characterize counsel's arguments. *See* Doc. 265, ¶¶ 13, 26, 29. I would certainly agree that these were unflattering words—harsh words, even. But I believed them to be correct then, and still believe them to be correct now. And at any rate, even if the Court was mistaken in this finding, then the only plausible alternative finding under these particular circumstances would have been just as harsh and unflattering: that either through incompetence or sheer neglect, Mr. Woods's counsel had provided his client with such deficient representation as to jeopardize Mr. Woods's Sixth Amendment right to counsel. When counsel makes a set of representations to the Court that force the Court to select from a set of terribly unflattering alternative findings about counsel, that is not a problem of the *judge*'s making; it is a problem of *counsel*'s making, and switching out one judge for another will not fix it.

Mr. Woods's Motion to Disqualify also frequently complains that at the November 30 hearing, "[t]he Court referred to defense counsel's motion practice attempting to obtain

---

[15] Those reasons occupy eighteen pages of the Pretrial Hearing transcript, *see* Doc. 260, pp. 56–73, and I see no point in recounting them here. I will simply observe that I am no less persuaded by them now than I was at the time I stated them from the bench on November 30, 2017.

13

relevant documents and recordings from the government as 'hysterical.'" *See id.* at ¶¶ 13, 26, 29. I used the words "hysteria" and "hysterical" once each during the November 30 hearing. Specifically, the word "hysteria" was used during an exchange with counsel for Mr. Woods about the voluminous discovery produced by the Government. Mr. Woods's counsel was complaining about what he perceived to be an improper document-dump by the Government in discovery, and he made the observation that the Government is "not required under the rules to hand over things just out of abundance of caution." (Doc. 260, p. 30). I responded with the following question:

> Well, unless they are accused of misconduct. And unless you—unless you are, with some amount of hysteria, accusing these prosecutors of hiding things and they tell you that they are not and then the Court sees responses of "You can't accept them at their word." What would you have them do?

*Id.* Later, I used the word "hysterical" when discussing one of the factors that a court must take into account when ruling on a motion to continue:

> The third factor is conduct of the opposing party [*i.e.*, the Government] and whether a lack of cooperation has contributed to the need for a continuance. For the reasons that I've already stated, I am persuaded that the truth, notwithstanding all of the hysterical accusations of the defendants against the government, I don't think that a lack of cooperation by the government has contributed to any need for a continuance; in fact, somewhat to the contrary. The government has exhibited several instances where they have tried to focus the defendants on the relevant evidence that they intend to produce.

*Id.* at 70–71.

Mr. Woods's Motion to Disqualify offers the following definition for the word "hysterical": "deriving from or affected by uncontrolled extreme emotion." (Doc. 265, ¶ 13). I agree that this is what I meant by that word when I used it from the bench on November 30. I disagree with the notion that my use of this word indicates any bias on my part against any of the Defendants in this case or in favor of the Government.

14

The plain fact of the matter is that the motion practice in this case has occasionally employed the most heated and vitriolic rhetoric that I have ever seen any lawyer ever hurl against another in a criminal case. The defense attorneys in this case have accused the Government's attorneys of intentionally invading the Defendants' attorney-client relationships, see Doc. 63, ¶ 4, of lying in the Government's filings in this case, see Doc. 132, ¶ 10, of acting in "bad faith" by intentionally sending the defense attorneys on a "fool's errand" in discovery, Doc. 116, pp. 2–3, of being motivated in their charging decisions by political partisanship, see Doc. 170, p. 39, etc., etc. To make the observation that this sort of motion practice is characterized by "hysteria" is *not* to say that the Government can do no wrong, or that it is unreasonable for defense attorneys to become upset if they perceive that the Government is wronging them or their clients; indeed, the Order that will be filed immediately after this one will make specific findings of certain Governmental wrongdoing, and it will impose sanctions that are designed to remedy any harm that may have resulted from Governmental misdeeds. But the hysterical tenor of this case is real, and it is a central part of the context for the Government's attorneys' decision to err on the side of overproduction in discovery. It would be unreasonable and unfair for the Court to ignore that context when asked to make findings about the extent, if any, to which Governmental obstructionism in discovery has contributed to the need for a continuance.

Mr. Woods also argues that I gave the appearance of bias on November 30 by "blanketly disregard[ing] co-defendant counsel's proffers regarding exculpatory evidence which was included in" discovery materials that Mr. Woods's counsel had not reviewed. *See* Doc. 265, ¶ 28. I am not sure whether Mr. Woods is referring to a proffer by counsel

15

for Mr. Paris or a proffer by counsel for Mr. Shelton, but in either event, I disagree with Mr. Woods.

Near the end of the Pretrial Hearing, after the Court had denied Mr. Benca's Second Motion to Continue, Mr. Payne, who is co-counsel for Mr. Paris, stood up and asserted that in his review of these discovery materials, he had found evidence that he believed was exculpatory. *See* Doc. 260, p. 150. He did not specifically identify any examples of such exculpatory evidence, and he did not provide the Court with any documents or exhibits to support his claim. *See id.* at 150–54. I was not sure what Mr. Payne's point was, since his client *opposed* Mr. Woods's request for a continuance, *see id.* at 151, 153, but regardless, it was not a "proffer" with any meaningful content; it was simply a bald assertion, utterly lacking in detail or proof. This brings us back to the same point that I have already made several times in this Opinion and Order, which is that *burdens matter*. When a party asks the Court to give it some sort of relief, it is not enough simply to say "I want *x*" or "I believe *y*." One must persuade the Court, through *reasons* and *proof*, that one is *entitled* to *x* and that *y* is *true*. It is not "bias" for a judge to disregard claims that are not supported by any proof; it is just the common-sense and straightforward application of the movant's burden.

As for the other November 30 proffer, by Chad Atwell, Mr. Shelton's counsel—the Court did not disregard it. Mr. Atwell subpoenaed a witness for the hearing and proffered the testimony she would provide if permitted to take the stand. *See id.* at 79–80, 154–55. At the conclusion of the hearing, I met with counsel for all parties in chambers, off the record, to discuss the matter further. *See id.* at 155. During that discussion, I was persuaded to continue the trial for the specific purpose of conducting an evidentiary

16

hearing at which Mr. Atwell's witness would provide the proffered testimony. *See* Doc. 225. And we have spent the three months following that discussion getting to the bottom of the issues implicated by that proffer, including holding a *three-day* evidentiary hearing on the matter. That is the complete *opposite* of disregard.

Ultimately, then, I find no merit to any of Mr. Woods's arguments concerning unfair treatment. So this Opinion and Order will turn now to the final category of arguments in Mr. Woods's Motion to Disqualify: arguments concerning my relationship with Mr. Woods's former counsel, W.H. Taylor.

## C. W.H. Taylor

Mr. Woods observes in his Motion that before I took the federal bench on March 7, 2014, I spent my "entire legal career in private practice with the Fayetteville, Arkansas law firm of Taylor Law Partners, LLP," which is named after W.H. Taylor, who was, and is, a partner there. *See* Doc. 265, ¶¶ 3–4. Mr. Woods states that from around February 14, 2014, through perhaps around August 15, 2014, Mr. Taylor represented a man named Robert Cessario in a divorce proceeding. *See id.* at ¶ 5. Mr. Cessario is an FBI Special Agent who played a central role in the investigation of the instant criminal matter, and whose misconduct has become the subject of collateral proceedings in this case. Much more will be said about Agent Cessario in the Order immediately following this one. But for our purposes in this Order, it is enough to observe there is no indication that the divorce proceeding in which Mr. Taylor represented Agent Cessario had anything to do with the instant case. Mr. Woods retained Mr. Taylor to represent him in the instant matter around October 20, 2015, and later terminated Mr. Taylor's representation of him around March 25, 2016. *See id.* at ¶ 6.

As discussed at the beginning of this Opinion and Order, Mr. Woods brings this Motion under 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." But in a footnote to his Motion, Mr. Woods states that he "has no information about the personal relationship, if any, that Judge Brooks has with W.H. Taylor, nor is he aware [of] any financial interest Brooks may currently have with Taylor Law Partners, LLP or other entities." See Doc. 265, p. 2 n.2. And immediately following that statement, Mr. Woods cites to 28 U.S.C. § 455(b), which requires that a judge "shall also disqualify himself" in circumstances that include "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," see id. at § 455(b)(1), "[w]here in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it," see id. at § 455(b)(2), or where "[h]e knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding," see id. at § 455(b)(4).

Although Mr. Woods technically has not asked for recusal under § 455(b), I will nevertheless take this opportunity to make the record crystal-clear on this point, since Mr. Woods seems to harbor some uncertainty over that subsection's applicability. I have no financial interest in Taylor Law Partners, LLP, nor in the building that houses it, and have not had any such financial interest at any time since taking the federal bench. I have

18

*never* discussed this case with Mr. Taylor in *any* context whatsoever, other than the communication that occurred in court, on the record, in the presence of Mr. Woods and his counsel, while Mr. Taylor was testifying, under oath, at a January 10, 2018 hearing in this case, having been called to the stand to so testify by Mr. Woods. I do not socialize with Mr. Taylor, and I do not communicate with Mr. Taylor outside of court about unrelated topics any more or less frequently than with countless other members of the local bar. And to emphasize what should already be obvious from the dates provided above, I was not affiliated with Taylor Law Partners, LLP at any time while Mr. Taylor represented Mr. Woods in this matter. So recusal would not be warranted under 28 U.S.C. § 455(b) even if Mr. Woods had sought it.

But returning to § 455(a): Mr. Woods appears to offer two related arguments in support of his contention that my "impartiality might reasonably be questioned" with respect to Mr. Taylor's role in this case. The first argument concerns an *ex parte* hearing that was conducted before the undersigned on November 14, 2017, regarding the discoverability in this case of various prior communications between the Government and Mr. Taylor. *See* Doc. 265, ¶¶ 10, 25. The second argument concerns the fact that Mr. Taylor was a witness at a January 10, 2018 *in camera* hearing in this case, and might also be a witness at the trial in this case. *See id.* at ¶¶ 18, 25. Those two arguments will be addressed in that sequence, below.

### 1. The November 14, 2017 *Ex Parte* Hearing

On October 13, 2017, the Government filed an *ex parte* motion, asking this Court to review communications between the Government and Mr. Taylor that occurred mostly, but not entirely, during the time period when Mr. Taylor had represented Mr. Woods, and

to make a ruling under Fed. R. Crim. P. 16(d)(1) on whether the Government should turn any of those communications over to the Defendants. *See* Doc. 120. The Court neither solicited nor anticipated that motion, but there was certainly nothing improper about the Government filing it, nor would there be anything improper about any of the Defendants in this case filing a similar motion. And given the motion's filing, there was nothing improper about conducting an *ex parte* hearing on the matter. "A trial court may conduct an *in camera* review of disputed materials in order to determine whether they are subject to disclosure. For example, under Federal Rule of Criminal Procedure 16, a district court may appropriately conduct *in camera*, *ex parte* review of discovery materials to determine whether they must be disclosed to the defense." *United States v. Salgado*, 761 F.3d 861, 866 (8th Cir. 2014). The Court would do the same for Mr. Woods or any of his codefendants if appropriate; indeed, as already noted above, the Court had already permitted *Mr. Woods* to engage in *ex parte* proceedings several months earlier in this very case. *See* Docs. 60, 61.

At the November 14 *ex parte* hearing, the Court ruled that the vast majority of the subject materials were not discoverable because they had no relevance to any of the charges, defenses, or issues in this case. Every single communication that the Court ruled undiscoverable either pertained to completely unrelated cases, pertained to no case at all, or was banal discussion of when to calendar meetings between the attorneys in this case.

However, there were three materials that the Court ordered the Government to produce in discovery. One was a document that the Court believed might be a statement by Mr. Woods, rather than by Mr. Taylor. *See* Fed. R. Crim. P. 16(a)(1)(B). The Court

20

ordered the Government to produce this document to all three Defendants. The other two materials involved communications that had taken place between the Government and Mr. Taylor, about this case, *after* Mr. Taylor was no longer representing Mr. Woods. The Court ordered the Government to produce these materials to Mr. Woods, to explain to him how it came into possession of them, and to ask him whether he would object to them being shared with his codefendants. The Court also ordered the Government to inform Mr. Woods's codefendants generally that these materials existed and that they were not being produced at that time.

Mr. Woods raises four complaints about my role in these events. One is that the subject materials involved Mr. Taylor. *See* Doc. 265, ¶ 25. The second is that "the Court did not disclose the nature of this hearing to Woods after the filing of his Motion to Dismiss on November 29, 2017." *See id.* The third is Mr. Woods did not receive a transcript of the November 14 hearing until he requested it in his Reply in support of his Motion to Dismiss. *See id.* And the fourth, as best I can tell, anyway, seems to be that even though I explicitly expressed concerns on the record during the November 14 *ex parte* hearing about the propriety of the Government's communications with Mr. Taylor about this case after his representation had ceased, and even though I expressly stated on the record that I might summon the Government attorney who had engaged in these communications before the Court to answer questions about the matter, "[t]he Court has not opened the record for any further inquiry of" that attorney, Kenny Elser.

As for the first of these complaints, it is not at all clear to me how Mr. Taylor's connection to the November 14 *ex parte* hearing could give rise to an appearance of bias. The implicit argument seems to be that because I have known Mr. Taylor for many years,

21

and spent many years working with him, that I might make rulings in this case that are motivated by a desire to protect Mr. Taylor's reputation instead of by the requirement that justice be done. But I do not see how any reasonable observer could reach that conclusion, given that at that very November 14 hearing, I ordered the Government immediately to inform Mr. Woods of certain communications with Mr. Taylor that might appear improper. If that were an attempt at protecting Mr. Taylor's reputation, then it would have been an extremely poor one, given the entirely predictable consequence that Mr. Taylor's actions are now featuring prominently in two public judicial opinions—this one, and the one immediately to follow. But of course the undersigned's actions were no such attempt to protect Mr. Taylor. Rather, they were actions undertaken, against the wishes of the Government, to protect Mr. Woods's rights even though Mr. Woods and his counsel were not there to protect those rights themselves, and to provide Mr. Woods and his codefendants the opportunity to make a record about, and seek relief for, any potential infringements of their rights that might have occurred. And of course that is exactly what resulted.

As for the second, third, and fourth complaints, I find them to be—dare I say it—disingenuous, and without merit. At the time that counsel for Mr. Woods filed the Motion to Disqualify that is the subject of this Order, he knew full well that on the very next day, the Court was going to permit him to place both Mr. Taylor and Mr. Elser under oath and to require them to submit to examination about the very materials that the Court had ordered during the November 14 hearing should be disclosed to Mr. Woods. The Court had already ordered the Government to explain to Mr. Woods how it came into possession of these materials. The Government also discussed the nature of the November 14 *ex*

22

parte hearing in its Response to Mr. Woods's Motion to Dismiss. See Doc. 234, pp. 5–6. The Court then disclosed to Mr. Woods the relevant portions of the November 14 ex parte hearing's transcript as soon as Mr. Woods's counsel indicated his desire to view them, even though that request was inconspicuously buried inside a reply brief instead of in a separate motion. See Doc. 235, ¶ 12; Doc. 253. And counsel for Mr. Woods knew all of this at the time he filed his Motion to Disqualify. The Court is not a mind-reader, and I am not Mr. Woods's counsel in this case. But the Court nevertheless did a thorough and effective job of ensuring that Mr. Woods received the notice and opportunity to be heard to which he was entitled on these matters.

## 2. Mr. Taylor's Status as a Witness in This Case

As noted above, in addition to the arguments concerning the November 14 ex parte hearing, Mr. Woods also raises arguments concerning the fact that Mr. Taylor was a witness at a January 10, 2018 in camera hearing in this case, and might also be a witness at the trial in this case. See id. at ¶¶ 18, 25. Specifically, Mr. Woods argues that if I were to make credibility determinations about Mr. Taylor's testimony, then a reasonable person would consider there to be an appearance of bias. See id. at ¶ 25. I disagree. If the Court were to make credibility determinations about Mr. Taylor's testimony and to base those determinations on facts from outside these judicial proceedings, then that would likely give rise to an appearance of bias. But I have no intention of doing so, and will not do so. The Opinion and Order immediately following this one will make certain credibility determinations regarding Mr. Taylor's testimony at the January 10 hearing; but interested readers will not find any evidence in that Opinion of those credibility determinations being informed by, or based on, extra-judicial facts.

23

As for testimony that Mr. Taylor might offer at *trial* in this case—I do not understand what credibility determinations Mr. Woods expects the Court to make about any such testimony, or for that matter, why Mr. Woods would want to call his own former attorney to testify at trial at all. If Mr. Woods does call Mr. Taylor at trial, then it would seem to me that the *jury* would be tasked with assessing Mr. Taylor's credibility, not the judge. Perhaps Mr. Woods is envisioning some scenario in which the Court might be asked to make a threshold finding under Fed. R. Evid. 104(a) as to some piece of evidence's admissibility that depends in some way on Mr. Taylor's credibility, but I cannot imagine right now what that scenario could possibly be. Regardless, if for some reason the Court is called upon to assess Mr. Taylor's credibility at trial, then the Court will base any and all such credibility determinations solely on the facts that are presented to it in this judicial proceeding. Thus, recusal is not warranted. *See Liteky v. United States*, 510 U.S. 540, 554–55 (1994).

## IV. CONCLUSION

I have perhaps spilled more ink on this Opinion than is strictly necessary. After all, except for the issues surrounding W.H. Taylor, Mr. Woods's complaints seem to amount to little more than that the Court has made certain findings and rulings that are unfavorable to Mr. Woods or to his codefendants. It is well-settled black-letter law that "[a]dverse judicial rulings . . . 'almost never' constitute a valid basis for recusal; the proper recourse for a dissatisfied litigant is appeal." *See Dossett v. First State Bank*, 399 F.3d 940, 953 (8th Cir. 2005) (quoting *Liteky*, 510 U.S. at 555). Otherwise our judicial system could not function, for the obvious reason that for any given ruling in any given case there is usually at least one party who is dissatisfied with it. But I have nevertheless attempted to address

Mr. Woods's misgivings at rather great length, because it is important to me that Mr. Woods, his counsel, and any other interested member of the public understand that, in fact, this Court has taken great care in this case to protect Mr. Woods's rights, even to the point of identifying, and ordering that he be made aware of, potential infringements of his rights that, absent the undersigned's actions, Mr. Woods likely would never even have learned occurred.

I have also given Mr. Woods's counsel an extraordinary and personally unprecedented amount of indulgence for behavior that, simply put, is wildly inappropriate and among the rudest that any attorney has ever exhibited before me during my time on the bench. On the record, and with no apology or apparent remorse, counsel for Mr. Woods has used profanity, *see* Doc. 260, p. 23 ("I don't know how to do things half-ass."), employed vulgar euphemisms, *see* Doc. 295, p. 40 ("I would have told them to get bent."), and interrupted the Court so many times that I have been compelled to threaten him with sanctions if he would not stop, *see* Doc. 289, pp. 82–84. If Mr. Woods has never previously encountered the judicial system, then perhaps he does not understand or appreciate how indulgent the Court has been and how unacceptable his counsel's behavior has been at certain times. But his *counsel* surely knows from *personal experience* that other judges would tolerate far less from him than this one already has. *See, e.g., Benca v. Benton Cnty. Circuit Ct.*, 2013 Ark. 448 (affirming finding of contempt for repeatedly interrupting a judge). It is beyond my comprehension who Mr. Woods's counsel imagines his audience to be when he behaves in such a manner, or why he would think that he is doing himself or his client any favors by conducting himself that way.

I say all of this to emphasize two very important points in closing. *First*, this Court will continue, as it has throughout this case, to ensure that the rights of *all* parties, including Mr. Woods, are protected—regardless of how inappropriately their attorneys may behave from time to time. (More will be said on this particular point in the Order filed immediately after this one.) But *second*, this Court has no remaining tolerance for the sort of profanity, vulgarity, and disrespect that was described in the preceding paragraph. The courthouse is not a locker room. Let this statement serve as notice to all attorneys and parties in this case that any further instances of such behavior will likely be met with sanctions, up to and possibly including findings of contempt, with especial severity for such behavior that occurs within the presence of the jury at trial. Regardless of whatever indulgence the Court has shown thus far, I am firmly resolved that this trial will not be a circus. The parties in this case all have far too much at stake for such nonsense.

**IT IS THEREFORE ORDERED** that Defendant Jonathan Woods's Motion to Disqualify District Court Judge Timothy L. Brooks from All Proceedings in this Matter (Doc. 265) is **DENIED**.

**IT IS SO ORDERED** on this _2nd_ day of March, 2018.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE