# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                    **PLAINTIFF**

**V.**                            **CASE NO. 5:17-CR-50010**

JONATHAN E. WOODS;
OREN PARIS III; and
RANDELL G. SHELTON, JR.                                    **DEFENDANTS**

## MEMORANDUM OPINION

This is a criminal case in which the Defendants, Jonathan Woods, Oren Paris, and Randell Shelton, have been charged in a seventeen-count indictment[1] with conspiring to bribe Mr. Woods while he was a state senator in the Arkansas General Assembly. *See* Doc. 74. All three Defendants vehemently deny these charges, and have indicated that they will exercise their right to a speedy and public trial.

However, the last seven months of these proceedings have had very little to do with the substance of the Government's charges against the Defendants. Instead, this case has become consumed with numerous heated accusations of Governmental misconduct that the Defendants allege occurred during both the pre-indictment investigative process and the post-indictment discovery process. The Defendants have filed numerous motions on this topic, some of which the Court has already ruled on, and others of which are still awaiting decision. Over the last couple of months, the Court has conducted four days of evidentiary hearings on these issues, at which a great deal of

---

[1] Technically, the Court is referring here to the Second Superseding Indictment. And to be clear, although fifteen of the counts in that charging instrument are brought against all three Defendants, the other two counts are brought only against Mr. Woods.

exhibits and testimony have been received. Now that the Court has considered all of the arguments and evidence that have been received on these matters, it is prepared to rule on all of the motions that are still pending in this case, which will be done in this Opinion and its accompanying Order. Along the way, the Court will either reject or remedy, as appropriate, every instance of alleged Governmental misconduct that has not already been addressed by any prior rulings in this case.

Tomorrow this case returns to being about the seventeen charges that the Government has brought against these Defendants. The Defendants have pleaded not guilty and are presumed innocent. They will have the opportunity to hold the Government to its burden of proof at a public trial before a jury of their peers. That trial will begin a little over a month from now, on April 9, 2018.

## I. BACKGROUND

The charges in this case arise from a multi-year federal investigation into accusations of public corruption against certain Arkansas legislators. The General Improvement Fund ("GIF") was established by the Arkansas General Assembly, for the purpose of using leftover taxpayer dollars to fund projects at the community level. Lawmakers throughout the state had some amount of individual discretion to steer GIF funds to projects of their own choosing. For example, a legislator might direct a GIF grant to a rural volunteer fire department for the purchase of new equipment. But however noble that might sound in theory, the Arkansas Constitution prohibits the disbursement of public funds for purposes that are not distinctly stated in an appropriations bill. *See, e.g., Wilson v. Walther*, 2017 Ark. 270, at \*1–\*5, \*9–\*11. And according to the Government's

2

theory in this case, the GIF grant process was, in practice, ripe for abuse and a conduit for corruption.

The Government's investigation into these and related matters is still ongoing, and it extends beyond the individuals and acts that have been charged in this particular case. Among other things, the investigation involved the tracing of legislative acts, the making and approval of GIF grants on a regional level, and the ensuing paper trail of disbursements, receipts, and proof that all of the proceeds were used as authorized. This dragnet involved the collection of an enormous number of documents—a number that has been represented to the Court as extending into the millions. Of course, only some fraction of GIF grant transactions are suspected of involving corruption. And whatever that fraction may be, the transactions that underlie the charges in *this* case are a still smaller fraction of it.

As previously mentioned, Mr. Woods is a former state senator. Mr. Paris is the president of a bible college, and Mr. Shelton is a businessman. Essentially, the Government alleges that these three Defendants entered into a conspiracy under which Mr. Woods would cause GIF funds to be disbursed to Mr. Paris's college, but with a portion of those funds being funneled back through Mr. Shelton's business to Mr. Woods for his own personal use. The Government also alleges that there was a fourth member of this conspiracy—former state representative Micah Neal—who also received kickbacks from Mr. Paris through Mr. Shelton. Unlike the three Defendants in this case, Mr. Neal admits to the existence of this scheme and to his receipt of kickbacks under it. More than a year ago, in a separate criminal case before this Court, Mr. Neal entered a guilty plea to one count of Conspiracy to Commit Honest Services Mail and Wire Fraud, *see* Case

3

No. 5:17-cr-50001, Doc. 5, and he is expected to testify as a cooperating witness for the Government against these three Defendants at their trial in April.

Mr. Neal began cooperating with the Government in January of 2016, roughly a year before he was formally charged, and almost immediately after he first learned that he was facing potential criminal charges. Throughout the period of his cooperation, Mr. Neal has been represented by an attorney named Shane Wilkinson. At some point in March 2016, Mr. Neal decided to begin secretly recording his conversations with Mr. Woods and others. He made the Government aware of this decision, but he and the Government both maintain that it was his decision alone and that the Government never asked or directed him to make these recordings.

Beginning in November 2015, Mr. Woods also cooperated for some time with the Government's investigation, while he was represented by an attorney named W.H. Taylor. However, in March 2016, Mr. Woods fired Mr. Taylor, hired his current counsel, Patrick Benca, and stopped cooperating with the Government. Mr. Woods and his two codefendants were indicted on March 1, 2017, roughly two months after Mr. Neal entered his guilty plea. Their trial was originally set to begin on May 3, 2017. But on Mr. Woods's motion, the trial date was continued to December 4, 2017. *See* Docs. 57–58.

On July 31, 2017, Mr. Woods filed a Motion and Request for Hearing (Doc. 63), arguing that the Government violated his Sixth Amendment right to counsel by having Mr. Neal make secret recordings of conversations with Mr. Woods while it knew Mr. Woods was represented by counsel. The Government, as noted a couple of paragraphs above, denied having played any role in the making of those recordings. *See* Doc. 67, pp. 9–10. But the Court saw no need to resolve this factual dispute, because even if Mr. Woods's

view of the facts were correct, the Sixth Amendment right to counsel does not attach until adversarial judicial criminal proceedings have been initiated, which had not yet occurred when these recordings were made. *See* Doc. 72, pp. 2–3. So the Court denied Mr. Woods's Motion and Request for Hearing, *id.* at 4, and it likewise denied Mr. Woods's later Motion and Request for Reconsideration (Doc. 83) of that earlier ruling, *see* Doc. 128.

Meanwhile, on September 8, 2017, Mr. Paris filed a Motion to Suppress (Doc. 73), arguing, among other things, that this Court should suppress confessional statements that Mr. Woods proffered to the Government while he was still represented by Mr. Taylor. Mr. Paris argued that these statements of Mr. Woods were the product of coercion by his attorney, Mr. Taylor, who Mr. Paris insinuated was colluding with FBI Special Agent Robert Cessario to pressure Mr. Woods into giving false confessions. *See id.* at 7–13. The Court eventually denied Mr. Paris's Motion, *see* Doc. 128, but not before that Motion had prompted the Government to gather up every record of communication it had with Mr. Taylor during the relevant time period, present it all to the Court *ex parte* under Fed. R. Crim. P. 16(d)(1),[2] and request a ruling that none of it was discoverable by the Defendants in this case, *see* Docs. 120, 124.

---

[2] Mr. Shelton has filed a Motion for Disclosure of Ex Parte Communications, Court Filings, and Hearing Transcripts (Doc. 217), in which he complains of "a 'ghost docket' of ex parte court filings" that "has developed alongside the public docket sheet of pleadings and motions that have been filed in this matter." *See id.* at ¶ 2. He cites no law or authority explaining why he believes he is entitled to see any of these *ex parte* filings, and the Court is not aware of any either. Indeed, the whole *point* of filing something *ex parte* is to *restrict* other parties' access to it. The Federal Rules of Criminal Procedure explicitly permit and even *require* filings to be made *ex parte* under some circumstances, *see, e.g.*, Fed. R. Crim. P. 16(d)(1), 17(b), 49(a), and all such applicable Rules have been complied with in this case. Mr. Shelton's Motion for Disclosure is meritless, and it will be **DENIED**.

5

At an *ex parte* hearing on these materials, the Court ruled in the Government's favor with respect to the vast majority of the Government's proffered documents, finding that they were wholly irrelevant to the claims and defenses in this case, and therefore not discoverable. However, there were three documents with respect to which the Court ruled against the Government.

One such document was a written statement that had been provided to the Government while Mr. Taylor was still representing Mr. Woods. *See* Doc. 124, pp. 28–30. The Court ordered the Government to produce this statement to all of the Defendants, because although the Government had initially been under the impression it was a communication by Mr. Taylor, it appeared more likely to the Court that it was actually a statement by Mr. Woods himself that had been conveyed to the Government by Mr. Taylor while Mr. Woods was still cooperating. *See* Doc. 251, pp. 59–64; Fed. R. Crim. P. 16(a)(1)(B)(i).

Another document that the Court ordered the Government to produce was an email exchange between Mr. Taylor and the Government, after Mr. Taylor's representation of Mr. Woods had ended, about the source of Mr. Woods's payment of attorney fees to Mr. Taylor. *See* Doc. 124, p. 33. It appears that potential forfeiture implications were what motivated this exchange. *See* Doc. 284, pp. 66–68. The Court ordered the Government to produce this document to Mr. Woods only, and to inquire of him whether he objected to it being shared with his codefendants. *See* Doc. 251, pp. 65–68.

The third document that the Court ordered the Government to produce consisted of three pages of notes that were handwritten by Mr. Taylor, about Mr. Woods, while Mr. Woods was still cooperating with the Government. *See* Doc. 124, pp. 25–27. Mr. Taylor

had originally shown at least some of these notes in February 2016 to counsel for the Government, Kenny Elser, in the course of representing Mr. Woods. At that time, Mr. Taylor had also offered to give Mr. Elser a physical copy of those notes; Mr. Elser responded that he did not need a physical copy then, but that he would follow up with Mr. Taylor if his needs changed. That follow-up eventually occurred—but not until around October 2017, when the Government was gathering materials for the aforementioned *ex parte* motion, and long after Mr. Taylor's representation of Mr. Woods had ended. True to his word, Mr. Taylor then provided those notes to Mr. Elser. As with the forfeiture-related communications, the Court ordered the Government to produce these notes to Mr. Woods only, and to ask him whether he would object to them being shared with his codefendants. *See* Doc. 251, p. 57.

The Government complied with these orders, and upon receipt of the Government's discovery and inquiry, Mr. Woods responded that he would indeed object to any disclosure to his codefendants of Mr. Taylor's handwritten notes and communications with the Government about the source of Mr. Woods's attorney-fee payments. Shortly thereafter, Mr. Paris filed a Motion to Compel (Doc. 209) disclosure of these materials to him over Mr. Woods's objection, and Mr. Woods filed a Motion to Dismiss due to Prosecutorial Misconduct (Doc. 211).

Meanwhile, this case had also become embroiled in acrimonious disputes over whether the Government was fulfilling its discovery obligations. Many of those disputes are not worth recounting here, but certain disputes relating to Mr. Neal's secret recordings are relevant to the case's present posture. On November 2, 2016, the Government was given access to these recordings by Mr. Wilkinson's office, and in April 2017, the

Government turned copies of them over to the Defendants. On October 12, 2017, the Government provided the Defendants with redacted copies of text messages between Mr. Wilkinson and Agent Cessario. The Defendants' review of those text messages convinced them that there must exist some additional secret recordings by Mr. Neal that had not yet been turned over to them. In particular, the Defendants found specific references in those text messages to recordings of conversations that were not contained in any of the recordings they already possessed.

After the Defendants brought these discrepancies to the Government's attention, a Government lawyer relayed these concerns to Mr. Wilkinson, which set in motion a chain of events that eventually led to the discovery that Mr. Wilkinson's office indeed possessed additional recordings that had never come into the possession of any lawyers for any of the parties in this case, including the Government. This revelation occurred in November 2017, only a couple of weeks before trial, after Mr. Paris and Mr. Shelton had filed Motions to Dismiss of their own (Docs. 168 and 170, respectively), but before the Court had an opportunity to rule on those motions. The Defendants asked the Court to take the events surrounding the discovery of these additional recordings into account when ruling on their pending Motions to Dismiss, and eventually the Court and all parties agreed that it would be necessary to continue the trial date to April 9, 2018, in order to allow time for evidentiary hearings to be held on these matters. Now, roughly three months and several more dramatic developments later, the Court is satisfied that we have finally gotten, if not to the very bottom of these issues, then as close to their bottom as we can ever reasonably expect to get. Accordingly, the Court is now prepared to rule on all of the aforementioned motions: Mr. Paris's Motion to Compel, and all three previously

mentioned Motions to Dismiss filed by each of the Defendants. The Court is also prepared to rule on a related, supplementary Motion to Dismiss (Doc. 293) that was filed on February 20, 2018 by Mr. Woods.

## II. DISCUSSION

In the first subsection below, the Court will simultaneously consider Mr. Paris's Motion to Compel (Doc. 209) and Mr. Woods's first Motion to Dismiss (Doc. 211), as these two motions implicate overlapping issues. Then in the second subsection, the Court will deal with Mr. Woods's second Motion to Dismiss (Doc. 293), along with the Motions to Dismiss filed by Mr. Paris (Doc. 168) and Mr. Shelton (Doc. 170).

### A. Mr. Paris's Motion to Compel and Mr. Woods's First Motion to Dismiss

In Mr. Woods's first Motion to Dismiss, he argues that the Government violated his Sixth Amendment right to counsel[3] by obtaining the information from his former counsel, Mr. Taylor, that this Court subsequently reviewed *ex parte* and ordered the Government to disclose to Mr. Woods. As a reminder to the reader, these materials are: (1) a statement by Mr. Woods that Mr. Taylor emailed to the Government in February 2016, while Mr. Woods was still cooperating with the Government and still being represented

---

[3] Mr. Woods also mentions the Fifth Amendment in his first Motion to Dismiss, with reference to his "right to a fair trial," but in substance the Motion focuses exclusively on the Sixth Amendment. *See* Doc. 211, ¶ 8. His first Motion to Dismiss appears to contend that the scope of the Fifth Amendment right and infringement in this case is coextensive with that of the Sixth Amendment right and infringement in this case, and that the standard applicable to them is identical. *See id.* It is not clear to this Court what Fifth Amendment argument, if any, Mr. Woods is making in his first Motion to Dismiss that would exist independently of his Sixth Amendment argument. Accordingly, the Court will confine its analysis in this subsection to the Sixth Amendment. To whatever extent Mr. Woods is arguing, as in his *second* Motion to Dismiss, that the cumulative effect of governmental misconduct in this case has also infringed his right to Due Process, *see* Doc. 293, ¶ 1, that argument will be taken up in subsection II.B.3 of this Opinion.

by Mr. Taylor; (2) information about the source of Mr. Woods's attorney-fee payments that Mr. Taylor provided to the Government in April 2017, after he was no longer representing Mr. Woods; and (3) Mr. Taylor's handwritten notes about Mr. Woods that he first showed Mr. Elser in February 2016, while he was still representing Mr. Woods and while Mr. Woods was still cooperating with the Government, but that Mr. Taylor subsequently provided to Mr. Elser in October 2017, after he was no longer representing Mr. Woods and Mr. Woods was no longer cooperating with the Government. Mr. Woods asks the Court to remedy the alleged Sixth Amendment violation by either dismissing the indictment in this case, or by disqualifying the United States Attorney for the Western District of Arkansas from prosecuting it.

"To establish a sixth amendment violation, a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant, or created a substantial threat of prejudice." *United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986) (internal citations omitted). However, "a sixth amendment violation alone . . . does not require dismissal of the indictment. The interests supporting the sixth amendment right, meant to assure fairness in the adversary criminal process, must be reconciled with society's competing interest in prosecuting criminal conduct." *Id.* (internal citation omitted). Accordingly, "the appropriate course when faced with a sixth amendment violation is to tailor a remedy to the injury suffered, to assure the defendant effective assistance of counsel in a subsequent proceeding." *Id.* Thus, the question of *prejudice* and the question of *remedy* are separate questions, though the type of remedy that is appropriate will by necessity depend on the type of prejudice that was suffered.

10

Mr. Woods argues that a "per se Sixth Amendment violation, with presumed prejudice, occurs when the government purposefully intrudes into the defendant's 'attorney-client relationship and lacks a legitimate justification for doing so.'" *See* Doc. 211, ¶ 9 (quoting *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995)). He argues further that if he can establish a *prima facie* case of such purposeful intrusion without legitimate justification, then "the government has the burden to rebut the defendant's prima facie case." *See id.* at ¶ 10 (citing *Kastigar v. United States*, 406 U.S. 441 (1972)). And he contends that in doing so, the Government must rebut his *prima facie* case by "clear and convincing evidence." *See id.* at ¶ 12–13 (citing *Addington v. Texas*, 441 U.S. 418, 423 (1979)). The Court does not think that Mr. Woods is correct about any of this, at least so far as the Eighth Circuit and United States Supreme Court are concerned. For one thing, *Kastigar* simply does not say what Mr. Woods says it says, and *Addington* has nothing to do with the Sixth Amendment. For another, although this Court believes that Mr. Woods has accurately characterized *Shillinger*, that is a *Tenth* Circuit case; and *Eighth* Circuit precedent, which is binding on this Court, would seem to contradict it on this issue of presumed prejudice and *per se* Sixth Amendment violations. *See, e.g.*, *United States v. Kriens*, 270 F.3d 597, 603 (8th Cir. 2001) ("The burden . . . is on the *defendant* to show that the representation or the proceedings leading to his conviction were adversely affected by virtue of a Sixth Amendment violation in order to obtain a dismissal of the indictment." (emphasis added)).

However, the picture in the Eighth Circuit is admittedly muddy. For example, *Singer* acknowledges in *dicta* that in the Eighth Circuit "[i]t is certainly true that where there is *gross misconduct* on the part of the government no prejudice need be shown."

11

*See* 785 F.2d at 234 n.6 (emphasis added) (quoting *United States v. Davis*, 646 F.2d 1298, 1303 n.8 (8th Cir. 1981)). And *Singer* seems to indicate that whether "gross misconduct" occurred depends on whether the Government acted in "good faith." *See id.*

Ultimately, though, it makes no difference whether Mr. Woods is correct about the legal standard here, because assuming for the sake of argument that he is, this Court nevertheless finds by clear and convincing evidence that: (1) the Government, and more specifically, Mr. Elser, acted in good faith when obtaining the aforementioned information from Mr. Taylor; and (2) Mr. Woods has suffered no prejudice and no substantial threat of prejudice from the Government's acquisition of this information from Mr. Taylor. The basis for these findings is as follows.

On January 10, 2018, the Court held an *in camera* evidentiary hearing at which only Mr. Woods, his counsel, and the Government were present. At that hearing, Mr. Woods called his former attorney, Mr. Taylor, and lead counsel for the Government, Mr. Elser, to testify under oath.[4]

Mr. Taylor testified that he began representing Mr. Woods around October 28, 2015, and that Mr. Woods signed an agreement to proffer information to the Government a couple of weeks later, on November 11.[5] *See* Doc. 284, p. 22. He testified that Mr. Woods proffered additional information to the Government the following month in December. *See id.* at 23. Then, on February 10, 2016, Mr. Taylor met alone with Mr.

---

[4] Mr. Woods also called Agent Cessario to testify, but his testimony was very brief and unsupportive of Mr. Woods's claims, as counsel for Mr. Woods acknowledged afterwards during oral argument. *See* Doc. 295, pp. 68–70.

[5] A copy of that proffer agreement was received into evidence as Defendant's Exhibit 4 to the January 10, 2018 hearing, but an identical copy was previously placed in the record at Doc. 263-1.

Elser at the United States Attorney's office in Fayetteville, to discuss some additional matters that had come up at the end of a previous proffer by Mr. Woods. *See id.* at 28–29. Mr. Taylor recalled having told Mr. Elser at some point that with respect to those additional matters, Mr. Woods had not done anything wrong; and he also recalled Mr. Elser asking him to get more information from Mr. Woods to support this contention. *See id.* at 33–34. He could not remember whether that previous conversation with Mr. Elser occurred on January 29, 2016, but he conceded it might have. *See id.* at 35–37. But at any rate, Mr. Taylor remembered the February 10 meeting as being the occasion on which he followed up with Mr. Elser in person about these matters after having discussed them with Mr. Woods. *See id.* at 34.

According to Mr. Taylor, his handwritten notes which are presently at issue generally reflected the contents of these discussions with Mr. Elser and Mr. Woods. Specifically, they contained a list of loans that Mr. Woods received dating back to 2012. *See id.* at 12, 34–35. Mr. Taylor testified that some of the information or questions in the notes came from Mr. Elser, and some of the information in the notes came from Mr. Woods in response to the questions that Mr. Elser had posed to Mr. Taylor about these loans. *See id.* at 16–17, 38–40, 44–45, 53–54, 56–58. Mr. Taylor recalled showing these notes to Mr. Elser during the February 10 meeting in an effort to persuade Mr. Elser not to indict Mr. Woods for this additional conduct—an effort Mr. Taylor considers to have been successful, given that Mr. Woods was never charged for the conduct described in the handwritten notes. *See id.* at 34–35, 40–41. Mr. Taylor also testified that Mr. Woods had authorized him to share those notes with Mr. Elser at the February 10 meeting for the purpose of explaining to Mr. Elser why Mr. Woods should not be indicted for the conduct

described therein, *see id.* at 41, and that after the meeting with Mr. Elser he reported to Mr. Woods what had happened and that he believed it had gone well, *see id.* at 43. Mr. Taylor also recalled asking Mr. Elser during the February 10 meeting whether Mr. Elser wanted to keep a copy of the notes, and Mr. Elser responding, "No. If I need them, I'll get those from you later," though Mr. Taylor expressed uncertainty about the accuracy of his memory on this point. *See id.* at 42–43.

Finally, Mr. Taylor testified that he was contacted by Mr. Elser at some point after his representation of Mr. Woods had ended; he could not remember the date, but he conceded that it could have been in September or October of 2017. *See id.* at 9. During this communication, Mr. Elser asked Mr. Taylor if he would provide him a copy of these notes, and Mr. Taylor agreed to do so. *See id.* at 10–12. Mr. Taylor testified that he turned over a copy of the notes to Mr. Elser at that time, because he felt he had already been authorized to do so by Mr. Woods, and because there was no harm in giving it to the Government since he believed the notes had helped to persuade them that Mr. Woods had done nothing wrong with respect to their contents. *See id.* at 43–44, 51.

Like Mr. Taylor, Mr. Elser testified that Mr. Taylor first reached out to him on behalf of Mr. Woods in October 2015, *see* Doc. 285, pp. 5–6, that Mr. Woods signed a proffer agreement on November 11, 2015, *see id.* at 6–7, and that Mr. Woods then proffered information to the Government once that same month and once more in the following month of December, *see id.* at 7. Mr. Elser also testified that Mr. Taylor informed him in March 2016 that Mr. Woods had terminated Mr. Taylor's representation of him and would likely no longer cooperate with the Government. *See id.* at 15–16, 50.

Mr. Elser recalled Mr. Taylor showing him the handwritten notes before then, at their February 10, 2016 meeting, and he recalled Mr. Taylor offering to let him copy them at that time, but he could not recall whether he had actually made a copy. *See id.* at 9. Mr. Elser also recalled asking Mr. Taylor in October 2017 for a copy of the notes. *See id.* at 8–9. Mr. Elser testified that "the whole point" of the February 10 meeting was to discuss "what an additional proffer would look like and what Mr. Woods would say in that proffer." *See id.* at 11. He also testified that when he asked in October 2017 for a copy of the notes, he recalled that they generally reflected the contents of the February 10 discussion, and that Mr. Taylor had conveyed to him on February 10 that the subject activities did not involve any criminal wrongdoing; but beyond those generalities, Mr. Elser testified that he had not been able to recall very much at all about the notes' specific contents when he asked Mr. Taylor for a copy of them in October 2017, *see id.* at 11–14. Mr. Elser further testified that the reason he reached out to Mr. Taylor to obtain a copy of the notes was because he wanted to review them and provide them to the Court in anticipation of the possibility that Mr. Taylor might "have to testify regarding the entire course of conduct in dealing with Mr. Woods and the proffer," given that a Motion to Suppress was then pending that implied that Mr. Taylor had conspired with the Government to procure false confessions from Mr. Woods. *See id.* at 8, 14–17.

Importantly, Mr. Elser testified that from his review of the notes, he believes they contain a combination, on the one hand, of information and questions that were given by him to Mr. Taylor during a meeting on January 29, 2016, and on the other hand, responsive information that was subsequently given to Mr. Taylor by Mr. Woods, prior to the February 10 follow-up meeting. *See id.* at 22–24, 29–31, 36–38. According to Mr.

Elser, the notes describe a list of loans that, prior to the February 10 meeting, Mr. Elser believed Mr. Woods had taken out and not repaid, and that Mr. Elser had believed might have been bribes. *See id.* at 24–25. But after Mr. Taylor showed him the notes and explained that Mr. Woods would proffer that the loans described therein had been fully paid off and were not a *quid pro quo*, Mr. Elser did some more searching and obtained additional bank records indicating that the loans had indeed been fully repaid. *See id.* at 25. Mr. Elser testified that he obtained these bank records long before he ever obtained a copy of the notes from Mr. Taylor in October 2017, and that the Government turned these bank records over to the Defendants during discovery in this case. *See id.* at 26–27.

Mr. Elser's testimony on this point was further corroborated by documentary evidence. Government's Exhibit 2 to the January 10 hearing, which was received into evidence without objection, is a spreadsheet whose metadata shows that it was created on January 20, 2016, and last modified on January 29, 2016, at 12:31 p.m.—one hour before the aforementioned January 29 meeting began. *Compare id.* at 38–39 *and* Government's Exhibit 2 to the January 10, 2018 hearing *with* Doc. 284, pp. 35–36 *and* Government's Exhibit 1 to the January 10, 2018 hearing (indicating the January 29, 2016 meeting was scheduled to begin at 1:30 p.m.). This spreadsheet contains Mr. Elser's notes from before the January 29 meeting, summarizing the evidence and suspicions the Government possessed at that time about the aforementioned loans to Mr. Woods that were subsequently memorialized in Mr. Taylor's handwritten notes. *See* Doc. 285, pp. 40–41; Government's Exhibit 2 to the January 10, 2018 hearing. Mr. Elser testified that he never showed Mr. Taylor this spreadsheet during the January 29 meeting, but that he

did reference it and orally inform Mr. Taylor of its contents at that time. *See* Doc. 285, pp. 41–42. At the conclusion of the January 29 meeting, Mr. Taylor told Mr. Elser that he would meet with Mr. Woods, go over the questions that the Government wanted to ask, and then follow up with the Government about Mr. Woods's responses. *See id.* at 42. A comparison of the spreadsheet, *see* Government's Exhibit 2 to the January 10, 2018 hearing, with Mr. Taylor's handwritten notes, *see* Defendant's Exhibit 1 to the January 10, 2018 Hearing, shows that in both substance and organization the two documents are in fact extremely similar—except that Mr. Taylor's notes also include Mr. Woods's responses and Mr. Taylor's thoughts and follow-ups, which, again, both Mr. Elser and Mr. Taylor testified that Mr. Taylor showed to Mr. Elser during the subsequent February 10 meeting.

As can be seen from the foregoing discussion, Mr. Taylor's testimony and Mr. Elser's testimony were almost entirely consistent in all material respects. To the extent that the two men's testimony differed in any material way, the differences were not true conflicts, but rather simply the result of equivocation or uncertainty on the part of Mr. Taylor about particular dates or details. Mr. Elser's testimony was generally more specific and certain, and as already mentioned, it was corroborated by documentary evidence.

Given all of this, the Court makes the following factual findings by clear and convincing evidence. Mr. Taylor represented Mr. Woods from October 2015 through March 2016, and the Government was aware at all relevant times of Mr. Taylor's representation of Mr. Woods, as well as of the termination of his representation when it occurred. Mr. Woods signed a proffer agreement with the Government on November 11, 2015, and met at least twice with the Government in November and December 2015 to

17

proffer information. On January 29, 2016, Mr. Elser met with Mr. Taylor and informed the latter of questions and suspicions the Government had about certain loans that Mr. Woods had received. During that January 29 meeting, Mr. Taylor took handwritten notes on the Government's concerns and suspicions, and agreed to discuss them with Mr. Woods and then report back about what information Mr. Woods might proffer on those matters. On February 10, 2016, Mr. Elser and Mr. Taylor met again to discuss these matters, at which time Mr. Taylor showed Mr. Elser the aforementioned handwritten notes, which included his thoughts and Mr. Woods's responses to the Government's questions. Mr. Taylor did this in an effort to persuade the Government that Mr. Woods had not done anything illegal with respect to those matters.

Furthermore, in light of the November 11, 2015 proffer agreement and in light of Mr. Elser's knowledge that Mr. Taylor was representing Mr. Woods in this matter, it was reasonable for Mr. Elser to believe—and Mr. Elser did in fact believe—that Mr. Taylor was authorized by Mr. Woods to make the disclosures and representations that he made to the Government during the period when he represented Mr. Woods. And when Mr. Elser asked Mr. Taylor for a copy of those notes in October 2017, he did not believe he was asking for anything other than what he had already been shown, pursuant to Mr. Woods's prior authorization.

However, Mr. Elser should have anticipated the possibility that those notes might also contain materials that he had not been shown during the February 10 meeting, but that had been subsequently added. And since Mr. Elser's memory of the precise details of the notes was fuzzy at the time that he asked Mr. Taylor for a copy in October 2017, this concern should have been heightened in Mr. Elser's mind. Accordingly, Mr. Elser

should have gone through or included Mr. Woods's current counsel on his October 2017 request to Mr. Taylor, because to whatever extent the notes he was seeking might have contained material still subject to the attorney-client privilege or work-product doctrine, these privileges would have been Mr. Woods's to waive. *See, e.g.*, *Henderson v. United States*, 815 F.2d 1189, 1192 (8th Cir. 1987) ("[T]he attorney-client privilege belongs to and exists solely for the benefit of the client.").

But the Court also finds that although Mr. Elser *should have* anticipated the potential for his request to result in a disclosure of privileged materials, he in fact *did not* so anticipate. And because he *did not* so anticipate, the Court finds that although his decision to request these notes from Mr. Taylor in October 2017 without copying Mr. Benca was misguided and improper, his decision was nevertheless made in good faith. This finding of good faith is based in part on the Court's crediting of Mr. Elser's testimony about his motivations for making the October 2017 request. But relatedly, it is based in larger part on the fact that upon receiving Mr. Taylor's notes, the Government promptly turned them over to the Court, unsolicited, and asked the Court to rule on their discoverability. While still no excuse for going around Mr. Benca, such conduct is wholly inconsistent with what one would expect from someone who is attempting in bad faith to obtain information to which he is not entitled.

Furthermore, the Court finds that there is no prejudice or substantial threat of prejudice here, because Mr. Taylor's notes did not provide the Government with any new insight into the claims, defenses, or strategies in this case. Essentially, the notes simply convey that Mr. Woods denies any wrongdoing with respect to certain conduct that has

not been charged in this case. But the Government already knew that Mr. Woods denied such wrongdoing, because Mr. Taylor *told Mr. Elser so* on February 10, 2016.

Mr. Woods argues that prejudice nevertheless exists because the *explanation* in those notes for the absence of wrongdoing with respect to this uncharged conduct is a similar *explanation* to what he intends to argue at trial with respect to his charged conduct. But this insight is nowhere to be found inside the notes; it is simply one that Mr. Woods has volunteered of his own volition to the Court and to the Government, after the disclosure had already occurred, during oral argument on his Motion to Dismiss.[6]

Mr. Woods also argues that prejudice exists here because even if the information contained in the notes was already known to the Government, the notes nevertheless organized and collated that information in a manner that would make it easier for the Government to prepare for trial in this case. But, again, the notes appear to pertain exclusively to *uncharged* conduct. And regardless, and more importantly, the Government had already organized these issues in the same manner that appears in the notes *before* the notes were ever even created; indeed, as has already been found above, the notes are organized in the manner that they are, precisely because *that is how Mr. Elser originally presented the issues to Mr. Taylor* during their January 29, 2016 meeting.

The foregoing discussion has focused heavily on Mr. Taylor's handwritten notes, as they present by far the thorniest issues. But the reader will recall that there were two other pieces of evidence on which Mr. Woods based his Motion: (1) a statement by Mr.

---

[6] At the January 10, 2018 hearing, before any witnesses were called, the Court explained to counsel for Mr. Woods that if he needed to explain or prove information to the Court that was itself privileged and that the Government did not already know, then the Court would be willing to remove the Government from the room and permit him to make that presentation or argument outside of their presence.

Woods that Mr. Taylor emailed to the Government in February 2016, while Mr. Woods was still cooperating with the Government and still being represented by Mr. Taylor; and (2) information about the source of Mr. Woods's attorney-fee payments that Mr. Taylor provided to the Government in April 2017, after he was no longer representing Mr. Woods. But with respect to the former, the Court has already found above that Mr. Elser reasonably believed that Mr. Woods authorized Mr. Taylor to disclose this information in February 2016. And as for the latter, Mr. Woods's counsel conceded at oral argument that he has not suffered any prejudice from it. *See* Doc. 295, pp. 40–41.

Given the absence of bad faith and the absence of any prejudice or risk thereof, Mr. Elser's actions here are not a sufficient basis to warrant dismissing the indictment in this case. To do so would be wildly disproportionate to the facts at hand, supplying the strongest of medicines to cure a nonexistent harm. Likewise, the Court does not believe it would be appropriate to disqualify Mr. Elser or the United States Attorney for the Western District of Arkansas from prosecuting this case. The Court believes that the only sanction warranted here is an admonishment, given that Mr. Elser has already acknowledged through his co-counsel Sean Mulryne that, with the benefit of hindsight, it was improper not to copy Mr. Woods's current counsel on his October 2017 request. *See id.* at 48–49. Accordingly, Mr. Elser is formally admonished by the Court, and cautioned never again to fail to go through a represented defendant's attorney of record when seeking potentially privileged materials from that attorney's file.

But before ruling on Mr. Woods's first Motion to Dismiss, one last issue must be addressed. Mr. Woods's *second* Motion to Dismiss seeks to supplement his first Motion to Dismiss with evidence of additional, unrelated Governmental misconduct. That second

Motion to Dismiss asks the Court to dismiss the indictment on account of *cumulative* and *persistent* Governmental misconduct, *see* Doc. 293, ¶ 1, whereas his first Motion to Dismiss limited its justifications for dismissal to the matters already discussed above. Given this posture, the Court will **DENY** Mr. Woods's first Motion to Dismiss (Doc. 211) for the reasons stated above. But the Court will construe Mr. Woods's second Motion to Dismiss as incorporating all of his arguments and evidence in support of his first Motion to Dismiss, and the Court will consider them, and its findings and rulings thereon, as part of the larger universe of Governmental misconduct that Mr. Woods alleges in support of his second Motion to Dismiss.

Finally, turning to Mr. Paris's Motion to Compel (Doc. 209): that Motion will be **DENIED**. Mr. Paris asks the Court to compel the Government to turn over to him Mr. Taylor's handwritten notes, as well as the communications about the source of Mr. Woods's attorney-fee payments. But, as discussed above, neither of these documents has anything at all to do with Mr. Paris, much less with his charges or defenses in this case. Thus, although he speculates that they "may have a direct bearing on arguments heretofore made . . . in his Motion to Suppress and pending in his Motion to Dismiss," *see* Doc. 209, ¶ 4, this argument runs headlong into the same problem of standing that resulted in the denial of his Motion to Suppress: the rights Mr. Paris seeks to protect are not his own, but Mr. Woods's. *See* Doc. 154, pp. 1–2.

### B. All of the Defendants' Remaining Motions to Dismiss

There are three remaining motions to deal with now: the Motions to Dismiss filed by Mr. Paris (Doc. 168) and Mr. Shelton (Doc. 170), as well as Mr. Woods's second Motion to Dismiss (Doc. 293). In the first subsection below, this Opinion will discuss Mr.

Paris's Motion to Dismiss. The second subsection will deal with Mr. Shelton's Motion to Dismiss. And finally, the third subsection will take up Mr. Woods's second Motion to Dismiss, along with certain issues raised in Mr. Paris's and Mr. Shelton's Motions to Dismiss that overlap with issues raised in Mr. Woods's Motion to Dismiss.

### 1. Mr. Paris's Motion to Dismiss (Doc. 168)

Mr. Paris's Motion to Dismiss makes three categorical arguments in support of dismissing the indictment: (1) that 18 U.S.C. § 1346 is void for vagueness, *see* Doc. 168, pp. 56–59; (2) that the indictment fails to state an offense, *see id.* at 2–16; and (3) that the Government has committed prosecutorial misconduct, *see id.* at 16–56. The first of these arguments fails because the United States Supreme Court has explicitly held at least twice in the last eight years that 18 U.S.C. § 1346 is *not* unconstitutionally vague. *See McDonnell v. United States*, 136 S. Ct. 2355, 2375 (2016) ("First, he argues that the charges against him must be dismissed because the honest services statute . . . [is] unconstitutionally vague. We reject that claim."); *Skilling v. United States*, 561 U.S. 358, 412 (2010) ("Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague.").

The second of these arguments also fails. "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). An indictment need only "contain[] the elements of the offense charged, and sufficiently apprise[] the defendant of what he must be prepared to meet." *United States v. Tebeau*, 713 F.3d 955, 962 (8th Cir. 2013). "An indictment which tracks the statutory language is ordinarily sufficient." *Id.* (internal quotation marks

omitted). The 37-page indictment in this case easily passes that threshold, describing in rather minute detail a conspiracy under which the parties are alleged to have funneled cash kickbacks to Mr. Woods in exchange for his appropriation of state funds to a non-profit entity, which would plainly constitute violations of the charged statutes if proven beyond a reasonable doubt.

As for Mr. Paris's third argument, about prosecutorial misconduct—in large part, this argument simply restates the same arguments that this Court already rejected when raised in his Motion to Suppress (Doc. 73), as well as in Mr. Woods's Motions for Hearing (Doc. 63) and Reconsideration (Doc. 83). *See* Doc. 168, pp. 16–39. The Court rejects those arguments now for the same reasons it has repeatedly rejected them before, *see* Docs. 72, 128, 154, and it will not waste time repeating those reasons yet again here.

There are, however, two lines of argument with respect to alleged prosecutorial misconduct that are raised for the first time in Mr. Paris's Motion to Dismiss. The first concerns alleged improprieties with respect to the grand jury process, in terms of alleged "misrepresentations made to the grand jury," *see* Doc. 168, pp. 39–53, as well as an alleged "fail[ure] to disclose exculpatory evidence to the grand jury," *see id.* at 53–56. The Court has carefully reviewed every alleged "misrepresentation" raised in Mr. Paris's Motion, and concludes that all these allegations really only amount to the notion that Mr. Paris disagrees with the Government's theory of the case. Fine; that is what jury trials are for. He is perfectly free to argue his own theory of the case to the jury next month. And "[t]he government is not obligated to present exculpatory evidence in grand jury proceedings, . . . since 'the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge,' an undertaking

for which it 'has always been thought sufficient to hear only the prosecutor's side.'" *United States v. Darden*, 688 F.3d 382, 387 (8th Cir. 2012) (quoting *United States v. Williams*, 504 U.S. 36, 51 (1992)). Accepting Mr. Paris's argument on this point would not only require straying from ancient and binding Supreme Court precedent, but also would likely require dismissing almost every single felony case currently pending before this Court, not to mention other federal courts all over the nation.

The second line of argument raised for the first time in Mr. Paris's Motion to Dismiss actually appears in an Addendum thereto that he subsequently filed in response to late-breaking developments. *See* Doc. 254. This argument concerns alleged misconduct on the part of Agent Cessario, with respect to his role and actions surrounding the additional secret recordings by Mr. Neal that were discovered in November 2017, which has been the subject of three days of evidentiary hearings over the past couple of months. This argument has far more merit than any of the others that have been discussed so far, and will require much more extensive treatment in this Opinion. Because all three Defendants have raised substantially the same issues on this point, discussion of this particular matter will be reserved for the third subsection below which takes up Mr. Woods's Second Motion to Dismiss. But having explored and rejected all of Mr. Paris's other arguments, the Court turns now to Mr. Shelton's Motion to Dismiss.

## 2. Mr. Shelton's Motion to Dismiss (Doc. 170)

Mr. Shelton's Motion to Dismiss is premised entirely on alleged prosecutorial misconduct. Similarly to Mr. Paris's Motion to Dismiss, Mr. Shelton's Motion to Dismiss raises many arguments that this Court has previously rejected—specifically, when ruling on his Motions to Compel (Docs. 91, 129), on Mr. Woods's Motions for Hearing (Doc. 63)

and Reconsideration (Doc. 83), and on Mr. Paris's Motion for Contempt (Doc. 132). *See* Doc. 170, pp. 9–21, 32–37, 41–47. Again, the Court rejects these arguments for the same reasons as it did before, and will not fill this page with redundant explanations; instead, interested readers are referred to this Court's prior Orders at Docs. 72, 128, 150, and 154. However, Mr. Shelton's Motion to Dismiss also raises four arguments that were not previously raised: (1) that the Government tainted the grand jury proceedings in this case, *see* Doc. 170, pp. 21–32; (2) that the Government has selectively prosecuted Mr. Shelton on the basis of his political party affiliation, *see id.* at 37–41; (3) that the Government has violated the Hatch Act by pressuring Mr. Woods and Mr. Neal to drop out of political races, *see id.* at 5–9; and (4) that Agent Cessario and the Government engaged in certain misconduct surrounding the additional Neal recordings, *see* Docs. 218, 267, which, as noted above, was the subject of three days of evidentiary hearings over the past couple of months.

Mr. Shelton's arguments about the grand jury proceedings in this case rest in large part on accusations that the Government misrepresented facts to the grand jury or misled the grand jury about the law. *See id.* at 26–31. But as with Mr. Paris's similar accusations, these arguments really amount to nothing more than that Mr. Shelton disagrees with the Government's theory of the case. Again, that is what jury trials are for. Mr. Shelton also accuses the Government of having improperly excused a member of the grand jury, *see id.* at 31–32, but it is plain from the transcript that in fact this juror chose to recuse him or herself because of his or her relationship with one of the targets of this investigation. *See* Doc. 170-10, pp. 10–11.

Mr. Shelton also opines that Mr. Neal has provided false testimony in another, unrelated proceeding, and concludes that therefore the Government should not have called Mr. Neal as a witness before the grand jury in this case. *See* Doc. 170, pp. 22–26. But even assuming that Mr. Shelton is correct that Mr. Neal provided false testimony in an unrelated matter, Mr. Shelton's conclusion is a *non sequitur*. A prosecutor violates due process by *suborning* perjury, *see, e.g., United States v. Myers*, 503 F.3d 676, 682 (8th Cir. 2007), but there is nothing improper about calling a witness who simply happens to have told lies, even under oath, on other occasions about other matters. Indeed, the Federal Rules of Evidence explicitly contemplate that witnesses may be called at trial who have suffered prior *convictions* for crimes involving dishonest acts or false statements. *See* Fed. R. Evid. 609(a)(2).

As for Mr. Shelton's contention regarding selective prosecution on the basis of his political party affiliation—in essence, his argument is that: (1) Mr. Woods is a Republican; (2) at least one Democrat had the sort of financial relationship with Mr. Woods that Mr. Shelton is accused of having; and (3) that Democrat has not been prosecuted. *See* Doc. 170, pp. 39–41. Mr. Shelton asks the Court to speculate that this Democrat "was insulated" from prosecution "by his Democratic political contributions." *See* Doc. 170, p. 41. What this has to do with Mr. Shelton is hard to fathom.

Mr. Shelton states that "[t]he distinguishing characteristics of his relationship with Woods and Woods' political affiliation are impermissible grounds for his indictment in this matter." *See id.* But Mr. Shelton does not indicate that Mr. Woods's political affiliation was different when Mr. Woods engaged in financial transactions with Democrats. And it strikes the Court that, at least on the basis of the facts presently before it, a starkly

distinguishing characteristic of Mr. Shelton's relationship with Mr. Woods is that in *this* case there is a member of *this* alleged conspiracy who has entered a guilty plea and apparently intends to testify that *Mr. Shelton* delivered cash *bribes* to him as part of a conspiracy with Mr. Woods. *Compare* Case No. 5:17-cr-50001, Doc. 5, ¶¶ 2, 13 *with* Case No. 5:17-cr-50010, Doc. 74. Mr. Shelton identifies no such similar circumstance characterizing the Democrat's relationship with Mr. Woods, and that absence belies any contention on Mr. Shelton's part that the two are "similarly situated." *See United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004). Mr. Shelton's unsubstantiated allegations here fall far short of satisfying his evidentiary burden, which "is a heavy one." *United States v. Peterson*, 652 F.3d 979, 981 (8th Cir. 2011) (quoting *United States v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004)).

Turning now to the Hatch Act—this statute prohibits federal employees from "knowingly solicit[ing] or discourag[ing] the participation in any political activity of any person who . . . is the subject of . . . an . . . investigation, or enforcement action" by their office, and it further prohibits FBI agents, IRS criminal investigators, and employees of the Department of Justice's criminal division from "tak[ing] an active part in political management or political campaigns." *See* 5 U.S.C. § 7323(a)(4), (b)(2)(A), (b)(2)(B)(i), (b)(3). As noted above, Mr. Shelton claims that the Government violated the Hatch Act by pressuring Mr. Neal and Mr. Woods to drop out of races for elected office. These claims are almost as unsubstantiated as his claims of selective prosecution are.

Mr. Shelton offers two items of evidence on this point. The first is an affidavit from Mr. Woods's wife, who claims that she heard Mr. Taylor tell Mr. Woods that Mr. Elser told Mr. Taylor that Mr. Woods "should not run for re-election." *See* Doc. 170-3. Mr. Taylor's

out-of-court statement, being offered to prove the truth of its contents, is hearsay. *See* Fed. R. Evid. 801(c). But if we must weigh hearsay on this point, then it is undermined by Mr. Woods's own out-of-court statements to Mr. Neal, indicating that although he discussed with the Government how staying in or dropping out would impact the investigation, his decision not to run for reelection was ultimately his own and he was happy with his decision. *See* Government's Exhibit 2 and Paris's Exhibit 8 to Cessario Hearing (pp. 92, 139, 151–52, 155 – 57 of Paris transcript).

The only other piece of evidence offered by Mr. Shelton in support of his Hatch Act argument is a series of text messages between Mr. Neal's attorney, Mr. Wilkinson, and Agent Cessario. In these messages, Mr. Wilkinson indicates that *Mr. Neal wants* to drop out of his race, but is concerned about how that would impact the Government's investigation of Mr. Woods. *See* Doc. 170-5, pp. 14–15. Agent Cessario responds that he will "run it by Kenny [Elser]." *See* Paris Exhibit 4 to Cessario Hearing, p. 15. But Mr. Wilkinson and Mr. Neal both testified that Mr. Neal's decision to drop out of the race was his own, motivated by his desire to spend time with his family and run their restaurant, as well as by his belief that the voters should have the option of selecting from candidates who would be able to finish out their term if elected. *See* Doc. 288, pp. 130–31; Doc. 289, pp. 121–22. Viewing the evidence as a whole, then, these particular text messages are innocuous, were not initiated by the Government, and did not lead to any Government action violative of the Hatch Act.

As with Mr. Paris's Motion to Dismiss, then, we are finally left only with Mr. Shelton's argument about Agent Cessario's alleged misconduct surrounding the November 2017 discovery of additional Neal recordings. Like Mr. Paris, Mr. Shelton

29

raised this argument not in his initial Motion, but rather in a couple of Addenda thereto, *see* Docs. 218, 267, due to the late-breaking nature of these events. Having now considered and rejected all other arguments for dismissal that Mr. Woods, Mr. Paris, and Mr. Shelton have raised, it is time to take up these events, along with Mr. Woods's second Motion to Dismiss.

### 3. Mr. Woods's Second Motion to Dismiss (Doc. 293)

The reader will recall from Section I of this Opinion that in April 2017, the Government's lawyers turned over to the Defendants copies of secret recordings that Mr. Neal had made of conversations he had with Mr. Woods and others. And as previously described, in November 2017, after the Defendants expressed concerns to the Government about the possibility of missing or additional recordings, the Government and the Defendants learned only a couple of weeks before trial that Mr. Wilkinson's office did indeed possess additional secret recordings that Mr. Neal had made. The Defendants were concerned that these recordings might contain exculpatory evidence, and argued that the Government intentionally withheld the fact of these recordings' existence from the Defendants until very late in the process so as to prejudice their ability to prepare for trial. The trial was reset for April 9, 2018, in order to allow time for an evidentiary hearing on these matters.

The parties learned that a paralegal in Mr. Wilkinson's office named Karri Layton had uploaded the Neal recordings to a Dropbox account and had given Agent Cessario access to that account in early November 2016. The Government further learned that Agent Cessario had used a Government-issued laptop to access that Dropbox account. So in early December 2017, one of the Government's attorneys in this case, Aaron

30

Jennen, instructed Agent Cessario to have another agent deliver that laptop to an FBI forensic examiner in Little Rock named Timothy Whitlock, so that Agent Whitlock could search it for information relevant to this Dropbox activity in advance of the evidentiary hearing. But on December 12, Agent Cessario informed Mr. Jennen that instead of complying with these instructions, he had wiped the laptop and then delivered it to Agent Whitlock himself. And with that fateful act, there was suddenly a lot more on the agenda for the pending evidentiary hearing than this Court and the parties had originally anticipated.

The evidentiary hearing, which had initially been set for December 14, 2017, *see* Doc. 232, was reset for January 25, 2018, *see* Doc. 243. It ended up running not only into a second day, on January 26, *see* Doc. 281, but also a third, on February 15, *see* Doc. 291. Over the course of this three-day hearing, the Court received testimony not only from Agent Cessario, but from many other witnesses as well. The Court had two primary fact-finding objectives for this hearing. One objective was to determine when the Government first became aware of the Neal recordings that surfaced in November 2017, and what prejudice, if any, the Defendants had suffered from the timing of their disclosure. The other objective was to determine why Agent Cessario had wiped his laptop, what relevant information, if any, had been destroyed by that act, and what prejudice, if any, the Defendants had suffered from that act. In the first subsection below, the Court will make findings on the matter of the additional Neal recordings. In the second subsection below, the Court will make findings on the matter of Agent Cessario's laptop. Then, in the third and final subsection below, the Court will discuss the implications of those

findings for Mr. Woods's second Motion to Dismiss as well as for the Motions to Dismiss by Mr. Paris and Mr. Shelton.

But before making factual findings, the Court would make a few observations here about burdens and legal standards. The reader might recall that in Section II.A of this Opinion, dealing with Mr. Woods's first Motion to Dismiss, the Court made a variety of findings by clear and convincing evidence. The Court did so in the context of an alleged *Sixth* Amendment violation, which is not the issue here.[7] Furthermore it did so, despite believing that the legal standard in the Eighth Circuit does not actually impose that (or any) burden on the Government where a Sixth Amendment violation is alleged. But the Court nevertheless made its factual findings on that issue by clear and convincing evidence, out of an abundance of caution, because Mr. Woods had argued that standard should be imposed and because, regardless of whether he was correct on that point, the evidence was so lopsided that it easily supported those findings under that standard.

_____

[7] The one caveat is that Mr. Woods's second Motion to Dismiss also seeks to supplement the record on his prior Motions for Hearing (Doc. 63) and Reconsideration (Doc. 83), which had argued that the Government violated his Sixth Amendment right to counsel by having Mr. Neal make secret recordings of conversations with Mr. Woods while it knew Mr. Woods was represented by counsel. As the Court already described in Section I of this Opinion, those arguments were rejected because the Sixth Amendment right to counsel does not attach until adversarial judicial criminal proceedings have been initiated, which had not yet occurred when these recordings were made. *See* Doc. 72, pp. 2–3. That was a ruling of *law* that did not depend on any factual findings other than the wholly uncontroversial one that Mr. Woods had not yet been indicted, or even so much as arrested, at the time the recordings were made. The fundamental point then was that there is no utility in holding an evidentiary hearing on the factual question of whether Mr. Neal's secret recordings of Mr. Woods were made at the direction of the Government, given that even if the answer to that question were "yes," this would not be a Sixth Amendment violation. That is no less the case now than it was then. So to the extent that Mr. Woods's second Motion to Dismiss seeks to supplement the record on his prior Motions for Hearing (Doc. 63) and Reconsideration (Doc. 83), it will be **DENIED**, and that denial does not depend in any way on any factual findings made anywhere in this Opinion.

However, the present issues do not concern the *Sixth* Amendment; instead, they concern the *Fifth* Amendment's due-process clause. When a defendant moves for dismissal of an indictment on the grounds that outrageous governmental conduct denied him due process, the defendant has the burden of proof. *See United States v. Larsen*, 427 F.3d 1091, 1094–95 (8th Cir. 2005). "Because the drastic step of dismissing an indictment is a disfavored remedy, a district court may properly dismiss an indictment only if the prosecutorial misconduct (1) was flagrant, and (2) caused substantial prejudice to the defendant." *United States v. Manthei*, 979 F.2d 124, 126 (8th Cir. 1992) (quoting *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988)) (internal alterations omitted). "The Supreme Court, in addressing governmental misconduct, held 'absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.'" *Id.* at 127 (quoting *United States v. Morrison*, 449 U.S. 361, 365 (1981)) (internal alterations omitted). If a Fifth Amendment violation can be remedied by some lesser sanction that is more proportional to the harm, such as exclusion of evidence, then that is preferable to "barring the prosecution altogether." *See United States v. Blue*, 384 U.S. 251, 255 (1966). "So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book." *Id.*

### a. Findings on the Matter of the Additional Neal Recordings

The Court finds that the Government did not become aware of the additional Neal recordings until November 2017, when it likewise made the Defendants aware of their existence. The Court also finds that the Defendants have not suffered any prejudice from

the timing of the Government's disclosure of those additional recordings' existence. The second of these findings is very simple to explain: soon after the recordings were discovered, the trial date was continued for four months, giving the Defendants ample time to review those recordings and to adjust their trial strategies accordingly if they wished.

As for the former finding, it is based on the following evidence. Mr. Neal, Mr. Wilkinson, and Agent Cessario all testified that Mr. Neal made the secret recordings of his own initiative. See Doc. 288, pp. 114–15, 117, 282–83; Doc. 289, pp. 99–100. Mr. Neal testified that while he was making the recordings, from time to time he would deliver them to Ms. Layton for safekeeping, and that he did not believe, at the time he was making the recordings, that the Government was interested in them. See Doc. 289, pp. 114, 124. Ms. Layton testified that she initially stored all of the Neal recordings on her work computer. See Doc. 288, pp. 38–40.

Agent Cessario and his supervisor, Supervisory Special Agent Brenan Despain, both testified that the FBI was not interested in the Neal recordings and did not intend to use them in their investigation, because those recordings were not made with the type of controls that the FBI prefers to employ when using confidential informants to make covert recordings. See Doc. 288, pp. 282–83, 289–90; Doc. 289, pp. 311–12. But they also testified that since they were aware that the recordings were being made, they were nevertheless eventually instructed by the Government's lawyers to collect them from Mr. Wilkinson, so that copies of them could be turned over to these Defendants in discovery. See Doc. 288, pp. 315–16; Doc. 289, pp. 311–12. Ms. Layton testified that on November 2, 2016, she uploaded a batch of Neal recordings to a Dropbox account in order to share

them with Agent Cessario, and that she then uploaded a second batch to Dropbox on November 28, 2016. *See* Doc. 288, pp. 40, 59. Mr. Wilkinson and Ms. Layton both testified that none of the Neal recordings were ever shared with Agent Cessario before Ms. Layton gave him access to the Dropbox account on November 2, 2016. *See id.* at 40–41, 57–59, 116. Dropbox logs confirm all of this testimony, and do not show any records of activity on that Dropbox account by Agent Cessario between November 3, 2016 and the time when the Government became aware of the additional recordings' existence a year later. *See* Government's Exhibit 1 to the Cessario Hearing. Text messages between Agent Cessario and Mr. Wilkinson on March 22, 2017, indicate that Agent Cessario was having difficulty accessing the Dropbox account and held an incorrectly low belief about the number of recordings that were stored on it—an error that went uncorrected by Mr. Wilkinson, who was on vacation at the time and preoccupied with his ski trip. *See* Paris's Exhibit 1, p. 37–38.

Importantly, Dropbox logs show no instances of Agent Cessario deleting files, and they show no instances of Agent Cessario adding any unique files. *See* Government's Exhibit 1 to the Cessario Hearing. Just as importantly, the ZIP files' metadata indicate that the Neal recordings have not been modified at any point since the moment the files were originally created. *See* Government's Exhibit 8 to the Cessario Hearing.

From all of the foregoing evidence, the Court believes the most plausible inference is that until November 2017, Agent Cessario—and the rest of the Government's team through him—mistakenly believed that on November 3, 2016, he had obtained all existing Neal recordings. Accordingly, the Court also believes that until November 2017, the Government was not aware of any Neal recordings other than the ones it provided to the

35

Defendants in April 2017, which Agent Cessario had obtained from the Dropbox account on November 3, 2016. With these findings out of the way, the Court will turn now to the matter of Agent Cessario's laptop wipe.

### b. Findings on the Matter of Agent Cessario's Laptop

On November 30, 2017, Mr. Jennen began discussing with Agent Cessario the need to have his laptop forensically examined. See Doc. 290, pp. 17–18. On December 1, Agent Cessario had a phone conversation with Agent Whitlock about what the examination would entail. See Doc. 289, p. 212. At some point during discussions with the Government's attorneys about what useful information might be obtained from the laptop, Agent Cessario told them that he had previously wiped its hard drive several times in 2017. See Doc. 267-1. On December 5, Agent Cessario repeated this claim to Agent Whitlock during a phone conversation. See Doc. 289, pp. 213–14. This representation was false; in fact, he had never wiped the laptop prior to December 4. Agent Cessario testified at the hearing that when he told the Government's attorneys and Agent Whitlock he had previously wiped the laptop twice in 2017, he had mistakenly used incorrect terminology, and that the incidents he had meant to refer to were: a time in January 2017 when he cleared his internet browser cache in order to get rid of malware that was causing annoying pop-up ads, and a time in the summer of 2017 when he uninstalled some video games that his children had been playing on the laptop. See Doc. 290, pp. 27–32.

The Court does not find this testimony credible. The Court does not believe that Agent Cessario did not know the difference between wiping a hard drive and clearing a browser's cache or uninstalling video games, given that on December 4 and then again on December 7, Agent Cessario actually *did* wipe the laptop, not only once, but twice.

And more importantly, even if Agent Cessario did not understand what it means to wipe a hard drive, he surely understood that clearing a browser cache and uninstalling video games are not the sort of activities that would necessarily prevent Agent Whitlock's pending forensic examination from yielding any fruit. The Court believes that Agent Cessario lied to the Government's attorneys and to Agent Whitlock, and the Court believes that Agent Cessario lied on the stand about why he had claimed in those conversations to have previously wiped his laptop in early and mid-2017.

On December 4, after receiving an email from Mr. Jennen instructing him to give his laptop to another agent for delivery to Agent Whitlock for forensic examination in Little Rock, Agent Cessario took the laptop to a computer service shop in his neighborhood, and paid a technician there to wipe the hard drive. *See* Doc. 288, pp. 230–33; Doc. 290, pp. 19–20. He received a discount for the service, because he asked them not to reinstall the operating system. *See* Doc. 289, pp. 176–77. On the morning of December 7, Agent Cessario wiped the laptop again himself, and then drove down to Little Rock to personally deliver the laptop to Agent Whitlock. *See id.* at 218–19. Upon delivering the laptop to Agent Whitlock, he did not inform Agent Whitlock that he had wiped it that morning. *See* Doc. 288, pp. 297–98. In fact, Agent Cessario did not tell *anyone* about the wipes on December 4 and 7 until he was confronted with evidence of them. *See* Doc. 288, pp. 298–99; Doc. 289, pp. 221–22; Doc. 290, p. 19. Because of the wipes, Agent Whitlock's forensic examination of the laptop did not yield any information. *See* Doc. 289, p. 230.

When testifying, Agent Cessario was asked whether, when he decided to wipe the laptop, he contemplated the potential that he might face consequences for obstructing justice if he carried through with the decision. *See* Doc. 290, p. 16. He responded that

he did. *See id.* When asked why he decided to face that risk anyway, he responded that he had previously stored medical records on that laptop, pertaining to sensitive medical issues of his own and of an immediate family member's. *See id.* at 8–12, 36–38. He explained that he was very frightened by the possibility that these records might eventually end up in the newspapers unless he wiped the laptop. *See id.* at 16–17.

The Court does not find this testimony credible either. The Court has reviewed the medical records that Agent Cessario claims motivated his decision to wipe the laptop. *See* Government's Exhibit 3 to Cessario Hearing. The Court will not detail here the medical issues that they describe, because they are indeed sensitive and potentially embarrassing. But the Court nevertheless finds it extremely implausible that Agent Cessario considered their small likelihood of being publicized so frightening as to justify taking on a significant risk of losing his job and potentially even facing prison time. As sensitive and potentially embarrassing as they are—and the Court in no way means to minimize that here—they simply are not *that* embarrassing, at least not to any reasonable person.

Furthermore, it is important to note Agent Cessario's testimony about why the medical records were ever on the laptop in the first place. He testified that he had scanned and saved some of them to the laptop in September 2017, in order to share them with an attorney who, at Agent Cessario's request, was considering whether to file a medical malpractice lawsuit on his behalf. *See* Doc. 290, pp. 11–13. So it would seem that Agent Cessario was not nearly so concerned in September 2017 about the risk of this information ending up in the public record as he claimed to be two months later.

Finally, the Court finds it very telling that Agent Cessario never once raised his concerns about the medical records with Agent Whitlock, his supervisor, or any of the Government's attorneys on this case before he wiped his computer—not even in a vague or general way that could have avoided getting into any of the potentially embarrassing details. *See id.* at 18. Instead, he simply lied to the Government's lawyers and Agent Whitlock about having previously wiped the laptop, then actually wiped the laptop, and *then* offered the medical records as a *post hoc* explanation for what he had done. This is not the behavior of a man who is trying to avoid public embarrassment; indeed, it practically *begs* for the spotlight. During closing argument, Mr. Jennen observed that Agent Cessario's explanation sounds like burning down the house when you don't like the drapes. The Court thinks that analogy is very apt. There was certainly *something* on that laptop that Agent Cessario was willing to risk his job, public reputation, and liberty to ensure that it never saw the light of day. But whatever it was, it was not these medical records. Far more likely, in this Court's mind, is that it was something that posed an even *greater* risk to his job, public reputation, and liberty than was posed by his decision to wipe the laptop.

So what was it? Frustratingly, we will probably never know. The Defendants insist that it must have been something related to this case. They point out that Agent Cessario used the laptop for at least one activity in this investigation (downloading the Neal recordings from Dropbox), that he testified he had never used the laptop for any other case, and that Agent Whitlock had been instructed to search the laptop for materials relevant to this particular case. In his second Motion to Dismiss, Mr. Woods argues that "[w]hile we can only speculate as to what evidence was destroyed on the investigator's

computer—no speculation is required to determine that it was so damaging to the government's case that its own investigator purposefully destroyed it, despite knowing that it could result in the end of his career, and possibly the end of his freedom." (Doc. 293, ¶ 3).

But Mr. Woods *is* speculating here. It is very easy to imagine possible explanations that have could have nothing whatsoever to do with this case. Perhaps there was contraband on the laptop. Perhaps there was evidence he had embezzled money. Perhaps there was evidence he was extorting someone. Perhaps there was evidence he had committed misconduct in some *other* investigation. Of course these possibilities are all pure speculation, grounded in no facts whatsoever, but they are no more speculative than Mr. Woods's theory.

Indeed, the Defendants' theories here seem especially *un*likely to the Court. Why would Agent Cessario so brazenly risk his job, public reputation, and liberty simply to prevent the Defendants from obtaining information that was "damaging to the government's case"? Everyone, even the Government, loses cases from time to time; but life goes on. Of course this is not to say the Court believes *no* cop would ever obstruct justice simply to win a case; but if that were Agent Cessario's motive, then the Court would expect him to have been much more furtive about it than he was here. The Court believes that Agent Cessario fully understood the risks he was running by wiping the laptop, and the Court believes that Agent Cessario is a reasonable enough man to understand that winning this case is not worth those risks—just as the Court believes that Agent Cessario is a reasonable enough man to understand that protecting medical records is not worth those risks either.

40

The Court will certainly grant the theoretical possibility that the laptop might have contained evidence of some sort of wrongdoing by Agent Cessario that relates to this case. But although the Court has tried to imagine what such wrongdoing might be, and what prejudice the Defendants could suffer by not obtaining evidence of it, the Court has been unable to come up with any plausible scenarios. Surely he was not falsifying the financial and legislative records on which the Government will rely at trial, given that the parties will simply subpoena the undoctored originals from the institutions that maintain them.

The Defendants have speculated that perhaps the laptop contained more secret recordings by Mr. Neal that have not yet been discovered and that might have been exculpatory. But there is no testimony or documentary evidence anywhere in the record to support the proposition that Mr. Neal was, for some inexplicable reason, going behind the back of not only the Government's attorneys but also his *own* attorney in order to provide Agent Cessario secret recordings of which no one else would ever learn. And even if this were happening, it simply makes no sense to imagine that Agent Cessario would assume such enormous personal risk by destroying such recordings, given that this Court had already ruled, several times, in accordance with well-settled law, that it would have been perfectly legal for Mr. Neal to have been making such recordings at Agent Cessario's direction in the first place.

During closing arguments, counsel for Mr. Shelton speculated in this vein that perhaps Agent Cessario used Mr. Neal's iCloud account to hack Mr. Neal's iPhone, remotely install a recorder app on it without Mr. Neal's knowledge or consent, and then secretly record Mr. Neal's conversations with others, saving these recordings to the

infamous laptop. The evidentiary basis for this theory was: that Mr. Neal voluntarily gave Agent Cessario his iCloud password; that one time after doing so, Mr. Neal received a notification that someone had logged into his iCloud account; and that when Mr. Neal had Mr. Wilkinson ask Agent Cessario whether that someone was with the FBI, Agent Cessario said it was not. See Paris's Exhibit 4 to Cessario Hearing, p. 17. This theory imagines a Rube Goldberg machine of investigative techniques, as breathtakingly complex as they are profoundly pointless. Why hack the iPhone of a confidential informant who has already given you his iCloud password? Why waste time haphazardly hitting the "record" button from afar and hoping that someone happens to be saying something important at the time, when you could simply ask your confidential informant to wear a wire?

And even if such extra-secret recordings existed, and even if Agent Cessario destroyed them not out of fear for his own welfare but rather simply out of altruistic concern for the welfare of the Government's case—what exculpatory evidence could they possibly have contained that would have been so damaging to the Government's case as to warrant his taking on such immense personal risk? The Government had *already* *turned over* recordings of Mr. Woods denying any wrongdoing, so it is very difficult to believe that Agent Cessario would be motivated to destroy more of the same.

In his second Motion to Dismiss, Mr. Woods argues that "we know" Agent Cessario "did not wipe his computer because of contraband, because [he] testified that he frequently allowed his children to play games on it," and that "we know the evidence destroyed had to be for this case, because [he] testified that the only case on his computer was this one." (Doc. 293, ¶ 3). But this argument gives far too much credence to the

testimony of a man whose credibility is in tatters, on the very topic where his incentive to lie is the strongest. It also sidesteps the fact that if troubling content is hanging out in unallocated space on a laptop's hard drive, then an FBI forensic examiner may well stumble across it, even though a child playing video games almost certainly would not. The bottom line is this: Agent Cessario committed intentional misconduct when he wiped the laptop, but there is no evidence in the record to show, and no good reason to believe, that he destroyed any information that is material to the charges and defenses in this case but not already in the Defendants' possession.

### c. Implications for the Defendants' Motions to Dismiss

The Second Circuit put the issue very well when it wrote that:

> the venality of individual agents does not necessarily affect the reliability of the government's evidence in a particular case or become relevant to the adjudication of every case in which the agents participated. Courts are obligated to ensure that probative evidence is disclosed to the defense, carefully evaluated by the court for its materiality to the case, and submitted for the jury's consideration where admissible. But courts must also take care that wrongdoing by investigators that has no bearing on the matter before the court not be used as a diversion from fairly assessing the prosecution's case.

*United States v. Ulbricht*, 858 F.3d 71, 105 (2d Cir. 2017). Here, we cannot quite say that Agent Cessario's wrongdoing has *no* bearing on the matter. After all, the laptop he wiped was meant to be examined for information that might be introduced at an evidentiary hearing in this case.

But as noted above, notwithstanding the wiping of the laptop, the Court has been able to get to the bottom of the matter for which that evidentiary hearing was originally set: the Court has concluded that the Government did not know about the additional Neal recordings until November 2017, and that the Defendants have not been prejudiced by

43

the late discovery of those recordings. *See* Section II.B.3.a, *supra*. Moreover, the Defendants have not shown that they have suffered any prejudice or substantial risk of prejudice from the wiping of the laptop. *See* Section II.B.3.b, *supra*. Therefore, "dismissal of the indictment is plainly inappropriate" here. *Manthei*, 979 F.2d at 127.

Mr. Woods urges the Court to dismiss the indictment even if no individual instance of misconduct would warrant dismissal when considered in isolation. *See* Doc. 293, ¶ 1. It is certainly true that "[f]actors to consider in assessing prejudice include the *cumulative* effect of any misconduct[.]" *United States v. Tulk*, 171 F.3d 596, 599 (8th Cir. 1999) (emphasis added). But although over the course of this case the Defendants have lodged myriad *accusations* against the Government of pretty much every conceivable form of misconduct, this Court has found only two instances of impropriety that actually occurred: one made in good faith, *see* Section II.A, *supra*, and one that was a flagrant and intentional wrong, *see* Section II.B.3.b. And the prejudice resulting to the Defendants from each of them was nil. So when it comes to assessing cumulative prejudice in this case, zero plus zero equals zero. Accordingly, Mr. Paris's Motion to Dismiss, Mr. Shelton's Motion to Dismiss, and Mr. Woods's second Motion to Dismiss will all be **DENIED**.

### III. CONCLUSION

The question remains, though, whether some sanction short of outright dismissal is warranted by Agent Cessario's conduct. After all, although Mr. Elser's conduct was not characterized by bad faith, Agent Cessario's certainly was. Thus, even if the Defendants cannot show that he destroyed material exculpatory evidence, they can still make out a violation of their due process rights if they can show that he destroyed "potentially useful

evidence." See Illinois v. Fisher, 540 U.S. 544, 547–48 (2004) (quoting Arizona v. Youngblood, 488 U.S. 51, 58 (1988)). In Fisher, Chicago police, "acting in accordance with established procedures," destroyed a substance that had been seized from the defendant during a traffic stop and that had tested positive for cocaine four different times. See 540 U.S. at 545–46. The Supreme Court held that this substance "was plainly . . . 'potentially useful evidence,'" rather than "material exculpatory evidence," because "[a]t most, respondent could hope that, had the evidence been preserved, a *fifth* test conducted on the substance would have exonerated him." See id. at 548 (emphasis in original).

The Court believes that under this precedent, the information on Agent Cessario's laptop about the Dropbox account constituted potentially useful evidence. Since Agent Cessario destroyed it in bad faith, that constitutes a Fifth Amendment violation. Given the Supreme Court's admonition that sanctions for Fifth Amendment violations should be "proportional to the harm," see Blue, 384 U.S. at 255, this Court believes that the following sanctions are appropriate here. First, the Government may not introduce in its case-in-chief at trial any covert recordings that were made by Micah Neal. Second, the Government may not call FBI Agent Robert Cessario as a witness in its case-in-chief at trial.

There may be readers of this Opinion who will feel that this Court, by declining to dismiss the indictment, is somehow allowing Agent Cessario—and by extension, the Government—to "get away with" bad conduct. The Court would emphasize here that it does not condone Agent Cessario's actions; it finds them reprehensible. But the public does not forfeit its interest in seeing crime prosecuted simply because one Government

agent happened to engage in bad conduct along the way. Agent Cessario's actions are currently being investigated by the FBI's Office of the Inspector General. *See* Doc. 289, p. 312. And depending on the results of that investigation, he may face criminal charges. *See id.* at 200.

But those are not the crimes that have been charged in *this* case. The grand jury has issued an indictment against these Defendants. The public has an interest in seeing that indictment prosecuted, just as the Defendants have an interest in holding the Government to its burden of proof at trial. Every party to this case is going to have its day in court.

A separate Order will accompany this Opinion, setting out in unadorned fashion the rulings and relief described herein. With the entry of that Order, all pending motions in this case will be resolved. It is time to return our focus to the central issues in this case. Trial will begin on April 9, 2018.

**IT IS SO ORDERED** on this _2nd_ day of March, 2018.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE