US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

JUL 2 5 2018

DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                    **PLAINTIFF**

**V.**                              **CASE NO. 5:17-CR-50010**

JONATHAN E. WOODS;
OREN PARIS III; and
RANDELL G. SHELTON, JR.                                     **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Currently before the Court are:

- Defendant Jonathan E. Woods's Motion for Judgment of Acquittal under Fed. R. Crim. P. 29 or New Trial under Fed. R. Crim. P. 33 (Doc. 395) and Brief in Support (Doc. 396), and the Government's Response in Opposition (Doc. 403); and

- Defendant Randell G. Shelton, Jr.'s Motion for Judgment of Acquittal, or in the Alternative, a New Trial (Doc. 392) and Memorandum Brief in Support (Doc. 397), and the Government's Response (Doc. 402).

For the reasons given below, both Motions are **DENIED**.

### I. BACKGROUND

Jonathan Woods, Oren Paris, and Randell Shelton were charged in a Second Superseding Indictment with, respectively, seventeen, fifteen, and fifteen felony counts related to public corruption schemes. *See* Doc. 74. Mr. Paris entered a guilty plea to one of those counts on April 4, 2018. *See* Doc. 321. Nearly a month later, on May 3, a jury convicted Mr. Woods and Mr. Shelton at trial on fifteen and twelve of the felony counts against them, respectively. *See* Doc. 378. Now, Messrs. Woods and Shelton ask this

1

Court to enter judgments of acquittal on all the counts charged against them, notwithstanding the jury's verdict. Alternatively, they ask this Court to grant them a new trial. The Government opposes these Motions, which are now ripe for decision.

## II. LEGAL STANDARD

Fed. R. Crim. P. 29(a) requires the Court, on a defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." However, "a district court has very limited latitude to do so and must not assess witness credibility or weigh evidence, and the evidence must be viewed in a light most favorable to the government." *United States v. Hassan*, 844 F.3d 723, 725 (8th Cir. 2016). When reviewing the sufficiency of the evidence to support a conviction, the Court must resolve evidentiary conflicts in the Government's favor, and accept all reasonable inferences from the evidence that support the verdict. *See United States v. Weaver*, 554 F.3d 718, 720 (8th Cir. 2009). "A verdict will only be overturned if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.*

Alternatively, Fed. R. Crim. P. 33(a) states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Unlike with respect to Rule 29, "the court has broad discretion in deciding motions for new trial, and its decision is subject to reversal only for a clear and manifest abuse of discretion." *Hassan*, 844 F.3d at 725. "Also in contrast to Rule 29, in considering a motion for new trial, the court need not view the evidence in the light most favorable to the verdict and it is permitted to weigh the evidence and evaluate the credibility of the witnesses." *Id.* at 725–26. "Nonetheless, motions for new trials based on the weight of the evidence generally are disfavored, and the district court's authority to grant a new trial should rarely

be exercised." *Id.* at 726. "The district court will only set aside the verdict if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." *United States v. Serrano-Lopez*, 366 F.3d 628, 634 (8th Cir. 2004) (quoting *United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir. 1987)) (internal quotation marks omitted).

## III. DISCUSSION

The Government's evidence at trial concerned two separate schemes involving corruption of Mr. Woods while he was a senator in the Arkansas General Assembly. In both of these schemes, the Government put on proof that Mr. Woods took official actions to direct money from the General Improvement Fund ("GIF") to private entities—in exchange for cash payments to him, and also in exchange for the hiring of his friends or loved ones by the entities (or their affiliates) who received the GIF money. One scheme involved directing GIF funds to an entity called AmeriWorks. The other scheme involved directing GIF funds to an Arkansas bible college called Ecclesia College ("Ecclesia"). Participants in the AmeriWorks scheme included another member of the Arkansas General Assembly named Micah Neal,[1] and a lobbyist named Milton "Rusty" Cranford, who was also the CEO of the Arkansas division of Alternative Opportunities, an affiliate of AmeriWorks. Participants in the Ecclesia scheme included Mr. Neal, Mr. Paris, who was the president of Ecclesia, and Mr. Shelton, a businessman who was hired as an independent contractor to provide consulting services to Ecclesia. The Government did not put on any evidence that Mr. Cranford was involved in the Ecclesia scheme, or that

---

[1] In the separate but related case of *United States v. Neal*, Case No. 5:17-cr-50001, Mr. Neal entered a guilty plea on January 4, 2017, to one count of conspiracy to commit honest services mail and wire fraud. He has not yet been sentenced in that case.

3

Mr. Paris or Mr. Shelton were involved in the AmeriWorks scheme. But the Government provided evidence that Mr. Woods and Mr. Neal were involved in both schemes.

As noted above, Mr. Woods and Mr. Shelton both challenge the sufficiency and the weight of the evidence against them at trial. The Court will address those matters below. But first, the Court will take up a few additional arguments that Mr. Woods raises concerning the instructions that this Court gave to the jury, and the speed with which the jury delivered its verdict.

Mr. Woods contends that the Court incorrectly instructed the jury on the meaning of the phrase "scheme to defraud." The Court instructed the jury that:

> The phrase "scheme to defraud" as used in [these] instruction[s] means any plan or course of action intended to deceive or cheat another out of the right to honest services where a bribe or kickback is solicited, paid, or received in exchange for official action or an official act. The definition of "official action" or "official act" is explained further in Instruction No. 13.

See Doc. 383, pp. 19, 25, 29. This definition of "scheme to defraud" was lifted word-for-word from the Eighth Circuit's Model Criminal Jury Instructions, and the Court believes it is correct. See 8th Cir. Crim. Jury Instr. § 6.18.1346 (2017).

Mr. Woods argues that this Court should have instead relied on the case of *United States v. McNeive*, 536 F.2d 1245 (8th Cir. 1976) when instructing the jury on the meaning of the phrase "scheme to defraud." The Court disagrees, and believes that *McNeive* is both legally and factually inapposite to the instant matter. For one thing, unlike this case, *McNeive* did not involve a prosecution under 18 U.S.C. § 1346, which was enacted more than a decade after *McNeive*. For another, while the underlying conduct in *McNeive* was a city plumbing inspector's acceptance of unsolicited $5 "gratuities or tips" (totaling $490 over a four-year period) for the nondiscretionary processing of plumbing permit

4

applications, *see* 536 F.2d at 1246, 1251–52, the underlying conduct in the instant matter involves the solicitation and receipt of tens of thousands of dollars in bribes by state legislators from private entities, in exchange for the discretionary direction of hundreds of thousands of taxpayer dollars to those entities. The two factual scenarios are not remotely comparable.

Mr. Woods also contends that the Court incorrectly instructed the jury on the meaning of the phrase "official act." The Court instructed the jury that:

> For something to be an "official action" or "official act" . . ., it must satisfy *two* elements, which are:
>
>> *One*, the government must identify a question, matter, cause, suit, proceeding, or controversy that may at any time be pending or may by law be brought before a public official, which would involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee; and
>>
>> *Two*, the government must prove that the public official *either* agreed to make a decision or take an action, *or* actually did make a decision or take an action on that question, matter, cause, suit, proceeding, or controversy.
>
> In this case, the government alleges that Mr. Woods and Micah Neal agreed to accept bribes or kickbacks in exchange for approving and directing GIF monies from Economic Development Districts to specific recipients, advising other legislators and Economic Development District officials to direct and approve GIF monies from Economic Development Districts to specific recipients, and sponsoring and voting for legislation directing GIF monies to Economic Development Districts and state agencies for grants to specific recipients. When considering the elements of a Count for Honest Services Fraud, it will be your responsibility to determine whether the government has proved beyond a reasonable doubt the existence of a scheme to defraud that involved a bribe or kickback in exchange for an official act.
>
> It is not necessary that an act or action by a public official ultimately be successful in attaining its desired end, in order for it to qualify as an official act. Nor is it necessary that an act or action by a public official be the final or ultimate act or action on a pending matter, in order for it to qualify as an

official act. Rather, an intermediate step towards some ultimately unaccomplished end may also qualify as an official act, so long as that intermediate step satisfies both of the elements listed in this instruction.

Merely hosting an event, meeting with other officials, speaking with interested parties, or expressing support for a pending matter, is not, standing alone, an official act. However, evidence that a public official hosted an event, met with other officials, spoke with interested parties, or expressed support for a pending matter, may be considered as evidence that the public official agreed to take an official act, if such evidence is corroborated by other evidence that in doing so the public official was attempting to pressure or advise another public official on a matter pending before that other public official. An official act by a public official may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an official act by another official.

(Doc. 383, pp. 38–39) (emphasis in original).

In crafting this particular instruction, the Court relied heavily on Chief Justice Roberts's unanimous opinion in the United States Supreme Court case of *McDonnell v. United States*, frequently quoting it verbatim, and otherwise always carefully and conservatively summarizing it without attempting to extend that case's reasoning beyond its plain text. *See* 136 S. Ct. 2355, 2368–72 (2016). *McDonnell* is binding authority, and this Court believes it accurately described *McDonnell*'s requirements to the jury.

Mr. Woods also asserts that "[d]espite sixteen (16) days of trial testimony and over four (400) hundred [sic] documentary exhibits totaling thousands of pages, the jury reached [its verdict] in less than two (2) hours of deliberations after it received additional instruction," that this "additional instruction" was "constitutionally ambiguous and violated his right to due process, a fair trial, and impartial jury under the Fifth, Sixth, and Seventh Amendments to the United States Constitution,"[2] and that "it shocks the conscience as to

---

[2] Mr. Woods's brief does not elaborate on his constitutional objections to this jury instruction, so the Court will not speculate on what their basis might be. Mr. Woods

the speed with which the jury delivered its verdict after it received additional instruction." *See* Doc. 396, pp. 2–3. The Court believes this argument is meritless. "[B]rief jury deliberation alone is not a sufficient basis for a new trial. 'At best, it is a factor to be considered when deciding a motion for new trial, and even then cannot be the only basis for granting a new trial.'" *United States v. Aguilera*, 625 F.3d 482, 487 (8th Cir. 2010) (quoting *United States v. Cunningham*, 108 F.3d 120, 124 (7th Cir. 1997)). And here, that factor carries no weight at all in Mr. Woods's favor, given the critical facts that he artfully omits: (1) that the jury conducted two full days' worth of deliberations (over a period of three calendar days); and (2) that the jury requested and received "additional instructions" from the Court *throughout* its deliberations, from very early in the process, through its middle, and all the way to the end. *See* Docs. 375–77. Every objective sign indicates that this jury took its job extraordinarily seriously and performed its task with great care and thoughtfulness, en route to *acquitting* Mr. Woods of two of the seventeen counts against him (and acquitting Mr. Shelton of three of the fifteen counts against him). *See* Doc. 378. This jury spent more days deliberating, and asked a larger number of questions during its deliberations, than any other jury at any other trial over which the undersigned has presided during his four and a half years on the bench.

With these preliminary issues out of the way, the Court will now turn to the matter of whether the evidence at trial was sufficient to support the jury's verdict. First, as context for what follows, the Court will briefly summarize the evidence concerning the control that

---

lodged objections to this instruction on the record, during oral argument that occurred both before and after the instruction was given to the jury. The Court believes the instruction was proper and legally correct, for the same reasons now as it stated from the bench then. *See* Court Exhibits 17 (question from jury), 18 (Court's proposed response), 19 (Court's final response).

individual legislators, specifically including Mr. Woods and Mr. Neal, exercised over the GIF process. Next, the Court will discuss the evidence concerning the existence and execution of the AmeriWorks scheme. Finally, the Court will take up the evidence concerning the existence and execution of the Ecclesia scheme.

### A. Sufficiency of the Evidence to Support the Verdict

### 1. Individual Legislators' Control over the GIF Process

At trial, the Government introduced legislative records into evidence, showing that Mr. Woods and Mr. Neal, along with other legislators, sponsored and voted for legislation that appropriated GIF to economic development districts, including the Northwest Arkansas Economic Development District ("NWAEDD"). *See, e.g.*, Government Exhibits 122–26. Many witnesses with direct knowledge of the economic development districts' GIF grant award process, including former NWAEDD executive director Mike Norton, NWAEDD deputy director Jeremy Ragland, West Central Arkansas Planning and Development District ("WCAPDD") director Dwayne Pratt, Mr. Neal, state senator Bart Hester, and Berryville Mayor Tim McKinney (who was on the NWAEDD's board of directors), all testified that those districts' GIF award process was effectively controlled by individual legislators, with each legislator in a district being apportioned a share of that district's GIF to award to applicants as he wished. This testimony was corroborated by extensive documentary evidence, including spreadsheets maintained by Mr. Norton that tracked Mr. Woods's and Mr. Neal's shares of the NWAEDD's GIF, numerous emails in which Mr. Woods instructed the NWAEDD to award his own GIF to various applicants, and text messages and emails from Mr. Woods to Mr. Hester and Mr. Norton regarding

awards of other legislators' GIF. *See, e.g.*, Government Exhibits 116, 142–43, 149, 161, 175–81.

## 2. The AmeriWorks Scheme

Mr. Neal testified at trial that in 2013, while he and Mr. Woods were both members of the Arkansas General Assembly, Mr. Woods told him "I've got a deal worked out with a gentleman named Rusty Cranford," in which Mr. Woods would cause GIF to be awarded to AmeriWorks, which was controlled by Mr. Cranford, in exchange for a kickback to Mr. Woods of 20% of the award. *See* Doc. 359, pp. 32–33. According to Mr. Neal, Mr. Woods invited him to participate in that deal, and Mr. Neal agreed to do so. *See id.* Ultimately, Mr. Neal testified that he decided to direct $125,000 of his GIF to AmeriWorks, and that Mr. Woods directed $275,000 of his own GIF. *See id.* at 33. Mr. Neal told the jury that he then emailed Mr. Norton with instructions to award those amounts to AmeriWorks, *see id.* at 34–36; and the Government introduced that email into evidence, *see* Government Exhibit 178.

The Government also introduced bank records documenting the issuance of checks for $275,000 and $125,000 from the NWAEDD to "Decision Point Inc. d/b/a AmeriWorks" on September 27, 2013, and the deposit of those checks in an AmeriWorks account three days later. *See* Government Exhibit 313, pp. 4–6. Those same bank records showed that within one month of that deposit, $396,500 of those funds had been withdrawn. *See id.* at 7–9. Of those withdrawals, $320,000—which is 80% of $400,000— was removed through a check payable to "Decision Point." *See id.* at 9. The remaining October 2013 withdrawals were made through checks for $60,000 and $16,500, payable to "White Dog Asset Holding," and the "Cranford Coalition," respectively. *See id.* at 7–8.

9

After the GIF award was made, Mr. Neal testified that Mr. Woods delivered $20,000 to him inside two envelopes, with each containing $10,000 in $100 bills. *See* Doc. 359, p. 39. He recounted that Mr. Woods explained the discrepancy between the 20% kickback he had been expecting and the amount he actually received by telling him that Mr. Cranford "kept $5,000 to pay taxes on that money." *See id.*

All of this evidence, considered together, is sufficient to support the jury's findings beyond a reasonable doubt that:

- Mr. Woods voluntarily and intentionally devised or participated in a scheme to defraud the public of its right to his and Mr. Neal's honest services as public officials through bribery;

- The scheme to defraud was an agreement between Mr. Woods and Mr. Neal to use their official positions as Arkansas legislators to direct GIF monies to Decision Point Inc. d.b.a. AmeriWorks in exchange for bribes;

- Mr. Woods did so with the intent to defraud;

- The scheme to defraud involved a material false representation or concealment of fact; and

- Mr. Woods used, or caused to be used, an interstate wire facility in furtherance of, or in an attempt to carry out, some essential step in the scheme—namely, an October 1, 2013 electronic transmission received by Arvest Bank to settle AmeriWorks's deposit of the aforementioned September 27, 2013 GIF checks from the NWAEDD.

In other words, there is sufficient evidence to support the jury's verdict finding Mr. Woods guilty on Count 4 of the Second Superseding Indictment, which charges him with honest

services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346. The Court turns now to the evidence regarding the Ecclesia scheme that was presented at trial.

### 3. The Ecclesia Scheme

Mr. Neal testified at trial that in December 2014, after learning that he and Mr. Woods had $400,000 in NWAEDD GIF available for use, he "asked Jon [Woods] if there was another deal that we could do like the AmeriWorks, where we could get paid," to which Mr. Woods responded "that he had something worked out with Oren [Paris] and Randell [Shelton] and that he would take care of it." *See* Doc. 359, p. 48. Eventually he and Mr. Woods agreed to direct $200,000 in GIF to Ecclesia in exchange for a 20% kickback. *See id.* at 49. Mr. Neal further testified that after the award was approved, Mr. Woods called him and told him "that Randell would swing by the cafe [that Mr. Neal's family owned in Springdale] and give me the money." *See id.* at 49–50. Mr. Neal then described for the jury how he met Mr. Shelton behind the cafe, where Mr. Shelton "handed me two envelopes with $100 bills in there," containing a total of $18,000. *See id.* at 50. Mr. Neal said that Mr. Shelton explained to him that Mr. Woods had instructed him to withhold $2,000 of Mr. Neal's cut to repay Mr. Woods for money that Mr. Neal had previously borrowed from Mr. Woods for a legislative trip to Alaska. *See id.*

When asked on the stand when this meeting with Mr. Shelton occurred, Mr. Neal initially responded, "I think it was before Christmas, but it was near the end of the year." *See id.* at 51. However, he also testified that on the same day when he received the cash from Mr. Shelton, he used some of it to purchase furniture; and after having his recollection refreshed by a dated receipt from the furniture store where he made the purchase, Mr. Neal testified that the meeting with Mr. Shelton occurred on January 8,

2015. *See id.* at 51–52. The receipt for Mr. Neal's cash purchase at the furniture store was then received into evidence. *See* Government Exhibit 259. The Government later introduced bank records showing that on January 8, 2015, in Springdale, Mr. Shelton withdrew $18,000 in cash from a bank account for an entity called Paradigm Strategic Consulting ("Paradigm"), of which he was the sole proprietor. *See* Government Exhibit 5, p. 141.

Under the Government's theory of the case, the Ecclesia scheme began well before Mr. Neal joined it; and Paradigm was essentially a shell company that Mr. Shelton created to funnel bribes from Ecclesia to Mr. Woods from 2013 through 2015, as well as to Mr. Neal on the January 8, 2015 occasion. Accordingly, the Government introduced an enormous amount of documentary evidence relating to Paradigm.

The Government presented the jury with emails between Mr. Shelton and Mr. Paris in August and September 2013, negotiating a consulting contract between Ecclesia and Paradigm. *See* Government Exhibits 263–67. The Government also presented the jury with NWAEDD documents showing that at the same time as these negotiations between Mr. Shelton and Mr. Paris were occurring, Mr. Woods was sponsoring Ecclesia's applications to the NWAEDD for GIF. *See* Government Exhibits 158–60. The Government introduced documents showing that on September 25, 2013, the NWAEDD awarded Ecclesia a $200,000 GIF check, *see* Government Exhibit 161, that on the following day, Paradigm was formally organized, *see* Government Exhibit 5, p. 11, and that on the day after that, Mr. Shelton opened Paradigm's bank account with a $50,000 check from Ecclesia, *see id.* at 2, 18. The Government also introduced bank records showing that only four days later, on October 1, 2013, Mr. Shelton transferred $40,000 of

those funds from Paradigm's bank account to Mr. Woods's bank account, *see* Government Exhibit 1, p. 248, and that later that same day in Springdale, Mr. Woods used those same funds to purchase a cashier's check payable to Bob Srigley in the amount of $33,000, *see id.* at 253. And phone records were introduced showing that after the $40,000 transfer but before the purchase of the $33,000 cashier's check, Mr. Shelton and Mr. Woods exchanged a couple of phone calls. *See* Government Exhibit 219, p. 350.

There is more to be discussed, but it is convenient to pause here and make a few findings regarding the sufficiency of the evidence that has been described so far. All of the aforementioned evidence (except, of course, the evidence pertaining to the AmeriWorks scheme discussed in Section III.A.2), considered together, is sufficient to support the jury's findings beyond a reasonable doubt that:

- Mr. Woods and Mr. Shelton each voluntarily and intentionally devised or participated in a scheme to defraud the public of its right to Mr. Woods's and Mr. Neal's honest services as public officials through bribery;

- The scheme to defraud was an agreement by Mr. Woods, and later Mr. Neal, to use their official positions as Arkansas legislators to direct GIF monies to Ecclesia in exchange for bribes consisting of payments by Mr. Paris through Ecclesia and Paradigm;

- Mr. Woods and Mr. Shelton did so with the intent to defraud;

- The scheme to defraud involved a material false representation or concealment of fact; and

- Mr. Woods used, or caused to be used, an interstate wire facility in furtherance of, or in an attempt to carry out, some essential step in the scheme—namely, an

August 19, 2013 email from Mr. Woods to Mr. Norton, forwarding Ecclesia's application to the NWAEDD for a $200,000 GIF grant.

In other words, there is sufficient evidence to support the jury's verdict finding Mr. Woods guilty on Count 2 of the Second Superseding Indictment, which charges him with honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346.

The aforementioned evidence is also sufficient to support the jury's findings beyond a reasonable doubt that:

- On or about October 1, 2013, Mr. Woods knowingly purchased an Arvest Bank cashier's check using funds from his Arvest Bank account ending in 2553;

- This purchase of a cashier's check was in currency of a value greater than $10,000 derived from honest services wire fraud;

- Mr. Woods then knew that this purchase of a cashier's check involved proceeds of a criminal offense;

- This purchase of a cashier's check took place in the Western District of Arkansas; and

- This purchase of a cashier's check in some way or degree affected interstate commerce.

In other words, there is sufficient evidence to support the jury's verdict finding Mr. Woods guilty on Count 17 of the Second Superseding Indictment, which charges him with engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

Furthermore, the aforementioned evidence is sufficient to support the jury's findings beyond a reasonable doubt that as of September 22, 2013:

14

- Mr. Shelton had used, or caused to be used, an interstate wire facility in furtherance of, or in an attempt to carry out, some essential step in the Ecclesia scheme—namely, a September 22, 2013 email from Mr. Shelton to Mr. Paris attaching a consulting agreement between Ecclesia and Paradigm;
- Mr. Woods and Mr. Shelton each knew honest services fraud was being committed or going to be committed;
- Mr. Woods and Mr. Shelton each had enough advance knowledge of the extent and character of honest services fraud that he was able to make the relevant choice to walk away from it before all of its elements were complete;
- Mr. Woods and Mr. Shelton each knowingly acted in some way for the purpose of causing or aiding the commission of honest services fraud; and
- Mr. Woods and Mr. Shelton each intended to deprive the public of its right to the honest services of a public official.

In other words, there is sufficient evidence to support the jury's verdict finding Mr. Woods and Mr. Shelton guilty on Count 3 of the Second Superseding Indictment, which charges them both with aiding and abetting honest services wire fraud in violation of 18 U.S.C. §§ 2, 1343, and 1346.

And the aforementioned evidence is also sufficient to support the jury's findings beyond a reasonable doubt that the following uses of the mail and of an interstate wire facility were reasonably foreseeable to both Mr. Woods and Mr. Shelton, and were used to carry out some essential steps in the Ecclesia scheme:

- An NWAEDD check to Ecclesia in the amount of $200,000, dated September 25, 2013, sent from the NWAEDD's office to Mr. Woods's mailing address in Springdale via the U.S. Postal Service; and

- An October 4, 2013 electronic transmission received by Arvest Bank to settle Ecclesia's deposit of the $200,000 check, dated September 25, 2013 and drawn from the NWAEDD's Arvest Bank account ending in 8611, into Ecclesia's Liberty Bank account ending in 0681.

In other words, there is sufficient evidence to support the jury's verdict finding Mr. Woods and Mr. Shelton guilty on Counts 16 and 5 of the Second Superseding Indictment, which charge them both with aiding and abetting honest services mail fraud in violation of 18 U.S.C. §§ 2, 1341, and 1346, and with aiding and abetting honest services wire fraud in violation of 18 U.S.C. §§ 2, 1343, and 1346, respectively.

With those findings out of the way, the Court will now resume its description of the evidence regarding the Ecclesia scheme where it left off chronologically: late 2013. The Government introduced emails and text messages showing that on December 19, 2013, Mr. Woods forwarded a text to Mr. Paris from Mr. Pratt (the executive director of the WCAPDD), confirming that Ecclesia would be awarded $50,000 in GIF. *See* Government Exhibits 183, 269, 234, p. 63. The Government also introduced documentation showing that on that same day, Ecclesia and Paradigm agreed to a 6-month extension of their contract, *see* Government Exhibit 210, for a one-time payment of $25,000 which was deposited in Paradigm's bank account the next day, *see* Government Exhibit 5, p. 43. And bank records showed that the very next day after that, Mr. Shelton withdrew $21,000 in cash from the Paradigm account. *See id.* at 44.

The evidence at trial showed that this pattern of GIF awards to Ecclesia, immediately followed by extensions of Paradigm's contract for one-time payments, immediately followed by cash withdrawals from Paradigm, repeated itself throughout the year 2014. For example, the jury saw documents showing that: on March 4, 2014, the NWAEDD issued a $30,000 check to Ecclesia, *see* Government Exhibit 164; on March 5, another extension of the Paradigm contract was executed for a one-time payment of $15,000, *see* Government Exhibit 211; on March 6, the $15,000 was deposited in Paradigm's bank account, *see* Government Exhibit 5, p. 58; and on March 10, Mr. Shelton withdrew a total of $5,250 in cash from that account, *see id.* at 55, 60.

Again in April 2014: a $50,000 GIF check was issued on April 1, *see* Government Exhibit 207; a contract extension was executed on April 2, *see* Government Exhibit 212; $25,000 was deposited into Paradigm's account on April 4, *see* Government Exhibit 5, p. 66; Mr. Shelton withdrew $13,000 in cash on April 7, *see id.* at 69; and Mr. Woods deposited $1,500 in cash into one of his own bank accounts later that same day, *see* Government Exhibit 3, p. 31.

And similarly in October 2014: a $91,500 GIF grant agreement was executed on October 6, *see* Government Exhibits 165–66; Paradigm invoiced a $45,000 fee that same day, *see* Government Exhibit 203; $45,000 was deposited into Paradigm's account that same day, *see* Government Exhibit 5, p. 103; Mr. Shelton withdrew $16,500 in cash on the following day of October 7, *see id.* at 113; and later that evening, Mr. Woods deposited $4,420 in cash into his own bank accounts, *see* Government Exhibits 2, p. 134; 3, p. 77; 4, p. 150.

Documentary evidence showed the pattern continuing in December 2014 and carrying over into the following year, during the previously-discussed period when Mr. Neal joined the Ecclesia scheme. But around this time an additional pattern also emerged, in which cash withdrawals from Paradigm's account would coincide with legislative actions taken by Mr. Woods to benefit Ecclesia. For example, on December 2, Mr. Woods emailed himself, with Mr. Paris blind-copied, a copy of a GIF appropriation bill he caused the Bureau of Legislative Research ("BLR") to draft, which would appropriate $2.5 million to the Arkansas Department of Higher Education ("ADHE") for grants to work-learning colleges, of which Ecclesia was the only one in the state of Arkansas. *See* Government Exhibits 276–77. Later that same day, Ecclesia paid Paradigm $15,000, *see* Government Exhibit 5, p. 121; and two days later on December 4, Mr. Shelton withdrew $12,400 in cash, *see id.* at 131. Then over December 4 and 5, Mr. Woods engaged in cash transactions totaling precisely $12,400: cash deposits totaling $2,400, *see* Government Exhibits 3, p. 91; 4, p. 173, and cash payments for jewelry totaling $10,000, *see* Government Exhibit 315, pp. 22–23. Mr. Woods continued instructing the BLR over the next couple of weeks on how to draft legislation that would benefit Ecclesia. *See* Government Exhibits 242–44, 250, 256, 278.

And then on December 19, a $200,000 GIF grant to Ecclesia was received from the NWAEDD and deposited. *See* Government Exhibits 149, 189, 200. December 30: another contract extension for Paradigm. *See* Government Exhibit 205. January 5, 2015: a $65,000 payment to Paradigm. *See* Government Exhibit 5, p. 136. January 6 and 7: $35,700 in cash withdrawals from Paradigm. *See id.* at 143, 145. Also January 6 and 7: $15,600 in cash deposits and cash payments for jewelry by Mr. Woods. *See* Government

Exhibits 2, p. 150; 3, p. 101; 4, p. 187; 315, pp. 24–26. January 8: an additional cash withdrawal of $18,000 from Paradigm, *see* Government Exhibit 5, p. 141. And per Mr. Neal's testimony described above, later that same day Mr. Shelton gave Mr. Neal $18,000 in cash, and Mr. Neal used some of it to buy furniture, as corroborated by the furniture store's receipts, *see* Government Exhibit 259.

Much more could be said about the evidence that was presented to the jury regarding the Ecclesia scheme as it pressed on into 2015. Bank records showed Paradigm continuing to conduct cash withdrawals of Ecclesia deposits all the way into October of that year, *see generally* Government Exhibit 5, with contemporaneous cash deposits occasionally going into Mr. Woods's bank accounts, *see generally* Government Exhibit 4. And legislative records and emails also showed Mr. Woods continuing to facilitate Ecclesia GIF applications and continuing to undertake legislative efforts designed to benefit Ecclesia well into that year. *See, e.g.*, Government Exhibits 127, 130, 135, 138–39, 151–52, 233, 257, 281. But this Opinion and Order grows long. Suffice it to say that the evidence described over the last several paragraphs, in combination with the findings preceding it, is sufficient to support the jury's findings beyond a reasonable doubt that the following uses of an interstate wire facility were either directly caused by, or reasonably foreseeable to, Mr. Woods and Mr. Shelton, and were used to carry out some essential steps in the Ecclesia scheme:

- A March 20, 2014 electronic transmission received by Arvest Bank to settle Ecclesia's deposit of a $30,000 check, dated March 4, 2014 and drawn from the NWAEDD's Arvest Bank account ending in 8611, into Ecclesia's Centennial Bank account ending in 0681;

- An October 17, 2014 electronic transmission received by Arvest Bank to settle Ecclesia's deposit of a $91,500 check, dated September 19, 2014 and drawn from the NWAEDD's Arvest Bank account ending in 8611, into Ecclesia's Centennial Bank account ending in 0681;

- A December 2, 2014 email from Mr. Woods to himself with a blind copy to Mr. Paris attaching a draft Senate bill to appropriate GIF money to the ADHE for GIF grants to a work-learning college;

- A December 2, 2014 electronic transmission sent by Arvest Bank to settle Paradigm's deposit of a $15,000 check, dated December 2, 2014 and drawn from Ecclesia's Centennial Bank account ending in 0681, into Paradigm's Arvest Bank account ending in 7761;

- A December 5, 2014 email from Ecclesia to the NWAEDD submitting a $200,000 GIF grant application;

- A December 15, 2014 email from Mr. Woods to an official at the BLR, instructing the official, among other things: "I would like whomever does the education bill drafting to please reach out to Oren. Oren and I have several bills we would like drafted. If you would please forward this email to the appropriate person that would be great.";

- A December 22, 2014 electronic transmission received by Arvest Bank to settle Ecclesia's deposit of a $200,000 check, dated December 18, 2014 and drawn from the NWAEDD's Arvest Bank account ending in 8611, into Ecclesia's Centennial Bank account ending in 0681; and

- A January 5, 2015 electronic transmission sent by Arvest Bank to settle Paradigm's deposit of a $65,000 check, dated January 5, 2015 and drawn from Ecclesia's Centennial Bank account ending in 0681, into Paradigm's Arvest Bank account ending in 7761.

In other words, there is sufficient evidence to support the jury's verdict finding Mr. Woods and Mr. Shelton guilty on Counts 6 through 13 of the Second Superseding Indictment, which charge them both with aiding and abetting honest services wire fraud in violation of 18 U.S.C. §§ 2, 1343, and 1346.

And the aforementioned evidence is also sufficient to support the jury's findings beyond a reasonable doubt that:

- On or before August 2013 and continuing to on or about October 2015, two or more people reached an agreement to commit the crimes of honest services wire fraud or honest services mail fraud;

- Mr. Woods and Mr. Shelton each voluntarily and intentionally joined in the agreement, either at the time it was first reached or at some later time while it was still in effect;

- At the time Mr. Woods joined in the agreement, he knew the purpose of the agreement; and

- At the time Mr. Shelton joined in the agreement, he knew the purpose of the agreement.

In other words, there is sufficient evidence to support the jury's verdict finding Mr. Woods and Mr. Shelton guilty on Count 1 of the Second Superseding Indictment, which charges

them both with conspiracy to commit honest services mail and wire fraud in violation of 18 U.S.C. § 1349.

Mr. Shelton makes a couple of general arguments that should be addressed. First, he argues that there is insufficient evidence to support a finding that he had intent to defraud, or that he ever made a material false representation. See Doc. 397, p. 2. The Court disagrees. "'[C]ircumstantial evidence alone can prove the elements of conspiracy,' including knowledge." United States v. Lundstrom, 880 F.3d 423, 436 (8th Cir. 2018) (quoting United States v. Foster, 740 F.3d 1202, 1205 (8th Cir. 2014)). Similarly, as to the underlying crimes of wire and mail fraud, "fraudulent intent need not be proved directly and can be inferred from the facts and circumstances surrounding a defendant's actions," see United States v. Krug, 822 F.3d 994, 999 (8th Cir. 2016), and "can be shown by circumstantial evidence," see United States v. Hansen, 791 F.3d 863, 867 (8th Cir. 2015). And as was noted much earlier in this Opinion and Order, when reviewing the sufficiency of the evidence to support a conviction, the Court must resolve evidentiary conflicts in the Government's favor, and accept all reasonable inferences from the evidence that support the verdict. See United States v. Weaver, 554 F.3d 718, 720 (8th Cir. 2009). Applying that standard to the evidence that was presented at trial, the Court believes there was sufficient evidence to support the jury's finding beyond a reasonable doubt that Mr. Shelton had intent to defraud, and that the Ecclesia scheme involved numerous material false representations or omissions, including numerous contract extensions and invoices between Paradigm and Ecclesia that were already discussed above.

Second, Mr. Shelton also contends that the GIF checks that were issued to Ecclesia on September 25, 2013, March 4, 2014, and September 19, 2014, and in

22

December 2014, were all used for the purposes that were stated in Ecclesia's GIF grant applications. *See* Doc. 397, pp. 8–12. But regardless of its truth, this argument is a red herring, as none of the elements in any of the counts of conviction required the Government to prove otherwise.

Ultimately, then, there was sufficient evidence presented at trial to support the jury's verdict, finding beyond a reasonable doubt that Mr. Woods is guilty of Counts 1– 13, and 16–17 of the Second Superseding Indictment, and that Mr. Shelton is guilty of Counts 1, 3, 5–13, and 16 of the Second Superseding Indictment. *See* Doc. 378. Accordingly, the Court will deny their request for it to enter a judgment of acquittal on those counts. The Court will turn now to their request for a new trial.

## B. Weight of the Evidence

Messrs. Woods and Shelton also contend that they should receive a new trial, on the grounds that the evidence at trial weighed so heavily against the verdict that a miscarriage of justice may have occurred. As the Court previously explained, in contrast to motions for judgment of acquittal, when "considering a motion for new trial, the court need not view the evidence in the light most favorable to the verdict and it is permitted to weigh the evidence and evaluate the credibility of the witnesses." *See United States v. Hassan*, 844 F.3d 723, 725–26 (8th Cir. 2016). The Court sees no point in recapping the voluminous evidence that was already described in the previous section of this Opinion and Order, but will simply observe here that it does not believe the evidence weighs against the verdict at all; rather, the Court believes the evidence weighs heavily in favor of the verdict.

Mr. Shelton challenges the credibility of Mr. Neal's testimony against him. But on the whole, this Court finds Mr. Neal's testimony very credible. Although Mr. Neal was initially uncertain of the specific date on which Mr. Shelton gave him the $18,000, he did recall that he paid cash for furniture on the same day that he received the bribe—which was corroborated by bank records and furniture store receipts showing that Mr. Neal purchased furniture with cash on the same day that Mr. Shelton withdrew $18,000 in cash from Paradigm's account.

Mr. Shelton also contends that "there is the real possibility" that Mr. Shelton's conviction was caused by "spillover" prejudice resulting from evidence at trial about Mr. Woods and the AmeriWorks scheme, in which Mr. Shelton did not participate. The Court believes that possibility is virtually nonexistent. Every time that evidence was presented to the jury on the AmeriWorks scheme, the Court gave the jury an interim instruction that they should not consider that evidence against Mr. Shelton. And the fact that the jury acquitted Mr. Shelton of Count 2 while convicting Mr. Woods of that same count shows that the jury not only *could* but *did* consider the evidence against each individual defendant separately.

The Court believes the evidence at trial does not weigh against the verdict, and the Court does not perceive any risk that a miscarriage of justice occurred. Therefore, the defendants' request for a new trial will be denied.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Jonathan E. Woods's Motion for Judgment of Acquittal under Fed. R. Crim. P. 29 or New Trial under Fed. R. Crim. P. 33

(Doc. 395), and Defendant Randell G. Shelton, Jr.'s Motion for Judgment of Acquittal, or

in the Alternative, a New Trial (Doc. 392) are both **DENIED**.

**IT IS SO ORDERED** on this _25th_ day of July, 2018.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE