IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                                    PLAINTIFF

V.                                      CASE NO. 5:17-CR-50010-1

JONATHAN E. WOODS                                                          DEFENDANT

## MEMORANDUM OPINION AND ORDER

Currently before the Court are Defendant Jonathan E. Woods's Motion for Release

Pending Appeal (Doc. 483) and Brief in Support (Doc. 484). For the reasons given below,

Mr. Woods's Motion is **DENIED**.

## I. BACKGROUND

On May 3, 2018, Mr. Woods, a former senator in the Arkansas General Assembly,

was convicted at trial on fifteen felony counts of honest services fraud and money

laundering. See Doc. 378. Among other things, the jury found that the Government had

proved beyond a reasonable doubt that Mr. Woods accepted multiple cash bribes in

exchange for using his authority as a senator to direct public grant money to an entity

called AmeriWorks and to another entity called Ecclesia College. See generally Doc.

422. At Mr. Woods's sentencing hearing on September 5, this Court varied downward

from the advisory Sentencing Guidelines range[1] and sentenced Mr. Woods to serve two

hundred and twenty months in the custody of the Federal Bureau of Prisons, to be

followed by three years of supervised release. See Doc. 471. The Court also imposed

---

[1] The Court calculated the Sentencing Guidelines range based on a total offense level of
41 and a criminal history category of I, which yielded an advisory range of 324–405
months of incarceration.

monetary penalties of $1,621,500.00 in restitution and a $1,500.00 special assessment. *See id.* Judgment was entered on the docket two days later, *see id.*, along with a separate Money Judgment of $1,097,005.00, *see* Doc. 466.

Mr. Woods has been released on bond throughout these proceedings. *See* Docs. 17, 385. When the Court imposed sentence, it ordered Mr. Woods to report by no later than 1:00 p.m. on Wednesday, September 26, 2018 to the institution designated by the Bureau of Prisons where he would begin his term of imprisonment. *See* Doc. 471, p. 2. The Court permitted Mr. Woods to remain out on bond until that date.

On September 20, Mr. Woods filed a Notice of Appeal to the United States Court of Appeals for the Eighth Circuit, *see* Doc. 485, along with a Motion for Release Pending Appeal, *see* Doc. 483. As the Motion's title indicates, Mr. Woods asks this Court to allow him to remain out on bond until his appeal is resolved. The Government has not yet had the opportunity to respond to Mr. Woods's Motion, as it was filed only four days ago. But the Court is already well apprised of the pertinent facts and law, and Mr. Woods's report date is only two days from now. Therefore, the Court believes it best to go ahead and rule now on Mr. Woods's Motion, so that he may have as much advance notice as reasonably possible of what his obligations are with respect to incarceration during his appeal.

Below, the Court will first recite the applicable legal standard. Then the Court will discuss the substance and merits of Mr. Woods's Motion.

2

## II. LEGAL STANDARD

A person who has been found guilty of an offense and sentenced to a term of imprisonment must be detained during the pendency of any appeal he has filed, unless the Court finds:

(A)    by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released . . . ; and

(B)    that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

   (i)    reversal,

   (ii)   an order for a new trial,

   (iii)  a sentence that does not include a term of imprisonment, or

   (iv)   a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1).

The Eighth Circuit has explained that this statute's requirement of a "substantial question" refers to "a close question or one that could go either way." *See United States v. Powell*, 761 F.2d 1227, 1233–34 (8th Cir. 1985). Elaborating on this, the Eighth Circuit observes that "[i]t is not sufficient to show simply that reasonable judges could differ (presumably every judge who writes a dissenting opinion is still 'reasonable') or that the issue is fairly debatable or not frivolous." *Id.* at 1234. However, "the defendant does not have to show that it is likely or probable that he or she will prevail on the issue on appeal." *Id.*

3

The Eighth Circuit has further explained that the statute's requirement that reversal or new trial be likely[2] means that the defendant must "show that the substantial question he or she seeks to present is so integral to the merits of the conviction that it is more probable than not that reversal or a new trial will occur if the question is decided in the defendant's favor." *Id.* In deciding this question, the Court "must assume that the substantial question presented will go the other way on appeal and then assess the impact of such assumed error on the conviction." *Id.*

Here, as a threshold matter, the Court finds by clear and convincing evidence that Mr. Woods is not likely to flee or pose a danger to the safety of any other person or the community if released. The Court also finds that Mr. Woods's appeal is not for the purpose of delay. Accordingly, the legal standard applicable to Mr. Woods's Motion collapses to a two-prong analysis. To remain out on bond pending appeal, Mr. Woods must show: (1) that his appeal will present a close question that could go either way; and (2) that if this close question is decided in his favor, it is more likely than not that reversal or a new trial will result.

### III. DISCUSSION

In his Motion, Mr. Woods raises four issues that he contends will present substantial questions of law or fact on appeal and that are likely to result in reversal or a new trial. The first issue is whether this Court should have dismissed the indictment after finding that FBI Special Agent Robert Cessario destroyed evidence. The second and third issues concern whether Mr. Woods performed an "official act" in exchange for bribes.

---

[2] Mr. Woods does not contend that any issues on appeal would present substantial questions that are likely to impact his sentence in the manner contemplated by 18 U.S.C. § 3143(b)(1)(B)(iii)-(iv).

4

And the fourth issue concerns whether this Court conducted improper *ex parte* communications with the jury during the jury's deliberations. The Court examines each of these issues below, in the sequence just listed.

## A. Destruction of Evidence and Dismissal of the Indictment

For the benefit of any readers who are not already familiar with the extensive docket in this case, a good bit of background is necessary before discussing the merits of Mr. Woods's first issue. The Court provides a summary here of the relevant facts and case history, but readers seeking more detail should turn to this Court's forty-six-page Opinion filed at Doc. 297 on March 2, 2018.

Micah Neal is a former representative in the Arkansas General Assembly, and was a coconspirator in both of the bribery schemes for which Mr. Woods was convicted at trial. Mr. Neal was also a cooperating witness for the Government in this case. Back in April 2017, as part of the discovery process in this case, "the Government's lawyers turned over to the Defendants copies of secret recordings that Mr. Neal had made of conversations he had with Mr. Woods and others." *See* Doc. 297, p. 30. Mr. Woods and his codefendants expressed concern to the Government and to the Court that additional undisclosed recordings might exist; and in November 2017, counsel for both sides learned that additional recordings indeed existed, and were in the possession of Mr. Neal's attorney, Shane Wilkinson. *See id.* As this Court has previously explained:

> The Defendants were concerned that these recordings might contain exculpatory evidence, and argued that the Government intentionally withheld the fact of these recordings' existence from the Defendants until very late in the process so as to prejudice their ability to prepare for trial. The trial was reset for April 9, 2018, in order to allow time for an evidentiary hearing on these matters.

5

The parties learned that a paralegal in Mr. Wilkinson's office named Karri Layton had uploaded the Neal recordings to a Dropbox account and had given Agent Cessario access to that account in early November 2016. The Government further learned that Agent Cessario had used a Government-issued laptop to access that Dropbox account. So in early December 2017, one of the Government's attorneys in this case, Aaron Jennen, instructed Agent Cessario to have another agent deliver that laptop to an FBI forensic examiner in Little Rock named Timothy Whitlock, so that Agent Whitlock could search it for information relevant to this Dropbox activity in advance of the evidentiary hearing. But on December 12, Agent Cessario informed Mr. Jennen that instead of complying with these instructions, he had wiped the laptop and then delivered it to Agent Whitlock himself. And with that fateful act, there was suddenly a lot more on the agenda for the pending evidentiary hearing than this Court and the parties had originally anticipated.

The evidentiary hearing, which had initially been set for December 14, 2017, see Doc. 232, was reset for January 25, 2018, see Doc. 243. It ended up running not only into a second day, on January 26, see Doc. 281, but also a third, on February 15, see Doc. 291. Over the course of this three-day hearing, the Court received testimony not only from Agent Cessario, but from many other witnesses as well. The Court had two primary fact-finding objectives for this hearing. One objective was to determine when the Government first became aware of the Neal recordings that surfaced in November 2017, and what prejudice, if any, the Defendants had suffered from the timing of their disclosure. The other objective was to determine why Agent Cessario had wiped his laptop, what relevant information, if any, had been destroyed by that act, and what prejudice, if any, the Defendants had suffered from that act.

See Doc. 297, pp. 30–31.

With respect to the hearing's first objective, the Court ultimately found, on the basis of the evidence received at the hearing, that Mr. Neal made all of his secret recordings of his own initiative and not at the direction or under the oversight of the Government, that "the Government did not become aware of the additional Neal recordings until November 2017, when it likewise made the Defendants aware of their existence," and that the Defendants did not suffer any prejudice "from the timing of the Government's disclosure" because "soon after the recordings were discovered, the trial date was continued for four months, giving the Defendants ample time to review those recordings and to adjust their

6

trial strategies accordingly if they wished." *See id.* at 33–34. The evidentiary basis for these findings is discussed in much greater detail at Doc. 297, pp. 34–36.

With respect to the hearing's second objective, the Court found, on the basis of the evidence received at the hearing, that "Agent Cessario lied to the Government's attorneys and to Agent Whitlock" about when and why he wiped the laptop, *see id.* at 37, that "Agent Cessario lied on the stand" about why he lied to the Government's attorneys and about why he wiped the laptop,[3] *see id.* at 37–38, and that "we will probably never know" what Agent Cessario was trying to conceal when he wiped the laptop, *see id.* at 39. The Court further found that "Agent Cessario committed intentional misconduct when he wiped the laptop," but that "there is no evidence in the record to show, and no good reason to believe, that he destroyed any information that is material to the charges and defenses in this case but not already in the Defendants' possession." *See id.* at 43. Noting that the laptop's original relevance to this case was that it should be examined for information that might be introduced about this same hearing about the Neal recordings, the Court pointed out that "notwithstanding the wiping of the laptop, the Court has been able to get to the bottom of the matter for which that evidentiary hearing was originally set." *See id.* at 43– 44. Therefore, since "the Defendants [had] not shown that they [had] suffered any prejudice or substantial risk of prejudice from the wiping of the laptop," and had not shown that they had suffered any cumulative prejudice from any other Governmental misconduct, the Court ruled that "'dismissal of the indictment is plainly inappropriate' here." *See id.* at 44 (quoting *United States v. Manthei*, 979 F.2d 124, 127 (8th Cir. 1992)).

---

[3] Agent Cessario testified at the hearing that he wiped the laptop in order to protect sensitive medical records pertaining to himself and another family member. *See* Doc. 297, p. 38. The Court did not find this testimony credible. *See id.*

The evidentiary basis for these findings is discussed in much greater detail at Doc. 297, pp. 36–44.

However, the Court also found that however minimal or nonexistent the ultimate prejudice to the Defendants from Agent Cessario's actions, the information on Agent Cessario's laptop about the Dropbox account nevertheless constituted "potentially useful evidence" since it related to the Neal recordings, which were the originally-intended subject of the evidentiary hearing. *See id.* at 45. The Court further found that "[s]ince Agent Cessario destroyed it in bad faith, that constitutes a Fifth Amendment violation." *See id.* Accordingly, as a sanction for the Fifth Amendment violation, the Court ordered that "the Government may not introduce in its case-in-chief at trial any covert recordings that were made by Micah Neal," and that "the Government may not call FBI Agent Robert Cessario as a witness in its case-in-chief at trial." *See id.*

In support of his Motion for Release Pending Appeal, Mr. Woods argues that "once it was established the lead F.B.I. agent acted in bad faith in either the destruction of exculpatory evidence or potentially useful evidence, the only available remedy to Mr. Woods, due to the evisceration of his right to due process and fundamental fairness, was dismissal." *See* Doc. 484, p. 8. His brief states that "Mr. Woods bases his argument primarily on *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988[)] and *Illinois v. Fisher*, 540 U.S. 544, 547–49 (2004)." *See id.* But *Youngblood* and *Fisher* say nothing of the sort. Rather, *Youngblood* and *Fisher* were only concerned with determining when destruction of evidence rises to the level of a due-process violation; they say absolutely nothing at all about what *remedies* are appropriate for due-process violations.

8

Under *Brady v. Maryland*, 373 U.S. 83 (1963), suppression by the prosecution of material exculpatory evidence constitutes a due-process violation regardless of whether the suppression was done in good or bad faith. *See Youngblood*, 488 U.S. at 55; *Fisher*, 540 U.S. at 547. But *Youngblood* drew a distinction between the sort of "material exculpatory evidence" contemplated by *Brady* on the one hand, and evidence that was merely "potentially useful" on the other, and held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does *not* constitute a denial of due process of law," 488 U.S. at 58 (emphasis added). *Fisher* simply reaffirmed *Youngblood*'s holding that "failure to preserve . . . 'potentially useful evidence' does not violate due process '*unless a criminal defendant can show bad faith on the part of the police*,'" *see* 540 U.S. at 547–48 (emphasis in original), and further emphasized that "the applicability of the bad-faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence," *see id.* at 549.

This Court explicitly relied on both *Youngblood* and *Fisher* in finding that *Mr. Woods's due process rights had been violated* by Agent Cessario's *bad faith destruction of potentially useful evidence. See* Doc. 297, pp. 44–45. So Mr. Woods is correct when he argues that under *Youngblood* and *Fisher*, his constitutional rights were violated regardless of whether Agent Cessario's laptop contained material exculpatory evidence or merely potentially useful evidence that was destroyed in bad faith. *See* Doc. 484, p. 9. But he misses the point, because this Court has *already ruled in his favor on this issue*. Again, Mr. Woods's grievance here goes not to whether a constitutional violation

9

occurred, but rather to what the *remedy* for that violation should be; and again, *Youngblood* and *Fisher* say precisely nothing about that.

In fact, Mr. Woods's Brief cites zero cases that have anything to say about when dismissing the indictment is an appropriate remedy for due-process violations. But this is not because no such caselaw exists—it *does* exist in the form of binding and well-settled Supreme Court and Eighth Circuit precedent. It counsels against the remedy that Mr. Woods seeks; this Court explicitly relied on it when fashioning its remedy for the due-process violation in this case; and the Eighth Circuit will be no more free to disregard that binding precedent on appeal than this Court was at trial.

Specifically, in *United States v. Blue*, the Supreme Court rejected the proposition that a Fifth Amendment violation automatically requires "barring the prosecution altogether" where some lesser remedy is available that is more proportional to the harm, because while "[s]o drastic a step" as dismissing the indictment "might advance marginally some of the ends served by exclusionary rules, . . . it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book." *See* 384 U.S. 251, 255 (1966). Fifteen years later in *United States v. Morrison*, the Supreme Court reiterated that "[a]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, *even though the violation may have been deliberate*." 449 U.S. 361, 365 (1981). The Eighth Circuit, of course, has acknowledged this binding Supreme Court precedent, and has characterized dismissal of an indictment as a "drastic step" that "is a disfavored remedy," cautioning district courts that if prosecutorial misconduct has not "caused substantial prejudice to the defendant"

10

then "this court *will* find that the district court's dismissal of an indictment *is an abuse of its discretion.*" *See Manthei*, 979 F.2d at 126–27 (emphasis added).

This Court does not believe that any of the foregoing legal analysis presents a "substantial question"—*i.e.*, that it presents "a close question or one that could go either way." *See United States v. Powell*, 761 F.2d 1227, 1233–34 (8th Cir. 1985). The governing cases simply say what they say; this Court heavily quoted them and explicitly relied on them when denying Mr. Woods's motion to dismiss the indictment, *see, e.g.*, Doc. 279, p. 33; and Mr. Woods does not so much disagree with this Court's interpretation of those cases as he just ignores them altogether.

So when Mr. Woods eventually argues on appeal that dismissal of the indictment is the only proper remedy for Agent Cessario's laptop wipe, the proper question for the Eighth Circuit to answer will be whether this Court abused its discretion by refusing to dismiss the indictment. In answering that question, the Eighth Circuit will be aware that Mr. Woods had the burden of proving to this Court that he was substantially prejudiced by Agent Cessario's actions, *see United States v. Larsen*, 427 F.3d 1091, 1094–95 (8th Cir. 2005), and it will review this Court's factual findings on that issue for "clear error," *see United States v. Nieman*, 520 F.3d 834, 838 (8th Cir. 2008). "Review for clear error requires a specific level of deference to the fact-finder's views: where there are two permissible views of the evidence, the fact-finder's choice between them *cannot* be clearly erroneous." *United States v. Almeida-Perez*, 549 F.3d 1162, 1173 (8th Cir. 2008) (emphasis added). And review for abuse of discretion looks to whether a district court failed to consider a relevant and significant factor, gave significant weight to an irrelevant or improper factor, or committed a clear error of judgment in weighing appropriate factors.

See, e.g., United States v. Johnson, 812 F.3d 714, 715 (8th Cir. 2016) (reviewing a district court's sentence for abuse of discretion); United States v. Koory, 20 F.3d 844, 847 (8th Cir. 1994) (reviewing a district court's refusal to dismiss an indictment under the Speedy Trial Act for abuse of discretion).

On March 2, 2018, this Court devoted seventeen pages of a forty-six-page Opinion to a thorough analysis of the evidence received at the three-day hearing regarding Agent Cessario's laptop wipe and the Neal recordings, of the applicable law, and of the Court's reasoning in support of its factual findings and rulings. See Doc. 297, pp. 30–46. In light of that exhaustive analysis, and given the extremely deferential nature of the applicable standards of review, this Court does not think it is a "close question" whether it abused its discretion in fashioning its remedy for the constitutional violation, or based its decision on a clearly erroneous factual finding in declining to dismiss the indictment in this case. And as already noted, the Court believes the law governing this issue (which will be reviewed de novo) is well-settled, crystal-clear, and not open to reasonable dispute. In other words, the Court does not believe a "substantial question" is presented on appeal by the issue of whether Agent Cessario's misconduct required this Court to dismiss the indictment.

However, one final set of observations is necessary before moving on to consider Mr. Woods's other issues on appeal. In Mr. Woods's Brief, at the end of the section discussing the matter of whether the indictment should have been dismissed, Mr. Woods asserts that if he "wins this argument on appeal, his case could be dismissed, or at the very least, a new trial granted where Mr. Woods is allowed to put on the evidence of the agent[']s 'bad faith' destruction of records." See Doc. 484, p. 9. Mr. Woods is conflating separate issues here. The Court's remedy for the violation of Mr. Woods's Fifth

Amendment rights was a prohibition on *the Government* calling Agent Cessario or introducing the Neal recordings in its case-in-chief; that remedy did not place any restrictions whatsoever on any of the Defendants. The Court did not prohibit anyone from putting on evidence of Agent Cessario's laptop wipe until a month later, on April 3, when the Court partially granted a motion in limine by the Government that sought exclusion of such evidence from trial under Fed. R. Evid. 403 on the grounds that it would be irrelevant and unfairly prejudicial. *See* Doc. 317, pp. 4–7.

In ruling on the Government's motion to exclude, the Court acknowledged the only argument the Defendants made in opposition, which was that "they need such evidence in order to have a meaningful opportunity to cross-examine Mr. Neal and attack his credibility when he testifies at trial." *See id.* at 5. The Court expressed puzzlement over what "*Agent Cessario*'s actions with respect to wiping his laptop have to do with *Mr. Neal*'s credibility as a witness," and noted that "the Government is not asking the Court to prohibit the Defendants from cross-examining Mr. Neal about" the recordings he made or of when he gave them to Agent Cessario. *See id.* at 5–6 (emphasis in original). The Court emphasized that "[t]he Defendants are free to cross-examine Mr. Neal about the recordings he made[,] . . . his interactions with Agent Cessario[,] . . . who he gave his recordings to and when he did so[,]" and "his motives for testifying[,]" and the Court acknowledged the possibility that "Mr. Neal's responses to those questions will lay some presently unforeseeable foundation to connect his testimony with Agent Cessario's decision to wipe the laptop." *See id.* at 6.

Ultimately, the Court recalled its finding from a month earlier that "there is 'no evidence in the record to show, and no good reason to believe, that [Agent Cessario]

13

destroyed any information that is material to the charges and defenses in this case but not already in the Defendants' possession,'" *id.* (alterations in original) (quoting Doc. 297, p. 43), and stated that "*[a]bsent some new or different evidence to undermine that finding,* excluding evidence of Agent Cessario's laptop wipe will not deprive the Defendants of *a meaningful opportunity to cross-examine Mr. Neal,*" *id.* (emphasis added). The Court then weighed this against the "obvious and extreme" danger of unfair prejudice presented by evidence of the laptop wipe which, based on the Court's prior experience with the three-day hearing, the Court expected "would likely devolve into a bewildering multi-day mini-trial on that issue alone, despite the fact that it has nothing to do with the charges and defenses in this case." *See id.* at 6–7. The Court also noted the "high risk" that "after being inundated with days' worth of evidence regarding Agent Cessario's misconduct . . . the jury might base its verdict on a desire to punish the Government . . . instead of on the overall body of evidence that is relevant to the charges and defenses in this case." *See id.* at 7. Thus, the Court concluded that the evidence's probative value was substantially outweighed by a danger of unfair prejudice, confusing the issues, and wasting time; but in so ruling, the Court also emphasized "that it cannot possibly anticipate how all of the evidence will come in at trial, and that testimony may well be given that could alter the foregoing analysis." *See id.* So rather than flatly prohibiting introduction of such evidence at trial, the Court simply prohibited the parties from introducing it "without having first obtained leave from the Court to do so," and instructed the parties that if at any time during trial any of them believed an adequate foundation had been laid to justify introducing such evidence, that party should seek leave from the Court to do so. *See id.*.

If Mr. Woods challenges this ruling on appeal, the Eighth Circuit will review it for abuse of discretion, *see United States v. Myers*, 503 F.3d 676, 682 (8th Cir. 2007), a deferential standard which the Court has already described above. The Court does not believe the issue of whether it abused its discretion in making this ruling will present a "close question" on appeal, given that the Court carefully considered the Defendants' arguments in opposition to the Government's request, weighed the evidence's probative value against its risk of unfair prejudice, confusing the issues, and wasting time, and explicitly left the door open for the Defendants to lay a foundation for its introduction or to otherwise re-raise the issue at trial. It is also worth noting that the Defendants chose not to avail themselves of that opportunity at trial, even after the Court permitted them to call *Agent Cessario* to the stand.[4]  *See generally* Doc. 366.

In sum, the Court does not believe any of the issues surrounding Agent Cessario's laptop wipe will present a "substantial question" on appeal, whether raised in the context of this Court's decision not to dismiss the indictment, or in the context of this Court's liminal ruling to exclude evidence of the laptop wipe from trial. So the Court will now proceed to consider the issues Mr. Woods intends to raise on appeal regarding "official acts."

## B. Official Acts

At trial, this Court instructed the jury that one of the elements of honest services fraud requires that the Defendant "voluntarily and intentionally devised or participated in

---

[4] Indeed, despite being reminded by the Court immediately prior to Mr. Neal's testimony that they were free to cross-examine Mr. Neal about his secret recordings, *see* Doc. 488, pp. 4–15, the Defendants ultimately elected not even to bring the topic up during their cross-examination of Mr. Neal, *see generally* Doc. 359, pp. 64–158.

a scheme to defraud the public of its right to the honest services of a public official through bribery." See Doc. 383, pp. 19, 25, 29. This instruction was lifted directly from the Eighth Circuit's Model Jury Instructions. See 8th Cir. Crim. Jury Instr. § 6.18.1346 (2017). This Court further instructed the jury that "[t]he phrase 'scheme to defraud' as used in this instruction means any plan or course of action intended to deceive or cheat another out of the right to honest services where a bribe or kickback is solicited, paid, or received in exchange for *official action* or an *official act*." See Doc. 383, pp. 19–20, 25, 29 (emphasis added). This too was lifted directly from the Eighth Circuit's Model Jury Instructions. See 8th Cir. Crim. Jury Instr. § 6.18.1346 (2017). However, the Eighth Circuit Model Jury Instructions did not contain any separate instruction on the definition of "official act." Since this phrase is potentially subject to a wide variety of lay interpretations, and was the topic of a recent prominent Supreme Court case, *McDonnell v. United States*, 136 S. Ct. 2355 (2016), this Court thought it prudent to craft and deliver an additional jury instruction on the definition of the phrase "official act." It did so in its jury instruction separately numbered and titled "Final Instruction No. 13—Official Act." See Doc. 383, pp. 38–40.

Mr. Woods identifies two arguments that he intends to raise on appeal regarding whether he performed an "official act" in exchange for bribes. His first such argument is described in his Brief as follows:

> Mr. Woods' appeal presents the substantial question whether a public official takes "official action" when he asks an aide a question, encourages a constituent to apply for state funds, connects individuals or organizations with each other, or asks a fellow legislator to aid an individual or organization without taking the further step of asking the aide, organization, or any other government official to take any particular action on the government's behalf before, during, or after the meeting or event. This case is the first to find that such actions qualify as "official" ones under federal law.

16

(Doc. 484, pp. 9-10). This argument radically mischaracterizes what the Court's instructions to the jury were, what the state of the caselaw is, what the Government's accusations against Mr. Woods were, what the evidence at trial was, and what the jury found beyond a reasonable doubt that Mr. Woods had done.

The Court instructed the jury that for something to be an "official action" or "official act," it must satisfy both of the following elements:

*One*, the government must identify a question, matter, cause, suit, proceeding, or controversy that may at any time be pending or may by law be brought before a public official, which would involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee; and

*Two*, the government must prove that the public official *either* agreed to make a decision or take an action, *or* actually did make a decision or take an action, on that question, matter, cause, suit, proceeding, or controversy.

See Doc. 383, p. 38 (emphasis in original). And the Court further instructed the jury, in relevant part, that:

*Merely hosting an event, meeting with other officials, speaking with interested parties, or expressing support for a pending matter, is not, standing alone, an official act.* However, evidence that a public official hosted an event, met with other officials, spoke with interested parties, or expressed support for a pending matter, may be considered as evidence that the public official agreed to take an official act, if such evidence is corroborated by other evidence that in doing so the public official was attempting to pressure or advise another public official on a matter pending before that other public official. An official act by a public official may include using his official position to exert pressure on another official to perform an official act, or to advise another official, *knowing or intending that such advice will form the basis for an official act by another official.*

*Id.* at 39 (emphasis added).

Simply put, then, this Court's instructions to the jury were effectively the very *opposite* of what Mr. Woods contends was the theory under which he was found to have taken "official acts" in exchange for bribes. And there was nothing novel or

17

unprecedented about these instructions. Any reader, whether trained in the law or not, may easily see this by simply comparing them with the following direct quotes from binding United States Supreme Court precedent:

> [A]n "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. . . . To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

*McDonnell v. United States*, 136 S. Ct. 2355, 2371–72 (2016). And a little earlier in *McDonnell*, this:

> Of course, this is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act, or is irrelevant . . . . If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act. A jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal.

*Id.* at 2371. In other words, the United States Supreme Court has squarely considered the very issue that Mr. Woods raises, and this Court essentially quoted to the jury what the Supreme Court had to say about it.

Likewise, the Government's accusations and the evidence at trial were well within the four corners of this legal precedent. As this Court has recapped in another post-verdict Order:

The Government's evidence at trial concerned two separate schemes involving corruption of Mr. Woods while he was a senator in the Arkansas General Assembly. In both of these schemes, the Government put on proof that Mr. Woods took official actions to direct money from the General Improvement Fun ("GIF") to private entities—in exchange for cash payments to him, and also in exchange for the hiring of his friends or loved ones by the entities (or their affiliates) who received the GIF money.

\* \* \*

At trial, the Government introduced legislative records into evidence, showing that Mr. Woods and Mr. Neal, along with other legislators, sponsored and voted for legislation that appropriated GIF to economic development districts, including the Northwest Arkansas Economic Development District ("NWAEDD"). *See, e.g.*, Government Exhibits 122–26. Many witnesses with direct knowledge of the economic development districts' GIF grant award process, including former NWAEDD executive director Mike Norton, NWAEDD deputy director Jeremy Ragland, West Central Arkansas Planning and Development District ("WCAPDD") director Dwayne Pratt, Mr. Neal, state senator Bart Hester, and Berryville Mayor Tim McKinney (who was on the NWAEDD's board of directors), all testified that those districts' GIF award process was effectively controlled by individual legislators, with each legislator in a district being apportioned a share of that district's GIF to award to applicants as he wished. This testimony was corroborated by extensive documentary evidence, including spreadsheets maintained by Mr. Norton that tracked Mr. Woods's and Mr. Neal's shares of the NWAEDD's GIF, numerous emails in which Mr. Woods instructed the NWAEDD to award his own GIF to various applicants, and text messages and emails from Mr. Woods to Mr. Hester and Mr. Norton regarding awards of other legislators' GIF. *See, e.g.*, Government Exhibits 116, 142–43, 149, 161, 175–81.

(Doc. 422, pp. 3, 8–9). And when the Court defined the phrase "official act" for the jury,

it reminded the jury that:

In this case, the government alleges that Mr. Woods and Micah Neal agreed to accept bribes or kickbacks in exchange for approving and directing GIF monies from Economic Development Districts to specific recipients, advising other legislators and Economic Development District officials to direct and approve GIF monies from Economic Development Districts to specific recipients, and sponsoring and voting for legislation directing GIF monies to Economic Development Districts and state agencies for grants to specific recipients. When considering the elements of a Count for Honest Services Fraud, it will be your responsibility to determine whether the government has proved beyond a reasonable doubt the existence of a

19

scheme to defraud that involved a bribe or kickback in exchange for an official act.

(Doc. 383, pp. 38–39).

So this Court disagrees with Mr. Woods's contention that his appeal "presents the substantial question whether a public official takes 'official action' when he asks an aide a question, encourages a constituent to apply for state funds, connects individuals or organizations with each other, or asks a fellow legislator to aid an individual or organization without taking the further step of asking the aide, organization, or any other government official to take any particular action on the government's behalf before, during, or after the meeting or event." Whatever case Mr. Woods is describing, it is not this one. *This* case presents the question whether a legislator takes "official action" when he sponsors and votes on legislation, when he instructs agencies to disburse public monies that those agencies have specifically committed to his discretion, or when he asks or advises other legislators to do the same while knowing or intending that they will honor his request. And that question is not a "substantial" one, because the Supreme Court has already directly answered it, as described above.

As noted above, Mr. Woods identifies *two* arguments for appeal regarding "official acts." His second argument regarding "official acts" presents no more substantial a question than his first one. Essentially, his second argument is that when a public official such as himself "conduct[s] or arrange[s] meetings, ask[s] aides questions, or make[s] public appearances in exchange for payments," those do not constitute "official acts" for purposes of honest services fraud "as long as the official does not pressure other government officials into exercising governmental power in favor of the donor or gift-giver." *See* Doc. 484, pp. 10–11. But *McDonnell* does not limit its definition of "official

20

act" in that manner. As already discussed, *McDonnell* explicitly states that it is also "an 'official act,' . . . to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *See* 136 S. Ct. at 2372. This Court, and the Eighth Circuit, must operate under the assumption that the Supreme Court means what it says; and contentions to the contrary do not present "substantial questions" within the meaning of 18 U.S.C. § 3143(b)(1)(B).

Before proceeding to Mr. Woods's final appellate issue, there is one remaining note this Court would make on the matter of "official acts." Mr. Woods never explicitly argues in his Motion for Release Pending Appeal that a "substantial question" is presented by the issue of whether there was sufficient evidence at trial to support the verdict. But it occurs to the Court that another possible way of casting his arguments regarding "official acts" would be if he were to contend that there was insufficient evidence at trial to support a finding beyond a reasonable doubt that he ever undertook any actions in exchange for payments from Ecclesia and AmeriWorks, beyond merely asking aides questions, encouraging constituents to apply for state funds, connecting individuals or organizations with each other, or asking fellow legislators to aid individuals or organizations. If this is Mr. Woods's implicit argument, then the Court rejects it, in light of the abundant evidence introduced at trial supporting the verdict, and the deferential standards of review applied to jury verdicts, as was described at much greater length in this Court's prior Order at Doc. 422.

## C. *Ex Parte* Communications with the Jury

The final issue for appeal that Mr. Woods contends will present a substantial question of law or fact and is likely to result in reversal or a new trial, is his claim that this

21

Court conducted improper *ex parte* communications with the jury during the jury's deliberations. The event to which Mr. Woods refers occurred on May 3, 2018, Day 19 of the trial, which was also the day on which the jury eventually returned its verdict. The Court will recap those events here for background.

Court convened at 8:34 a.m. that day, and the jury was released three minutes later to begin its third day of deliberations. *See* Doc. 377, p. 1. A few minutes before 10:00 a.m., the jury sent the following written question to the Court:

Final Jury Instructions P. 18

Beginning
        "Mr. Woods, and later Micah Neal; . . .
Ending Strategic Consulting LLC; . . .

When considering possible
illegal activity:

1. Do monies have to flow to
   Ecclesia College and
2. Do payments have to be made
   to
3. Mr. Woods and
4. Mr. Neal

Is the paragraph in Element One a
General description or specific criteria
that needs to be met?

[JUROR SIGNATURE REDACTED]

The Court promptly marked the question as Court Exhibit 17, emailed a copy of Court Exhibit 17 to all trial counsel, and asked them "to be ready to discuss this question from the jury on the record" as soon as the Court finished conducting a change of plea hearing in another case. *See* Doc. 490-3, p. 2.

22

That on-the-record discussion with all trial counsel commenced at 11:04 a.m., outside the presence of the jury. *See* Doc. 377, p. 1. Roughly ten minutes before then, the Court had provided all trial counsel with paper copies of a response that the Court would propose giving the jury, which it had marked as Court Exhibit 18. *See* Doc. 489, pp. 4–5. Importantly, when the parties went on the record at 11:04 a.m. to discuss the jury's question and the Court's proposed response, the Court had not yet actually sent any response to the jury. Court Exhibit 18 was merely a response that the Court was *contemplating* sending to the jury, and the attorneys for all parties spent more than twenty minutes extensively discussing, on the record, their parties' respective positions and objections, if any, to the response proposed in Court Exhibit 18. *See generally* Doc. 489, pp. 4–22. Again, that entire discussion was held on the record; it began more than an hour after the Court notified all the parties of the jury's question; and attorneys for all parties were present at and participated in this twenty-minute on-the-record discussion.

At the conclusion of that discussion, the Court made the following statement to the attorneys:

> All right. The Court's going to take all of your comments under further advisement. We will let you know whether we are, in fact, going to send back Court's Exhibit 18. To the extent that we make modifications based on your comments, we will remark that as Court's Exhibit 19, again, if necessary, and we will provide you with a copy of the modified instruction— or any modified response when it is sent back. So we're in recess at this time.

(Doc. 489, p. 22). No party voiced any objection at that time to the procedure the Court had just described.

Roughly ten minutes after the Court recessed, the Court made two minor revisions to Court Exhibit 18, labeled the new response as Court Exhibit 19, sent Court Exhibit 19

23

to the jury, and emailed a copy of Court Exhibit 19 to all the attorneys, along with a description of the two changes that had been made. The Court's delivery of Court Exhibit 19 to the jury is the event that Mr. Woods contends was an improper *ex parte* communication with the jury that is likely to result in reversal or a new trial. He asserts that "[t]he answer the Court gave the jury was not known to Mr. Woods until his counsel received that email, Mr. Woods was not given an opportunity to object or allowed to argue the merits of the answer given, the jury was not recalled to the court room, and Mr. Woods was not allowed to be present in court while the answer was given to the jury." *See* Doc. 484, pp. 19–20.

Before diving into the caselaw that governs this issue, it is important to highlight exactly what the differences were between Court Exhibits 18 and 19. Those Exhibits are attached to this Order at Docs 490-1 and 490-2, respectively. But, for the reader's ease, the Court will block-quote here, in the body of this Order, its entire response that was sent to the jury in Court Exhibit 19. The only parts of that response that differ from Court Exhibit 18 are **underlined and in bold**. The Court's response in Court Exhibit 19 reads as follows:

The paragraph in Element One that describes the alleged scheme to defraud is a **summary** of the alleged scheme. In order for you to find that the Government has proved Element One beyond a reasonable doubt with respect to the particular Defendant and Count you are considering, it is not necessary for you to find that payments were actually made to any particular person or entity, and it is not necessary for you to find that monies actually flowed to Ecclesia College. With respect to Element One, you are simply being asked to determine whether the Government has proved beyond a reasonable doubt that the particular Defendant you are considering "voluntarily and intentionally devised or participated in a scheme to defraud the public of its right to the honest services of a public official," which scheme is **summarized** in the paragraph you referenced. When determining whether Element One has been proved beyond a reasonable doubt, bear in mind the definition of the phrase "scheme to defraud" that

24

appears in the first paragraph of the "Definitions and Explanations" section of Final Instruction No. 7, as well as the definition of "official action" or "official act" that appears in Final Instruction No. 13.

In order for you to find that the Government has proved Element Four beyond a reasonable doubt with respect to the particular Defendant and Count you are considering, it is not necessary for you to find that the particular use of an interstate wire facility associated with that Count specifically involved monies or payment. Rather, with respect to Element Four, if you find beyond a reasonable doubt that "the defendant used, or caused to be used, an interstate wire facility" as I explained to you in Court Exhibit 16 in response to your previous question to me yesterday, then you may find that Element Four has been satisfied if you also find beyond a reasonable doubt that the use of an interstate wire facility associated with the Count you are considering was "in furtherance of, or in an attempt to carry out, some essential step in the scheme."

Compare Doc. 490-1 with Doc. 490-2. To be perfectly clear, then—the entire wall of text quoted above, which was sent to the jury, was identical to the proposed response that the attorneys for all parties spent twenty minutes discussing with the Court, on the record, before any response was sent, except for two changes: in one spot, the words "general description" were replaced with the word "summary," and in another spot, the words "generally described" were replaced with the word "summarized." See id.

A little over two hours later, counsel for Mr. Woods's codefendant emailed the Court to inform it that "Defendant Shelton would like to make a record that he objects to Court's Exhibit 19 and the fact that it went to the jury without counsels' ability to make a record of their objections." See Doc. 490-3, p. 1. The Court responded thirteen minutes later with an email to all attorneys that it would reconvene and go on the record to take up the matters Mr. Shelton's attorney had raised. See id. The Court reconvened at 2:23 p.m. with attorneys for all parties, on the record and outside the presence of the jury. See Doc. 377, p. 1. At that time, the Court described its reasons for changing "general

description" and "generally described" to the words "summary" and "summarized,"[5] respectively, and then stated:

So having made those two small wording changes, the Court marked that as Exhibit 19; and consistent with what it had explained would happen, it took—or it had the clerk send its answer to the jury's question in the form of Exhibit 19, and at that time the parties were provided with a copy of Exhibit 19. What the Court did not do was give an opportunity for the parties to make any further record that they would like to make, which they certainly have a right to do, and the parties have requested an opportunity to make a further record on apparently why they believe the Court's changing the "general description" to "summary" or "summarize" was inappropriate, and I'm very happy to entertain that record at this time.

See Doc. 489, pp. 22–25.

At this point, twenty-four minutes of discussion and objection ensued, during which time neither counsel for Mr. Woods nor counsel for Mr. Shelton ever so much as once stated what their substantive objections, if any, were to the changes the Court made to Court Exhibit 18. See generally Doc. 489, pp. 25–41. Instead, they simply objected over and over again to having not received the opportunity to object to the change before it was sent to the jury. See id. The following especially ironic remark was made at one point by counsel for Mr. Woods: "I realize now that the Court is providing that opportunity for us to do so. But at this time it's been done. The instruction is already sent back, in violation of what I perceive to be these rules. I have to ask for a mistrial at this time because of it. It is prejudicial. I don't think there's anything that you can do to cure it." Id. at 30–31. The irony here is that there was a very obvious cure available to him in that

---

[5] This change was prompted by arguments made by counsel from all parties during the on-the-record discussion of Court Exhibit 18, and was done in order to bring the wording of the Court's response into closer alignment with 8th Cir. Crim. Jury Instr. § 6.18.1346 (2017). See Doc. 489, pp. 24–25.

very moment: make an argument on the record as to *why* the changes were prejudicial, and then ask the Court to *send the jury a curative instruction that remedies the prejudice*.

There is, of course, an obvious reason why neither Defendant ever made any substantive objection to the changes despite being given more than twenty minutes of time to do so on the record: they had no substantive objection to the changes. They knew, just as well as any other person who is fluent in the English language, that in this context "summary" means the same thing as "general description," and that the Court's changes made no substantive difference whatsoever. Every single substantive objection they had to Court Exhibit 19 had already been placed on the record during the earlier discussion of Exhibit 18, and was preserved for appeal. The changes did not prejudice them; and even if there had been prejudice, they declined to identify it so that the Court could cure it, despite being given ample opportunity to do so before the jury returned its verdict.

The Court will assume here for the sake of argument that a "substantial question" is presented by the issue of whether the Court erred by sending Court Exhibit 19 to the jury without first giving the parties the opportunity to object to it having changed the words "general description" and "generally described" to "summary" and "summarized," respectively. But the reader will recall from Section II of this Order that if a "substantial question" exists, a second requirement must also be satisfied before the Court may permit Mr. Woods to remain out on bond during his appeal: that if this close question is decided in Mr. Woods's favor, it is more likely than not that reversal or a new trial will result. That requirement is not met here.

27

Mr. Woods cites two cases in his Brief, and referenced an additional one during the discussion on the record, in support of his argument on this point. But none of them is apposite. It is true that in all three cases—*Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76 (1919), *Shields v. United States*, 273 U.S. 583 (1927), and *Rogers v. United States*, 422 U.S. 35 (1975)—the Supreme Court reversed and remanded for new trials where the trial courts had sent *ex parte* responses to questions from juries. But in *Fillipon*, the *ex parte* communication conveyed an instruction that was "erroneous and calculated to mislead the jury," and therefore "presumptively injurious." *See* 250 U.S. at 82. And in *Shields* and *Rogers*, the parties did not learn of the *ex parte* communications until well after the verdicts had been returned, thus depriving them of the opportunity to make any objections to the communications or to cure any prejudice therefrom. *See Shields*, 273 U.S. at 585; *Rogers*, 422 U.S. at 41. Neither of those factors is present here. The Defendants were given ample opportunity to object to the Court's use of the word "summary" before the jury returned its verdict, and to cure any prejudice that may have resulted from that change. And the Defendants made no such objection and identified no such prejudice, for the rather obvious reason that none existed.

In *Rogers*, the Supreme Court acknowledged that *ex parte* judicial responses to jury questions "may in some circumstances be harmless error." *See* 422 U.S. at 40. And the Federal Rules of Criminal Procedure, when discussing "harmless error," instruct that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." So it is here. Assuming the Eighth Circuit finds this Court erred in sending Court Exhibit 19 to the jury before giving the parties an opportunity to object to its changes of "general description" and "generally described" to "summary" and "summarized," this

Court believes it far more likely than not that the Eighth Circuit would find that such error is harmless and should be disregarded. The corollary, then, is that it is *not* more likely than not that reversal or a new trial would result.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Jonathan E. Woods's Motion for Release Pending Appeal (Doc. 483) is **DENIED**. Mr. Woods's deadline to report to the institution designated by the Bureau of Prisons where he shall begin his term of imprisonment remains 1:00 p.m. on Wednesday, September 26, 2018.

**IT IS SO ORDERED** on this __24th__ day of September, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

29