**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**V.**                               **CASE NO. 5:17-CR-50010-001**

**JONATHAN E. WOODS**                                    **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

Defendant Jonathan Woods was convicted in this Court on May 3, 2018, for his role in two public corruption schemes. Currently before the Court are Mr. Woods' Motion for Relief Pursuant to Federal Rule of Criminal Procedure 33 for *Brady* Violations (Doc. 552) and Brief in Support (Doc. 553), and the Government's Response in Opposition (Doc. 559). Mr. Woods asks the Court to vacate his conviction, or, in the alternative, grant him a new sentencing hearing. For the reasons stated below, the Motion is **DENIED**.

Mr. Woods has requested the Court hold an evidentiary hearing on this Motion. The Court retains broad discretion to decide if a post-conviction hearing is needed to consider new evidence. *United States v. LaFuente*, 991 F.2d 1406, 1409 (8th Cir. 1993). A district court "is required to hold a hearing only in 'exceptional circumstances,' and . . . the need for an evidentiary hearing is lessened where . . . the motion is decided by the district judge who presided at trial." *United States v. Glinn*, 965 F.3d 940, 942 (8th Cir. 2020) (quoting *United States v. Baker*, 49 F.3d 574, 579 (8th Cir. 2007)). Given the type of evidence at issue, the substantial briefing by the parties, and the Court's deep familiarity with this case, the Court does not find a hearing necessary to decide this Motion. Therefore, Mr. Woods' request for a hearing is **DENIED**.

1

## I.  BACKGROUND

Jonathan Woods was charged in the Second Superseding Indictment (Doc. 74) with seventeen felony counts related to public corruption schemes. The allegations and subsequent trial concerned two separate schemes that occurred while Woods was a senator in the Arkansas General Assembly. At trial, the Government put on proof that, in both schemes, Woods took official actions to direct money from the Arkansas General Improvement Fund ("GIF") to private entities—in exchange for cash payments to him, and also in exchange for the hiring of his friends or loved ones by the entities (or their affiliates) that received the GIF money.

One scheme involved directing GIF funds to an entity called AmeriWorks. The second involved directing GIF funds to an Arkansas bible college called Ecclesia College ("Ecclesia"). As relevant to the instant Motion, participants in the AmeriWorks scheme included another member of the Arkansas General Assembly, Micah Neal, and a lobbyist, Milton "Rusty" Cranford, who was also the CEO of the Arkansas division of Alternative Opportunities ("AO"), an affiliate of AmeriWorks. At trial, the Government introduced evidence showing that AO hired Woods' then-fiancée and subsequently-wife, Christina Mitchell, in exchange for Woods directing GIF funds to AO.

Jeremy Hutchinson, a former Arkansas state senator who purportedly served as counsel to Cranford and AO, was also involved. Hutchinson was a confidential source for the FBI from 2014 to 2016.  Subsequent to the Woods trial, both Cranford and Hutchinson pleaded guilty to related bribery charges.

The Woods case was mired in a litany of discovery disputes and accusations of government misconduct leading up to trial. One such dispute involved covert recordings

taken by Micah Neal—on his own accord—that included recordings of Neal's conversations with Woods. Neal eventually provided these recordings to the Government, but a dispute then arose as to *when* Neal turned them over and whether *all* such recordings had been disclosed to the defense.  The Court scheduled a hearing to get to the bottom of this dispute.   To locate proof of its position as to the timing and completeness of its disclosures about the recordings, the Government's attorney instructed one of the case agents, FBI Agent Robert Cessario ("SA Cessario"), to provide his FBI-issued laptop to the FBI computer lab in Little Rock for forensic examination.  But for reasons that remain unknown, Agent Cessario intentionally wiped the laptop's hard drive before turning it over.  Nevertheless, while the contents of the laptop were of no help, the Court was able to determine after a lengthy hearing that all of Neal's recordings had been timely disclosed. The Court sanctioned Cessario's misconduct by disallowing the Government from introducing any testimony from Cessario or Neal's recordings at trial. (Doc. 297, p. 45).  Woods has maintained ever since that Cessario's laptop must have contained exculpatory evidence.  The Court has consistently explained in response why that was highly unlikely and purely speculative.  *See id*., pp. 36–44.

On May 3, 2018, a jury convicted Woods on fifteen of the felony counts against him. Following his conviction, Woods moved for and was denied a judgment of acquittal under Federal Rule of Criminal Procedure 29 or a new trial under Rule 33. (Doc. 422). On appeal, the Eighth Circuit affirmed Woods' conviction. *United States v. Woods*, 978 F.3d 554 (8th Cir. 2020).

Now, Woods again asks this Court to grant him a new trial, alleging that, prior to and during trial, the Government was in possession of favorable evidence that it failed to

disclose to Woods, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Woods alleges that, among other unspecified evidence, the Government was in possession of a letter, dated October 20, 2017, from Hutchinson's counsel to government prosecutors ("the Hutchinson Letter").[1] The letter contains allegations that FBI Special Agent Michael Lowe ("SA Lowe") coerced Hutchinson into violating the attorney-client privilege that existed between Hutchinson and Cranford.

Prior to trial, and at the Government's request, a summary of the Hutchinson letter was provided to the Court for an in camera, ex parte ruling on whether it was discoverable under Rule 16.  On November 29, 2017, the Court determined that it was "not presently aware of any reason why the materials . . . should be disclosed to the Defendants in this case." (Doc. 213).   On February 27, 2019, Mr. Woods was given access to the Government's ex parte submission describing the letter (Doc. 207) and the Court's Order (Doc. 213) for purposes of appeal.

The instant Motion is premised on three pieces of allegedly undisclosed, favorable evidence, contained in the Hutchinson Letter and other unidentified sources: (1) the involvement of Hutchinson in AO's hiring of Christina Mitchell, (2) information related to SA Lowe's alleged interference with attorney-client privilege, and (3) information that SA Lowe was involved with the investigation that eventually led to the indictment of Woods.

Based on these alleged *Brady* violations, Woods asks this Court to "grant a hearing on this motion, vacate the convictions, and dismiss the charges." (Doc. 552, p. 3). In the

---

[1] Woods sought and was granted leave to file the Hutchinson Letter as a sealed exhibit in support of the instant Motion. (Docs. 554, 556). The letter was provided to the Court via email, but Woods never actually filed it on the docket.

alternative, he seeks a new sentencing hearing. The Government opposes the Motion and all relief requested.

## II.  LEGAL STANDARD

Federal Rule of Criminal Procedure 33(a) states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Under Rule 33, "the court has broad discretion in deciding motions for new trial, and its decision is subject to reversal only for a clear and manifest abuse of discretion."  *United States v. Hassan*, 844 F.3d 723, 725 (8th Cir. 2016).

Under *Brady*, a defendant's due process rights are violated when the prosecution withholds favorable evidence that "is material either to guilt or to punishment." 373 U.S. at 87. "To establish a *Brady* violation, a defendant is required to show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." *United States v. Keltner*, 147 F.3d 662, 673 (8th Cir. 1998) (citing *United States v. Van Brocklin*, 115 F.3d 587, 594 (8th Cir. 1997)). "Evidence is not material simply because it would have helped a defendant prepare for trial. Rather, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Spencer*, 753 F.3d 746, 748 (8th Cir. 2014) (cleaned up).

## III.  DISCUSSION

For the reasons stated below, the Courts finds the Government did not violate *Brady* with respect to the information that is the subject of this Motion. As a result, there is no basis to grant Woods any relief under Rule 33 and no basis to grant Woods a new sentencing hearing.

## A.  Information Related to the Hiring of Christina Mitchell

Woods first argues that the Government suppressed "statements by Jeremy Hutchinson to Agent Lowe that Christina Mitchell was vetted by Hutchinson, while counsel for Alternative Opportunities, Inc., for employment by Rusty Cranford prior to her hiring." (Doc. 553, p. 6). This piece of information is not contained in the Hutchinson Letter, and Woods does not specify how or when he discovered the Government was in possession of it. However, the Government concedes it was, in fact, in possession of SA Lowe's interview notes and internal report that described Hutchinson's involvement in Mitchell's hiring and that these notes were not turned over to Woods. Therefore, there is no dispute that this information existed prior to trial and was not disclosed.

According to the Government, SA Lowe's notes include the following summary from an interview with Hutchinson: "After giving Dayspring $—Woods told Rusty he wanted them to hire his wife. R asked J—Is she qualified, (yes) Is there a position?— yes—fund by GIF. -Then yes you can hire her." (Doc. 559, p. 11).[2] The Government also concedes SA Lowe's notes reflect that "it was Hutchinson's opinion that AO could hire Mitchell." *Id*.

Woods argues this information is favorable to him because it suggests AO's hiring of Mitchell was completely appropriate, rather than part of a quid pro quo between Woods and Cranford. Woods further argues the information would have favored him at sentencing, where the GIF funds distributed to AO in exchange for Mitchell's hiring were used to calculate Woods' offense level. The Government argues the information in SA Lowe's notes was inculpatory, rather than exculpatory, in part because Hutchinson

---

[2] "Dayspring" refers to AO. Dayspring and AO merged in 2007. (Doc. 531, pp. 3220).

admitted in his plea agreement that Cranford and AO were compensating him for legal services in exchange for taking official action on their behalf as a state senator. *See United States v. Hutchinson*, Case No. 6:19-CR-03048, at Doc. 58 (W.D. Mo.).

In the Court's view, the information contained in SA Lowe's notes and internal report regarding Hutchinson's opinion on hiring Christina Mitchell is not favorable to Woods. SA Lowe's notes suggest—consistent with what the Government argued to the jury—that a direct link existed between the GIF funds being transferred to AO and Woods asking Cranford to hire his wife. Woods fails to explain how the fact that Hutchinson weighed in on Mitchell's hiring dispels the inference of a quid pro quo. Woods makes the conclusory argument that the information shows the hiring was "properly vetted by someone without interest." (Doc. 553, p. 10). SA Lowe's notes do not suggest any "proper vetting" occurred. The notes instead suggest Hutchinson approved the hiring in the context of Cranford explaining to Hutchinson how he was bribing Woods in exchange for official actions. Woods also fails to understand that Hutchinson was *not* a disinterested party, because he too was conspiring with Cranford to accept bribes in exchange for official action.  Had these facts been adduced at trial or at sentencing, they would not have favored Woods.

Even assuming this information is favorable to Woods, it is not material under *Brady*. Woods argues this information is material to both the Government's case— because it undercuts any inference of a quid pro pro—and to Woods' sentencing— because had Woods been able to undercut this inference, the one million dollars in GIF funds would not have been included in his guidelines calculation. But, had Woods been able to show SA Lowe's notes to the jury, or have Hutchinson himself testify, it is unlikely

this evidence would have led to a different outcome. In fact, the information would have substantiated the Government's version of events.

Woods points out that the Government relied on the testimony of Tammy Pierce, AO's human resource manager, who "provided the speculative basis for the government to argue to the jury that there was a quid pro quo between Woods and Cranford." (Doc. 553, p. 7). Pierce testified that Mitchell was hired by AO, paid $70,000 per year, worked at AO for two months, and that Mitchell's replacement was paid $35,000 per year. (Doc. 531, pp. 3226–33; Doc. 532, pp. 3362–69). But, contrary to Woods' suggestion, *see* Doc. 553 at p. 7, this was not the extent of the Government's evidence on this issue. The Government introduced emails showing AO's decision to hire Mitchell occurred contemporaneously—and at times in the same email chains—with requesting additional GIF funds from Woods. (Doc. 559, pp. 3–4). For example, one email, sent by Cranford to other AO employees, had the subject line "1 million dollars" and explained AO had been approved for those GIF funds. Responding to that email, AO's Chief Operating Officer Bontiea Goss wrote that there "is a woman in Northwest Arkansas that Rusty would like to hire to direct the project," referring to Mitchell. (Doc. 532, pp. 3383–84).

Hutchinson's purported vetting of Mitchell does not refute the Government's substantial evidence that Mitchell was hired in exchange for Woods directing GIF funds to AO. An applicant might be fully vetted and eminently qualified, yet still be hired as part of a quid pro quo. To be sure, a successful applicant's *lack* of qualifications could give rise to an inference of impropriety. But the Government did not argue Mitchell was unqualified. In fact, Pierce testified on cross-examination that Mitchell was not only qualified for the position but the most qualified of all the applicants. (Doc. 532, pp. 3278–

8

92). Therefore, any further evidence of Mitchell's qualifications is not material under *Brady*.

With Mitchell's qualifications undisputed, that leaves only Woods' contention that Hutchinson's opinion would have shown the legal validity of Mitchell's hiring. However, whether Cranford was under the impression that the arrangement was appropriate is ultimately irrelevant to whether Woods received bribes in exchange for official actions. Hutchinson was providing legal advice to Cranford as part of a bribery scheme, and his advice was provided only to Cranford. But it was Woods, not Cranford, who was on trial in this case. Hutchinson said nothing to Woods about the arrangement, the person whose conduct was in question.

As for sentencing, the Court finds that, had the information in question been considered by the Court, there would have been no effect on Woods' guideline calculation. The Court found the one-million-dollar grant to AO was properly considered in the loss amount, which totaled $2,021,500. This placed the loss amount in the range of more than $1,500,000 but less than $3,500,000, giving Woods a 16-level enhancement.

At sentencing, the Court found, "based on a preponderance of the evidence introduced today, and as supplemented by other evidence introduced at trial, that the government has met its burden to show that this $1 million grant was part of a related bribery scheme involving Woods, Cranford, and AO." (Doc. 540, p. 105). This finding did include consideration of the evidence showing Mitchell was hired by AO in exchange for GIF funds. However, even assuming Hutchinson's approval of Mitchell's hiring refutes the Government's evidence on that claim—which it does not—there was more than sufficient

9

remaining evidence for the Government to meet its burden to show the one-million-dollar GIF grant was part of the bribery scheme. The Court had before it Cranford's admission in his plea agreement that he and other AO executives bribed Woods in order to obtain the one-million-dollar grant. *See id*. at 28. The Court also had before it the testimony of Tammy Pierce at trial and the many emails showing that Mitchell's hiring was connected to the one-million-dollar grant.

For these reasons, the Court finds there was no *Brady* violation with respect to the Government's nondisclosure of information related to Hutchinson's involvement in the hiring of Christina Mitchell, and there is no cause to either vacate Woods' conviction or grant a new sentencing hearing on this basis.

### B. Information Related to Alleged Interference with Attorney-Client Privilege

Woods next argues that the Government suppressed favorable and material allegations of misconduct contained in the Hutchinson Letter. Namely, that "Agent Lowe pressured and directed Hutchinson to reveal attorney-client relationship information on multiple individuals, particularly Rusty Cranford." (Doc. 553, p. 11).  It is undisputed that the Government did not turn over the Hutchinson Letter to Woods.

Woods argues this information is favorable and material because it supports his allegation of governmental intrusion into the attorney-client relationship and claim of outrageous governmental action. Woods argues that "[b]oth of these issues would have been materially advanced by the information that Agent Lowe had intentionally coerced an invasion into the attorney-client privilege of Hutchinson and Cranford." *Id*. at p. 12. Assuming that is true in a general sense, the argument nevertheless fails because the allegations in the Hutchinson Letter do not relate to Woods' specific claim—that the

Government instructed a cooperating co-conspirator, Micah Neal, to "probe Woods about Woods' legal strategy and conversations between Woods and his counsel." *Id*. at p. 12.

Woods attempts to use mere allegations of government intrusion into the attorney-client relationship of a third party, Hutchinson, as substantive evidence that the government also intruded into his own attorney-client relationship. Woods argues the "tactics" used by the FBI were same in both his and Hutchinson's cases. *Id*. at p. 14. But allegations of similar tactics in a related case do not make Woods' own allegations sufficiently more probable that a different result would have been achieved. The Hutchinson Letter does not add factual relevance or legal consequence to Woods' own allegations and, therefore, would not have led to dismissal of Woods' charges or an acquittal.  Nor does the existence of the Hutchinson Letter change the Court's conclusion that "under controlling legal precedent, it would not have been a Sixth Amendement violation for the Government to do exactly what Mr. Woods accuses it of doing." (Docs. 72, p. 3, and 128, p. 1).  In a related appeal taken by co-defendant Oren Paris on the same issue, the Eighth Circuit concluded there was "no evidence that government officials directed Neal to gather information on Paris. Without this type of evidence, Neal's actions could not have violated Paris's constitutional rights." *United States v. Paris*, 954 F.3d 1069, 1073 (8th Cir. 2020) (citing *Stewart v. Wagner*, 836 F.3d 978, 986 (8th Cir. 2016)). The Hutchinson Letter does not lead to a different conclusion here because it is not material evidence that Neal was making recordings of Woods at the Government's direction.

Moreover, Woods was given access to the Government's summary of the Hutchinson Letter (Doc. 207) and the Court's ex parte Order (Doc. 213) by order of the

Eighth Circuit on February 27, 2019.   Woods filed his appeal brief three months later on June 3, 2019, but he did not assert any error associated with the ex parte Order, nor did he raise any issue about intrusion into the attorney-client privilege or outrageous governmental conduct—despite then knowing the contents of the previously sealed filings. Only now, after his conviction was affirmed, does Woods argue the Hutchinson Letter is so consequential.

The Court considered the information in the Hutchinson Letter prior to Woods' trial and found there was no known reason the information would need to be disclosed by the Government. *See* Doc. 213. After consideration of the evidence brought at trial and Woods' "new" evidence and arguments in the instant Motion, the Court finds that its prior rulings on this issue would remain the same.

For these reasons, the Court finds there was no *Brady* violation with respect to the Government's nondisclosure of the portion of the Hutchinson Letter that claims SA Lowe directed Hutchinson to violate the attorney-client privilege between Hutchinson and Cranford.

**C. Information Related to SA Lowe's Involvement in the Woods Investigation**

Finally, Woods argues the suppressed Hutchinson Letter would have revealed that SA Lowe was involved in the investigation that ultimately led to the indictment of Woods. The Government contends this information was not suppressed. That is, Woods was aware—prior to trial—that SA Lowe had been involved in the investigation.

The Court finds that the Government did not suppress SA Lowe's involvement in the investigation that led to the indictment of Woods. The Government points to two pieces of information provided in discovery that revealed SA Lowe's involvement. The

first is a letter from the Government to Woods on November 16, 2017, that included two statements by Hutchinson to SA Lowe "regarding Woods directing GIF to Ecclesia in exchange for a kickback." (Doc. 559, p. 18). The second is an FBI 302 report, produced to Woods on April 23, 2018, that indicated SA Lowe was present for Cranford's proffer interview. *Id*. This second discovery item was admittedly provided after Woods' trial had begun and after the Court heard and resolved the issues related to SA Cessario's conduct. But the first discovery item disclosing SA Lowe's involvement pre-dates these events. In short, the Government did not conceal the fact that SA Lowe was involved in the investigation that ultimately led to the indictment of Woods.

The Court further finds that, even if it had been suppressed, SA Lowe's involvement in the investigation is neither favorable nor material to Woods' position. Woods argues the information is favorable and material because SA Cessario placed a phone call to SA Lowe near in time to Cessario wiping the hard drive of his government-issued laptop. This latter event was the subject of a motion to dismiss the indictment by Woods on February 20, 2018. *See* Doc. 293. Woods claims that, had he known SA Lowe was involved with the investigation, the phone call between the two agents would have triggered Woods to pursue a line of inquiry that would have "support[ed] Woods' claim all along that the hard drive possessed information about the corrupt investigation into the GIF funds generally, and Woods specifically." (Doc. 553, p. 20). Woods requests he now be allowed additional discovery on this matter to learn the purpose of that phone call.

In denying the prior motion on this topic, the Court explained at length that although SA Cessario engaged in blatant misconduct, it was pure speculation that the wiped laptop contained exculpatory evidence, and Woods suffered no prejudice from that incident. *See*

Doc. 297, pp. 36–44. The Court need not rehash all those findings here. Suffice it to say, the "revelation" that SA Lowe was involved in this case does nothing to change the Court's prior ruling on this matter. Even conceding this information is favorable to Woods, it would not have led to a different result. Cessario placing a phone call to another agent working on a related investigation does not make Woods' claims about Cessario's laptop more probable. Moreover, the Court already found that Woods' due process rights were violated by Cessario destroying potentially useful information. As a sanction, the Court excluded Neal's recordings and Cessario's testimony from the Government's case-in-chief. *Id*. at 45. What the Court did not do, and what Woods had requested, was dismiss the indictment, a remedy disproportionate to the harm suffered. The fact of SA Lowe's involvement in the investigation does not make dismissal any more proportionate, and thus the information is not material under *Brady*.

The Court also does not find the information in the Hutchinson Letter warrants further discovery on a topic already subject to extensive investigation, evidentiary hearings, and briefing. Woods was aware of the phone call between SA Lowe and SA Cessario and had the opportunity to question Cessario on that topic. As the Court found at the time, "we will probably never know" what information on the laptop drove Cessario to risk his career by wiping it. *Id*. at 39. The Hutchinson Letter gets us no closer to that answer.

SA Lowe's involvement in the investigation that led to the indictment of Woods was not concealed by the Government, and—if it had been—would not have led to a dismissal of the indictment or an acquittal. For these reasons, the Court finds there was no *Brady* violation with respect to this information.

## IV.  CONCLUSION

In summary, Woods has not identified any suppressed information that would have led to a different result in these proceedings and has not identified any sufficient basis on which to grant him a new trial—or any of his requested relief—under Rule 33. The Government did not suppress *Brady* information. The case against Woods was primarily based on voluminous documentary evidence. Woods has not identified any new countervailing documentary evidence, nor any other evidence, that would have led to his acquittal or would otherwise be a basis for a new trial. As the Government points out, had Woods called Hutchinson or Cranford to testify, they very likely would have invoked their Fifth Amendment right against self-incrimination. If they did not, their testimony would likely have been favorable to the Government's case. To the extent it would have favored Woods, Woods has not articulated how their testimony would have rebutted the Government's substantial documentary evidence.

**IT IS THEREFORE ORDERED** that Defendant Jonathan Woods' Motion for Relief Pursuant to Federal Rule of Criminal Procedure 33 for *Brady* Violations (Doc. 552) is **DENIED**.

**IT IS SO ORDERED** on this 20th day of October, 2021.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE